**FILED**
September 08, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: DM
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| MICHAEL S. QUALIZZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | 1:26-cv-02251-ABD-SH |
| U.S. BANK NATIONAL ASSOCIATION and | § | |
| U.S. BANCORP COMMUNITY | § | |
| DEVELOPMENT CORPORATION, | § | |
| | § | |
| Defendants. | § | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**UNDER RULES 12(b)(6) AND 12(b)(3) AND, ALTERNATIVELY, MOTION TO TRANSFER**
**VENUE UNDER 28 U.S.C. § 1404(a) (Doc. 7)**

---

# TABLE OF CONTENTS


I. Introduction and Summary of Argument

II. Background

III. Argument and Authorities

A. The Rule 12(b)(3) / § 1406(a) venue motion fails as a matter of law.

1. Section 1390(c) preserves the removal-venue rule of § 1441(a).

2. Polizzi is directly on point and controls.

3. Even if § 1391 applied, § 1406(a) would still afford no relief.

B. The Rule 12(b)(6) arguments do not warrant dismissal, and none warrants dismissal with prejudice.

1. Plaintiff will amend as of right to address the asserted pleading deficiencies.

2. Res judicata does not bar claims arising from a March 2026 closing that postdates the October 2025 judgment.

3. This action is not a collateral attack on the Consent Judgment.

C. Transfer under § 1404(a) should be denied. Defendants have not carried their burden.

1. Under the standard Defendants cite, convenience to the defendant is not enough.

2. The pending Missouri enforcement proceedings do not alone establish that transfer is warranted.

3. The private-interest factors do not favor transfer.

4. The public-interest factors do not favor transfer.

5. First-to-file requires examination of the actual overlap.

D. Abatement is unwarranted.

E. Judicial notice.

IV. Conclusion and Prayer

Exhibit A: Receipt of Filing, Qualizza v. Freeman, et al., No. 2622-CC13433 (22nd Jud. Cir., City of St. Louis, Mo.) (Sept. 8, 2026)

# TABLE OF AUTHORITIES

**Cases**

Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex., 571 U.S. 49 (2013)

Burlington N. & Santa Fe Ry. Co. v. Herzog Servs., Inc., 990 F. Supp. 503 (N.D. Tex. 1998)

Busch v. Robertson, No. 3:05-CV-2043-L, 2006 WL 1222031 (N.D. Tex. May 5, 2006)

Chesterfield Vill., Inc. v. City of Chesterfield, 64 S.W.3d 315 (Mo. banc 2002)

City of Lubbock v. Stubbs, 160 Tex. 111, 327 S.W.2d 411 (1959)

Collin Cnty. v. Siemens Bus. Servs., Inc., 250 F. App'x 45 (5th Cir. 2007)

Dunn v. Babco Textron, 912 F. Supp. 231 (E.D. Tex. 1995)

Educ. Mgmt. Servs. v. Cadero, No. SA-14-CA-587, 2014 WL 12586780 (W.D. Tex. Oct. 6, 2014)

Haines v. Kerner, 404 U.S. 519 (1972)

Hart v. Donostia LLC, 290 F. Supp. 3d 627 (W.D. Tex. 2018)

HSC Holdings v. Hughes, No. H-12-0496, 2012 WL 12937484 (S.D. Tex. Apr. 4, 2012)

In re Chamber of Commerce of the U.S., 105 F.4th 297 (5th Cir. 2024)

In re Graves, 555 B.R. 603 (Bankr. N.D. Tex. 2016)

In re Volkswagen of Am., Inc., 545 F.3d 304 (5th Cir. 2008) (en banc)

Kortebein v. Am. Mut. Life Ins. Co., 49 S.W.3d 79 (Tex. App.—Austin 2001, pet. denied)

Lawrence Sys., Inc. v. Superior Feeders, Inc., 880 S.W.2d 203 (Tex. App.—Amarillo 1994, writ denied)

Masco Operators, Inc. v. Thompson Tractor Co., No. G-12-152, 2012 WL 3028075 (S.D. Tex. July 23, 2012)

Moch v. E. Baton Rouge Parish Sch. Bd., 548 F.2d 594 (5th Cir. 1977)

Naranjo v. Universal Surety of Am., 679 F. Supp. 2d 787 (S.D. Tex. 2010)

Nova Nilla Entm't, L.L.C. v. Players Nightclub, LLC, No. SA-18-CV-00596-FB, 2018 WL 4955221 (W.D. Tex. Oct. 12, 2018)

Polizzi v. Cowles Magazines, Inc., 345 U.S. 663 (1953)

Rothwell v. Anthony & Sylvan Corp., 2026 WL 2033145 (W.D. Tex. July 13, 2026)

Rountree v. Dyson, 892 F.3d 681 (5th Cir. 2018)

Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497 (2001)

Serrano v. U.S. Fire Ins. Co., No. EP-00-CA-255-DB, 2000 WL 33348220 (W.D. Tex. Nov. 7, 2000)

Taylor v. Charter Med. Corp., 162 F.3d 827 (5th Cir. 1998)

Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559 (5th Cir. 2005)

**Statutes and Constitutional Provisions**

28 U.S.C. § 1332

28 U.S.C. § 1390(c)

28 U.S.C. § 1391

28 U.S.C. § 1404(a)

28 U.S.C. § 1406(a)

28 U.S.C. § 1441

28 U.S.C. § 1446

28 U.S.C. § 1963

Tex. Civ. Prac. & Rem. Code Ch. 37

Tex. Civ. Prac. & Rem. Code Ch. 65

Tex. Prop. Code § 42.0021

Rules

Fed. R. Civ. P. 8(d)

Fed. R. Civ. P. 12(b)(3)

Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 15(a)(1)(B)

Fed. R. Civ. P. 15(a)(2)

Fed. R. Civ. P. 69(a)(1)

**TO THE HONORABLE ANDREW B. DAVIS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Michael S. Qualizza, appearing pro se, files this Response in Opposition to Defendants' Motion to Dismiss Under Rules 12(b)(6) and 12(b)(3) and, alternatively, to Defendants' Motion to Transfer Venue Under 28 U.S.C. § 1404(a) (Doc. 7) (the "Motion"), and respectfully shows the Court as follows.

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

1. Defendants brought this case in this Court. They removed it from the 353rd District Court of Travis County under 28 U.S.C. §§ 1441 and 1446, selecting the Austin Division of the Western District of Texas as the federal forum. Doc. 1; Doc. 7 at 6. They then moved to dismiss on the ground that venue in this Court is improper under 28 U.S.C. § 1391(b)(2) and § 1406(a). Doc. 7 at 12–14. The venue chapter itself forecloses that argument.

2. 28 U.S.C. § 1390(c) provides: "This chapter shall not determine the district court to which a civil action pending in a State court may be removed but shall govern the transfer of an action so removed as between districts and divisions of the United States district courts." The "chapter" is Chapter 87 of Title 28—the chapter that contains both § 1391 and § 1406, the provisions Defendants invoke to assert improper venue. The Supreme Court settled the point seventy-three years ago in language that fits this case exactly: "But even on the question of venue, § 1391 has no application to this case because this is a removed action. The venue of removed actions is governed by 28 U.S.C. § 1441(a)." Polizzi v. Cowles Magazines, Inc., 345 U.S. 663, 665 (1953). Defendants' Motion cites neither § 1390(c) nor Polizzi.

3. The Rule 12(b)(6) arguments do not warrant dismissal, let alone dismissal with prejudice. Defendants' res judicata and "collateral attack" theories fail on the calendar: the Consent Judgment was entered on October 15, 2025 (Doc. 7 at 3), and the closing conduct challenged in

the original Petition—the March 5, 2026, closing and disbursement of the sale proceeds—occurred nearly five months later. A judgment cannot extinguish a claim that did not exist when it was rendered, and Defendants' own Motion states that the Consent Judgment "makes no reference to" the sale and that "the sale of the hotel did not involve Judgment Creditor." Doc. 7 at 4, 6. As for the contention that the Petition pleads remedies without an underlying cause of action, Plaintiff's right to amend once as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B) has not expired. Plaintiff will file an amended complaint pleading the underlying claims on or before September 14, 2026. The amendment will narrow this action to the account-exemption and post-satisfaction accounting issues described below. Plaintiff requests that the Court evaluate that pleading when filed and deny as moot those portions of Part A directed to claims or deficiencies the amendment eliminates; Plaintiff does not rely on automatic mootness.

4. That leaves 28 U.S.C. § 1404(a), which governs Defendants' alternative convenience-transfer request. Defendants bear the burden, and under the standard they cite—Rothwell v. Anthony & Sylvan Corp., 2026 WL 2033145, at *2 (W.D. Tex. July 13, 2026) (Davis, J.), quoting In re Chamber of Commerce of the U.S., 105 F.4th 297, 303–04 (5th Cir. 2024)—"the fact that litigating would be more convenient for the defendant elsewhere is not enough to justify transfer." 105 F.4th at 304. Defendants identify no witnesses by name and no documents by location. The pending Missouri exemption and TRO proceedings create genuine overlap, but the Court must weigh that overlap against the claims actually remaining here and the full transfer showing. Plaintiff requests denial of transfer or, at a minimum, deferral until the amended complaint is on file so the Court can assess its precise scope.

5. Defendants' positions also collide. If the Consent Judgment truly extinguished the claims here, there would be nothing to transfer. If the claims are live enough to warrant transfer to

Missouri for adjudication, they were not extinguished. Rule 8(d) permits Defendants to argue in the alternative, but the tension is instructive: the transfer request presupposes exactly the live controversy the preclusion argument denies.

## II. BACKGROUND

6. Plaintiff is a resident of Austin, Travis County, Texas. See Doc. 7 at 20 (Certificate of Service). He filed this action in the 353rd District Court of Travis County, Cause No. D-1-GN-26-005626 and served Defendants on July 23, 2026. Doc. 7 at 6. Defendants removed to this Court under §§ 1332, 1441, and 1446. Doc. 1; Doc. 7 at 6.[1] Travis County lies within the Austin Division of this District, so Defendants removed to "the district court of the United States for the district and division embracing the place where such action [was] pending," exactly as § 1441(a) directs.

7. The Petition seeks declaratory relief under Chapter 37 of the Texas Civil Practice and Remedies Code and injunctive relief under Chapter 65, directed to (1) the garnishments as they affect Texas-held accounts of a Texas resident; (2) the remaining balance owed after the partial satisfaction Defendants filed; and (3) whether the March 2026 sale structure was authorized. Doc. 7 at 9 (citing Dkt. 1-1 at 21–26). The Petition alleges that Defendants have not domesticated the Consent Judgment in Texas—a fact Defendants concede. Doc. 7 at 14 (citing Dkt. 1-1 at 11).

8. The Missouri action, U.S. Bank Nat'l Ass'n v. Qualizza, No. 4:21-cv-00120-MTS (E.D. Mo.) (the "EDMO Case"), was a suit on a 2017 loan and guaranty, filed January 29, 2021. Doc. 7 at 2–3. The Court resolved it by a Judgment by Consent with Stay of Execution entered October 15, 2025. Doc. 7 at 3; Doc. 7-1, Ex. A. By Defendants' own account, "the Consent Judgment makes no reference to, nor is the extent of Judgment Debtor's personal liability connected to, the sale of a hotel owned and operated by 1501 Washington." Doc. 7 at 4. The hotel was sold on or about March 5, 2026, for $14,000,000, of which $13,299,435.42 was paid toward the judgment. Id.

Defendants filed a Partial Satisfaction on April 29, 2026. Id. Again, in Defendants' words, "the sale of the hotel did not involve Judgment Creditor," and "disagreements Judgment Debtor may have with the other EDMO Defendants do not involve Judgment Creditor." Doc. 7 at 6, 7.

9. What remains active on the EDMO docket is post-judgment execution: applications for writs of garnishment, garnishee answers, a Verified Claim of Exemption, and Plaintiff's Second Application for a Temporary Restraining Order, which Defendants describe as "still pending" (Doc. 7 at 4–6). The Missouri court has set an in-person conference for September 23, 2026, to address outstanding matters. The parties resolved the loan and guaranty merits by consent in October 2025; the post-judgment enforcement disputes remain active.

10. Separately, on September 8, 2026, Plaintiff's Petition for Personal Damages was docketed in the Circuit Court of the City of St. Louis, Twenty-Second Judicial Circuit, as Qualizza v. Freeman, et al., No. 2622-CC13433 (McGraugh, J.). **Exhibit. A** (Receipt of Filing). That action asserts personal-capacity damages claims arising from the hotel's financing, receivership, sale, and March 2026 closing against eleven defendants, including U.S. Bank National Association and U.S. Bancorp Community Development Corporation. It is a plenary state-court action, not a proceeding in the EDMO Case.

## III. ARGUMENT AND AUTHORITIES

### A. The Rule 12(b)(3) / § 1406(a) venue motion fails as a matter of law.

#### *1. Section 1390(c) preserves the removal-venue rule of § 1441(a).*

11. Defendants' venue argument rests entirely on § 1391(b)(2) and § 1406(a). Doc. 7 at 12–14. Both are in Chapter 87 of Title 28. Congress opened that chapter with a scope provision: "This chapter shall not determine the district court to which a civil action pending in a State court may be removed but shall govern the transfer of an action so removed as between districts and divisions

of the United States district courts." 28 U.S.C. § 1390(c). The distinction Congress drew is between the initial federal forum of a removed case—fixed by § 1441(a), outside Chapter 87—and any later change of that forum, which § 1404(a) governs. A motion asking this Court to declare its own venue "improper" in a removed action seeks relief the chapter does not authorize.

12. Section 1391's text points the same way. It governs "the venue of all civil actions brought in district courts of the United States." 28 U.S.C. § 1391(a)(1) (emphasis added). This action was not brought in a district court. Defendants removed it from a Texas state court.

***2. Polizzi is directly on point and controls.***

13. In *Polizzi*, the plaintiff sued in Florida state court; the defendant removed to the Southern District of Florida and then obtained dismissal on the ground that it was not "doing business" there within the meaning of § 1391(c). 345 U.S. at 664–65. The Fifth Circuit affirmed. The Supreme Court reversed, and its reasoning fully disposes of Defendants' argument. First, § 1391 "is a general venue statute," and "[i]n a case where it applies, if its requirements are not satisfied, the District Court is not deprived of jurisdiction." *Id.* at 665. Second: "But even on the question of venue, § 1391 has no application to this case because this is a removed action. The venue of removed actions is governed by 28 U.S.C. § 1441(a), and under that section venue was properly laid in the Southern District of Florida." *Id.* Third, the Court explained why: "Section 1391(a) limits the district in which an action may be 'brought.' . . . This action was not 'brought' in the District Court, nor was Respondent 'sued' there; the action was *brought* in a state court and *removed* to the District Court. Section 1441(a) expressly provides that the proper venue of a removed action is 'the district court of the United States for the district and division embracing the place where such action is pending.'" *Id.* at 665–66. The lower courts had "based [their] holding . . . on a statute which has no application to the case." *Id.* at 666.

14. The parallel is exact. Defendants removed under § 1441(a) to the district and division embracing Travis County. Under § 1441(a) and *Polizzi*, venue is properly laid here. The 2011 enactment of § 1390(c) codified that rule; it did not disturb it. Every page Defendants devote to whether "a substantial part of the events" occurred in Texas, Doc. 7 at 12–14, addresses a statute that does not apply.

15. The Fifth Circuit and the courts of this District apply *Polizzi* as a matter of course. "[S]ection 1441(a), and not the ordinary federal venue statute, 28 U.S.C. § 1391, governs venue in removed cases." *Collin Cnty. v. Siemens Bus. Servs., Inc.*, 250 F. App'x 45, 51 (5th Cir. 2007) (per curiam). This Court has held the same: "Venue in removed cases is governed solely by 28 U.S.C. § 1441(a)," and where a case "was initially brought in a Texas state court and removed to this Court," "venue was properly laid in the Western District of Texas." *Nova Nilla Entm't, L.L.C. v. Players Nightclub, LLC*, No. SA-18-CV-00596-FB, 2018 WL 4955221, at *1–2 (W.D. Tex. Oct. 12, 2018); *accord Educ. Mgmt. Servs. v. Cadero*, No. SA-14-CA-587, 2014 WL 12586780, at *3 (W.D. Tex. Oct. 6, 2014) (denying removal of defendant's motion to transfer for improper venue: "Section 1441(a), and not the ordinary federal venue statute, 28 U.S.C. § 1391, governs venue in removed cases."); *Burlington N. & Santa Fe Ry. Co. v. Herzog Servs., Inc.*, 990 F. Supp. 503, 504 (N.D. Tex. 1998) ("§ 1391 has no application to a removed action"); *Dunn v. Babco Textron*, 912 F. Supp. 231, 232 (E.D. Tex. 1995) (removing defendants' "reliance on § 1391(a) is misplaced"). Indeed, a court in this District has explained that "the only proper way [for a removing defendant] to assert a challenge to venue, without flouting the venue provisions of 28 U.S.C. § 1441, is to do so pursuant to 28 U.S.C. § 1404(a)." *Serrano v. U.S. Fire Ins. Co.*, No. EP-00-CA-255-DB, 2000 WL 33348220, at *2 (W.D. Tex. Nov. 7, 2000) (quoted in *HSC Holdings v. Hughes*, No. H-12-0496, 2012 WL 12937484, at *2 (S.D. Tex. Apr. 4, 2012)). Because removal lies only to the district

embracing the state court, "it is immaterial whether the federal court to which the action is removed would have been a proper venue if the action originally had been brought there." *Masco Operators, Inc. v. Thompson Tractor Co.*, No. G-12-152, 2012 WL 3028075, at *8 (S.D. Tex. July 23, 2012). Even the *Busch* litigation Defendants cite for their *res judicata* argument, Doc. 7 at 10, rejected this very venue theory: the removing defendants there "mistakenly rel[ied] on 28 U.S.C. § 1391," because "[i]t is well-established that venue in an action removed from state court to federal court is controlled by 28 U.S.C. § 1441, and not § 1391." *Busch v. Robertson*, No. 3:05-CV-2043-L, 2006 WL 1222031, at *8 (N.D. Tex. May 5, 2006).

***3. Even if § 1391 applied, § 1406(a) would still afford no relief.***

16. Section 1406(a) applies only to "a case laying venue in the wrong division or district." The Supreme Court has held that "a district cannot be 'wrong' if it is one in which the case could have been brought under § 1391," and that "a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex., 571 U.S. 49, 55–57 (2013). Defendants cite Atlantic Marine for the § 1404(a) standard, Doc. 7 at 15, but not for this holding.

17. Were § 1391 the measure, venue would lie here under § 1391(b)(2). Plaintiff is a Travis County resident; the accounts Defendants have frozen are his; the exemption rights he asserts arise under Texas law as to property of a Texas domiciliary; and the harm from the freeze is felt where he lives. Doc. 7 at 13 (quoting Dkt. 1-1 at 13). Defendants' rejoinder—that the hotel is in Missouri and the writs were issued from Missouri, Doc. 7 at 13–14—goes to where Defendants' collection activity was initiated, not where its effects were directed and felt. In any event, Defendants have appeared without contesting personal jurisdiction, so venue would also lie under § 1391(b)(1) and (c)(2). None of this is necessary to decide, because § 1441(a) determines venue upon removal.

### B. The Rule 12(b)(6) arguments do not warrant dismissal, and none warrants dismissal with prejudice.

#### *1. Plaintiff will amend as of right to address the asserted pleading deficiencies.*

18. Defendants' first Rule 12(b)(6) theory is that the Petition seeks declaratory and injunctive relief without alleging an underlying substantive claim. Doc. 7 at 8–10. Plaintiff does not concede the point: the Petition, drafted for a Texas court under Texas notice-pleading standards, alleges concrete disputes over the amount remaining due after Defendants' partial satisfaction, whether the March 2026 sale structure was authorized, and the exempt status under Texas law of a Texas resident's property—disputes that rest on the exemption statutes, the parties' agreements, and the law governing satisfaction of judgments, not on the Declaratory Judgment Act alone. Doc. 7 at 9 (citing Dkt. 1-1 at 21–26).

19. Federal Rule of Civil Procedure 15(a)(1)(B) permits one amendment as a matter of course within the applicable 21-day period after service of a responsive pleading or a Rule 12(b), (e), or (f) motion, whichever is earlier. The Motion was filed on August 24, 2026 (Doc. 7). No prior amendment has been made in state court or here. Plaintiff will file his amended complaint on or before September 14, 2026, and requests that the Court defer its Rule 12(b)(6) ruling until that pleading is on file. The amendment will identify the substantive rights and supporting facts underlying the requested relief: Plaintiff's asserted exemption rights in his retirement and other accounts under Chapter 42 of the Texas Property Code, including § 42.0021; the ownership and character of the frozen funds, including the asserted separate-property interest of Kimberly Qualizza in jointly titled accounts; the enforcement and registration issues discussed in paragraph 32; and an accounting of credits and the balance remaining after the April 2026 Partial Satisfaction. The amendment will be confined to those account and accounting questions. It will not plead the merits of whether the March 2026 sale structure was authorized or duplicate the closing-conduct

damages claims pending in the Circuit Court of the City of St. Louis, No. 2622-CC13433. An amendment does not automatically moot a pending dismissal motion: where challenged defects remain, the Court may apply the motion to the amended pleading—Rountree v. Dyson, 892 F.3d 681, 683–84 (5th Cir. 2018). Plaintiff therefore requests that only the portions directed to claims or deficiencies eliminated by the amendment be deemed moot, and that any remaining objections be considered against the amended pleading. See Cadero, 2014 WL 12586780, at *4 & n.1 (denying the motion without prejudice after amendment). To the extent leave is required, Plaintiff requests leave under Rule 15(a)(2), which directs that leave be "freely give[n] when justice so requires."

20. Plaintiff is proceeding pro se. His pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam). That principle bears directly on Defendants' request for dismissal with prejudice: a pleading defect of the kind Defendants identify is, for a pro se litigant in particular, an occasion for amendment, not for termination of the case.

21. Defendants' request that any dismissal be "with prejudice," Doc. 7 at 18, should be rejected in any event. Dismissal with prejudice for a curable pleading defect, before the plaintiff has amended even once, is not the practice in this Circuit, and nothing about the defect Defendants identify—a remedies-only pleading—is incurable.

***2. Res judicata does not bar claims arising from a March 2026 closing that postdates the October 2025 judgment.***

22. Defendants say Plaintiff's claims "arise from the same transaction as the transaction underlying the EDMO Case." Doc. 7 at 10. Their own Motion refutes that. The EDMO Case "arose from a Construction Loan Agreement dated December 29, 2017" and a guaranty of the same date. Doc. 7 at 2–3. The Consent Judgment "makes no reference to" the hotel sale, and Plaintiff's liability

under it is not "connected to" the sale. Doc. 7 at 4. The sale "did not involve Judgment Creditor." Doc. 7 at 6. Plaintiff's disagreements with his co-defendants "do not involve Judgment Creditor." Doc. 7 at 7. If all of that is true—and it is Defendants who say it—then claims about who authorized what at the March 2026 closing are not part of the "transaction" the 2021 loan suit resolved.

23. The Fifth Circuit's transactional test confirms it. A prior judgment's preclusive effect extends to "the transaction, or series of connected transactions, out of which the original action arose," and "[w]hat grouping of facts constitutes a 'transaction' . . . must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). Facts that arose five months after judgment are not "related in time" to a 2021 loan default; they have a different "origin" (a third-party escrow closing, not a guaranty); and they could not have formed "a convenient trial unit" with claims that were resolved before they existed. A plaintiff cannot be faulted for failing to bring a claim that had not yet accrued.

24. Defendants' reliance on the sentence in *Test Masters* that "[i]f a party can only win the suit by convincing the court that the prior judgment was in error, the second suit is barred," Doc. 7 at 10–11 (quoting 428 F.3d at 571), misdescribes this action. Plaintiff does not contend that the Consent Judgment was in error. He does not seek to vacate, modify, or relitigate it. He accepts that it was entered and that it fixed the parties' liabilities as of October 15, 2025. The original Petition disputes subsequent satisfaction and closing conduct. Under the amendment described in paragraph 19, the closing-authorization merits are not at issue here. The remaining accounting question concerns how much of the judgment has since been satisfied, not whether the judgment

was erroneous when entered. Indeed, the Partial Satisfaction Defendants filed, Doc. 7 at 4, is itself an acknowledgment that post-judgment events determine what remains owed.

25. Two further points. First, because the Consent Judgment was rendered by a federal court sitting in diversity, its claim-preclusive effect is governed by federal common law, which adopts "the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Missouri requires identity of the thing sued for, of the cause of action, of the parties, and of the quality of the person for or against whom the claim is made. *Chesterfield Vill., Inc. v. City of Chesterfield*, 64 S.W.3d 315, 318–19 (Mo. banc 2002). Defendants do not address Missouri law. Second, the Fifth Circuit has observed that "generally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense." *Test Masters*, 428 F.3d at 570 n.2. The court has permitted the defense to be reached under Rule 12(b)(6) only where its elements are apparent from the face of the pleadings and matters properly subject to judicial notice. *Id.* (citing *Moch v. E. Baton Rouge Parish Sch. Bd.*, 548 F.2d 594, 596 n.3 (5th Cir. 1977)). They are not apparent here. Whether a March 2026 closing is part of the "transaction" underlying a 2021 guaranty suit is a question about the relationship between two sets of facts, one of which did not exist when the judgment was entered; the Consent Judgment's text does not answer it, and Defendants' own description of that judgment as making "no reference to" the sale, Doc. 7 at 4, cuts against them.

26. The result is no different under Texas law, should the Court look to the law of the forum. The Texas Supreme Court has long held that preclusion "extends only to facts in issue as they existed at the time the judgment was rendered and does not prevent a re-examination of the same question between the same parties, where, in the interval, the facts have changed, or new facts have occurred which may alter the legal rights or relations of the parties." *City of Lubbock v.*

*Stubbs*, 160 Tex. 111, 115, 327 S.W.2d 411 (1959). Applying that rule, a federal court in Texas has explained that "an action based on facts that develop after the prior action is not barred by res judicata," and that "Texas courts also consider judgment-enforcement actions to be legally distinct from actions on a contract." *In re Graves*, 555 B.R. 603, 607–08 (Bankr. N.D. Tex. 2016). The March 2026 closing is exactly that kind of post-judgment development.

***3. This action is not a collateral attack on the Consent Judgment.***

27. Defendants' third theory is that this action is an "improper collateral attack"—a "horizontal appeal"—on rulings of the Missouri court. Doc. 7 at 11–12. The cases they cite involve litigants who lost a ruling in one court and sued in another to undo it. *Id.* That is not this case. Plaintiff has not lost a merits ruling in Missouri on any question presented here. Defendants themselves describe the Second TRO Application as "still pending." Doc. 7 at 5. Nothing to "appeal" horizontally.

28. Texas law defines the concept narrowly: "A collateral attack is an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose." *Kortebein v. Am. Mut. Life Ins. Co.*, 49 S.W.3d 79, 88 (Tex. App.—Austin 2001, pet. denied). Plaintiff does not seek to avoid the effect of the Consent Judgment; he seeks to determine what remains of it after a partial satisfaction Defendants themselves filed, and to hold Defendants to account for post-judgment conduct. Courts in this Circuit have rejected the "collateral attack" label in precisely that setting. In *Naranjo v. Universal Surety of America*, 679 F. Supp. 2d 787 (S.D. Tex. 2010), a judgment debtor sued over the creditor's collection conduct; the creditor argued preclusion and collateral attack. The court "reject[ed] Defendants' arguments," because the plaintiff was "not attempting to challenge the validity of the state court default judgment itself, but rather Defendants' practices in seeking to collect on the debt," and it denied the Rule 12(b)(6) motions and ordered an amended

complaint. *Id.* at 799–800. And Texas courts recognize that challenges which "could only be raised for the first time in [an] enforcement proceeding" are neither collateral attacks nor precluded. *Lawrence Sys., Inc. v. Superior Feeders, Inc.*, 880 S.W.2d 203, 208–09 (Tex. App.—Amarillo 1994, writ denied).

29. Plaintiff does not seek to vacate or revise the Consent Judgment. As narrowed by the amendment described in paragraph 19, he seeks adjudication of his asserted exemption rights in the frozen accounts and the balance remaining after partial satisfaction, not the merits of sale authorization. Plaintiff recognizes that relief concerning accounts subject to existing Missouri writs raises enforcement and coordination questions even if an injunction is directed to Defendants or garnishees rather than the Missouri court. He does not contend that the absence of Texas registration alone invalidates those writs. The scope of relief must be evaluated under the applicable enforcement rules and the specific process at issue, as discussed in paragraph 32. Those questions should be addressed against the amended pleading and relevant record, rather than by treating every post-judgment dispute as an attack on the original adjudication of liability.

## C. Transfer under § 1404(a) should be denied. Defendants have not carried their burden.

### *1. Under the standard Defendants cite, convenience to the defendant is not enough.*

30. Defendants correctly identify the standard: the movant must show "good cause" by demonstrating that the transferee venue is "clearly more convenient." Doc. 7 at 15 (citing *Rothwell*, 2026 WL 2033145, at *2, and *In re Chamber of Commerce*, 105 F.4th at 303–04). The Fifth Circuit has been explicit about what that means: it is "the movant's burden—and the movant's alone—to 'adduce evidence and arguments that clearly establish good cause,'" the standard "is not met if the movant merely shows that the transferee venue 'is more likely than not to be more convenient,'" and "the fact that litigating would be more convenient for the defendant elsewhere is not enough

to justify transfer." *Chamber of Commerce*, 105 F.4th at 304. "[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc). The analysis weighs the familiar private- and public-interest factors. *Id.*; *Chamber of Commerce*, 105 F.4th at 304–05. No forum-selection clause is at issue, so the modified analysis of *Atlantic Marine*, under which the plaintiff's choice receives no weight, does not apply; Plaintiff's choice of his home forum receives its ordinary deference. *See Atl. Marine*, 571 U.S. at 63–64.

***2. The pending Missouri enforcement proceedings do not alone establish that transfer is warranted.***

31. Defendants contend that "identical issues are already pending" in Missouri. Doc. 7 at 14. The loan and guaranty merits were resolved by consent, but the exemption claim and TRO application remain active. Doc. 7 at 3, 5. Plaintiff recognizes that § 1404(a) does not require a pending merits action in the transferee district or consolidation with another case. The issue is whether Defendants have established that transfer of this action is warranted under the applicable standard. The Missouri court's familiarity with enforcement and the risk of inconsistent account rulings are relevant considerations. Still, they must be assessed alongside the scope of the amended complaint, the particular issues already presented in Missouri, and the private- and public-interest factors.

32. Plaintiff does not minimize the overlap: his Verified Claim of Exemption and Second TRO Application concern the same accounts, and the Missouri court has set a September 23, 2026, conference. Doc. 7 at 5–6. He does not contend that labeling the requested relief a Texas-law declaration eliminates that overlap. He maintains his Texas exemption claims, including under Tex. Prop. Code § 42.0021, but recognizes that Fed. R. Civ. P. 69(a)(1) governs federal execution procedure and generally incorporates the procedure of the state where the enforcing court sits,

subject to applicable federal statutes. 28 U.S.C. § 1963 separately addresses federal registration in another district. The asserted absence of Texas registration, Doc. 7 at 14, is therefore not by itself dispositive of the validity or reach of existing Missouri writs. The pertinent questions include the actual process, service, garnishees, property interests, and governing exemption law. Neither the absence of registration nor Plaintiff's Texas residence alone answers all of them. Likewise, the Court should compare the amended accounting claim with the credits and balance questions actually before Missouri rather than assume either complete identity or complete separation. Plaintiff requests that the Court defer transfer until the amended complaint is filed, then determine which issues overlap and whether Defendants have carried their burden as to the action as narrowed. The separate closing-conduct damages action is pending in Missouri state court, No. 2622-CC13433; § 1404(a) cannot transfer this federal action into that state case. These distinctions support a claim-specific assessment, not automatic transfer merely because the Consent Judgment originated in Missouri.

***3. The private-interest factors do not favor transfer.***

33. Defendants' showing on the private-interest factors consists of three sentences: the property is in Missouri, “nearly all the relevant information regarding the property” is there, and “[m]any of the witnesses reside in the Eastern District of Missouri or in the State of Missouri.” Doc. 7 at 16. No witness is named. No document is located. The proposed amendment removes the closing-authorization merits from this action. Defendants' references to the hotel and its witnesses do not identify which witnesses or records are needed for the narrower account-exemption and post-satisfaction accounting issues, or why those sources make Missouri clearly more convenient. The Fifth Circuit requires the movant to “adduce evidence” that gains in convenience “will actually materialize,” 105 F.4th at 304; assertion is not evidence.

34. On the other side of the ledger, Plaintiff is a Travis County resident proceeding *pro se*. Under the proposed amendment, the property issues concern the frozen accounts, while the accounting issue concerns credits and the remaining judgment balance. Closing-authorization witnesses should not drive transfer of claims that will not litigate that subject. Defendants' generalized witness assertions do not establish a compulsory-process advantage for the narrower issues. Plaintiff resides in Austin and maintains his records there, and his spouse, Kimberly Qualizza—whose separate interest in certain frozen accounts has been asserted—also resides in Travis County. Transfer would impose real and asymmetric costs on Plaintiff while relieving a national bank—represented by counsel admitted in both districts—of any burden it has identified with specificity.

***4. The public-interest factors do not favor transfer.***

35. Texas has a local interest in adjudicating a Texas resident's claims concerning the exempt status of his property under Texas law and the effects of collection activity directed at him in Texas. Defendants' contrary point—that the hotel and the judgment are in Missouri, Doc. 7 at 16—must be weighed against the narrower account and accounting issues Plaintiff will plead, while recognizing Missouri's interest in enforcement of its judgment. Court congestion is at best neutral; Defendants offer no comparative data. And familiarity with governing law carries little weight: "federal judges routinely apply the law of a State other than the State in which they sit." *Atl. Marine*, 571 U.S. at 67–68. Judge Schelp's familiarity with the EDMO Case and its enforcement proceedings, Doc. 7 at 16–17, is relevant. Plaintiff submits that it does not, standing alone, establish that Missouri is clearly more convenient for the entire action as narrowed; the Court should assess the actual overlapping issues and the remaining factors.

***5. First-to-file requires examination of the actual overlap.***

36. The first-to-file rule applies "[w]here two pending district court cases substantially overlap." Doc. 7 at 17 (citing Satco Prods.). The rule seeks "to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." Id. (quoting Hart v. Donostia LLC, 290 F. Supp. 3d 627 (W.D. Tex. 2018)). Plaintiff acknowledges that the pending Missouri exemption and TRO proceedings require serious consideration under those principles; entry of the Consent Judgment does not make those proceedings disappear. Nevertheless, the Court should compare the actual issues and requested relief, not merely the common judgment or account names. Plaintiff requests deferral until the amended complaint is filed so that substantial overlap can be assessed on a concrete pleading. He opposes automatic transfer or dismissal of the entire action without that comparison and without identifying which issues the Missouri proceedings will resolve.

**D. Abatement is unwarranted.**

37. Defendants request that the Court "abate this matter until the EDMO Case is closed." Doc. 7 at 18. Plaintiff opposes that open-ended request. Missouri's pending enforcement proceedings may resolve overlapping issues, but the proposed endpoint does not identify which ruling would resolve which claim here or when that ruling will occur. Meanwhile, Plaintiff alleges continuing harm from the account freezes, and interest accrues at $239.58 per day by Defendants' calculation. Doc. 7 at 6. Plaintiff requests denial of indefinite abatement. If the Court concludes that a pause is needed to avoid inconsistent rulings, he alternatively requests a limited, reviewable stay tied to identified overlapping issues and a prompt status review after the September 23 conference, rather than a stay lasting until all Missouri collection proceedings conclude.

**E. Judicial notice.**

38. Plaintiff does not oppose judicial notice of the fact and terms of the Consent Judgment for the limited purpose Defendants' own authority describes—"taking as true the action of the [Missouri] court in entering judgment." Doc. 7 at 18 (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998)). Plaintiff objects to any broader use. Judicial notice of a filing does not establish the truth of the assertions within it, and notice of the EDMO docket as a whole may not be used to draw inferences about the scope of the "transaction" underlying the Consent Judgment, to resolve any disputed fact concerning the March 2026 closing, or otherwise to supply the elements of an affirmative defense on a Rule 12(b)(6) motion.

## IV. CONCLUSION AND PRAYER

39. Plaintiff respectfully requests that the Court: (a) DENY the Motion to dismiss or transfer for improper venue under Rule 12(b)(3) and 28 U.S.C. § 1406(a), because 28 U.S.C. § 1390(c) and *Polizzi* make Chapter 87 inapplicable to the determination of the district to which a removed action goes, and venue is fixed by § 1441(a)—the statute Defendants themselves invoked; (b) DEFER the Rule 12(b)(6) ruling until Plaintiff's amended complaint is filed, then DENY as moot the portions directed to claims or deficiencies eliminated by that amendment and DENY any remaining grounds on the merits; alternatively, grant leave to amend under Rule 15(a)(2) rather than dismiss with prejudice; (c) DENY the alternative motion to transfer under 28 U.S.C. § 1404(a), or at minimum DEFER ruling until the amended complaint is on file; (d) DENY the request for indefinite abatement or, alternatively, limit any stay to identified overlapping issues with prompt status review after the September 23 conference; and (e) grant Plaintiff all other and further relief to which he may be justly entitled.

[1] Defendants' Motion states that removal occurred "[o]n August 6, 2026." Doc. 7 at 6. The Notice of Removal was docketed August 17, 2026. Doc. 1. Nothing turns on the discrepancy; both dates fall within thirty days of service on July 23, 2026.

Dated: September 8, 2026

Respectfully submitted,

**Michael S. Qualizza**
Plaintiff, *Pro Se*
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, a true and correct copy of the foregoing was filed through the Court's Pro Se Portal system, and was sent by electronic mail to counsel for Defendants: Alexander J. Pennetti(apennetti@thompsoncoburn.com), Thompson Coburn LLP, 2100 Ross Avenue, Suite 3200, Dallas, Texas 75201; and Mark Bossi (mbossi@thompsoncoburn.com), Brian W. Hockett(bhockett@thompsoncoburn.com), and Caleb S. Crahan (ccrahan@thompsoncoburn.com), Thompson Coburn LLP, One US Bank Plaza, St. Louis, Missouri 63101.

**Michael S. Qualizza**
Plaintiff, *Pro Se*
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

# EXHIBIT A

Circuit Court of the City of St. Louis, Twenty-Second Judicial Circuit, as Qualizza v. Freeman, et al., No. 2622-CC13433 (September 8, 2026)

**IN THE 22ND JUDICIAL CIRCUIT**
**CITY OF ST LOUIS, MISSOURI**
**CITY OF ST. LOUIS**
CIVIL COURTS BUILDING, SAINT LOUIS, MO 63101

Payor: MICHAEL S QUALIZZA

| | |
|---|---|
| Receipt Date: | 08-Sep-2026 |
| Receipt Number: | 22ST3411347 |
| Date Printed: | 08-Sep-2026 |
| Time Printed: | 12:50 PM |

****RECEIPT****

**Case Number:** 2622-CC13433 - MICHAEL S QUALIZZA V NEIL FREEMAN ET AL

| | | |
|---|---|---|
| | Balance Due prior to receipt: | $145.50 |
| Pet Filed in Circuit Ct | Law Library: | -$15.00 |
| Pet Filed in Circuit Ct | Dom Viol-Circuit Civil: | -$2.00 |
| Pet Filed in Circuit Ct | Court Restor (St L City): | -$45.00 |
| Pet Filed in Circuit Ct | Circuit Civil Costs: | -$83.50 |
| | Current Balance Due as of 08-Sep-2026: | $0.00 |

| **Payment Types Applied to Case(s)** | **Amount** |
|---|---|
| Cash: | -$145.50 |

| | |
|---|---|
| Total Payment(s): | $145.50 |
| Remaining Balance Due for Cases Listed Above as of 08-Sep-2026: | $0.00 |

**Note:** Information shown on receipt is current as of date printed. Verify Next Scheduled Event(s) on Case.net.

**Case Information for Case(s) Listed Above:**

**Case Number:** 2622-CC13433 - MICHAEL S QUALIZZA V NEIL FREEMAN ET AL
**Party:** QUALIZZA MICHAEL S

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**STATE OF MISSOURI**

MICHAEL S. QUALIZZA, individually,

Plaintiff,

v.

NEIL D. FREEMAN;
ROBERT J. HABEEB, individually and as former Receiver;
MAVERICK HOTELS & RESTAURANTS, LLC, individually and as former Receiver;
RICHARD WALTERS;
SPENCER FANE LLP;
CHICAGO TITLE COMPANY, LLC;
U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION;
U.S. BANK NATIONAL ASSOCIATION;
OCTAGON CREDIT PARTNERS LP;
DOWD BENNETT LLP;
JAMES F. BENNETT; and
JOHN DOES 1-10,

Defendants.

Cause No.: ____________

Division: ____________

JURY TRIAL DEMANDED

# QUALIZZA PETITION FOR PERSONAL DAMAGES

## PRELIMINARY STATEMENT

This case arises from the deliberate financial dismantling of Michael S. Qualizza (the "Plaintiff") through a coordinated course of conduct spanning nearly a decade and encompassing every critical stage of The Last Hotel STL ("TLHSTL") enterprise: its financing, operation, receivership, forced sale, and post-sale enforcement. Qualizza has

spent his entire career working in or supporting Low-Income Communities. Qualizza built a nationally recognized tax-credit-finance syndication business with his principal investors and business partners, including U.S. Bank and Neil Freeman. Over nearly twenty years, Qualizza delivered hundreds of millions of dollars in transactional business to U.S. Bank and earned millions in personal income by creating and managing The Urban Development Fund, LLC ("UDF"). What began as a profitable and trusted business relationship was corrupted into a systematic campaign to seize control, strip value, self-deal, conceal material conflicts, force a distressed transfer, and drive the resulting financial wreckage into Qualizza's personal estate.

The campaign accelerated when Qualizza uncovered significant financial misrepresentations by Freeman. In retaliation, Freeman engineered Qualizza's without-cause removal as Manager of UDF in 2021. The consequences were immediate and devastating. A business that had distributed more than $50 million to its owners since 2003 abruptly ceased all distributions in 2022. Under Freeman's grossly negligent control, UDF received no additional New Markets Tax Credit allocations, closed no new deals, and generated no new revenue. Instead, Freeman diverted and misallocated the seven-year revenue stream Qualizza had built, transforming the enterprise from a productive tax-credit platform into a vehicle for Freeman's personal benefit.

Qualizza personally guaranteed the TLHSTL financing and provided substantial personal funding and labor to preserve the Hotel. The goal was to strip him of equity and weaponize

his personal guarantees. Freeman, the U.S. Bank Defendants, Dowd Bennett, Octagon, and others deployed a series of coordinated leverage points of harm. One scheme involved installing a Trojan-horse Receiver to facilitate a $29M sale. Freeman orchestrated the appointment of his own compensated hotel manager to the Cook County Court, falsely presenting that relationship as independent. In fact, the Receiver was already the management company at another property involving Freeman. This was an intentional, material conflict, deliberately concealed from the Court. Once installed, this secretly conflicted Receiver failed to act on his primary court order: to execute and sell the Hotel with the PSA in hand. Instead, the Receiver intentionally obstructed the value-preserving sale opportunity and allowed the property to deteriorate until its going-concern value collapsed.

As the Hotel's value was systematically destroyed, U.S. Bank and Octagon, along with the closing attorneys and escrow agents, forced a distressed $14 million fire sale. To close the transaction, fiduciaries released and used Qualizza's signature pages, violating his express written escrow instructions. The unauthorized closing deliberately left unresolved the very deficiencies, collateral defects, and tax liabilities Qualizza had identified long before closing. These defects were intentionally left unresolved to preserve leverage against Qualizza personally after the Hotel was gone.

This conduct did not stop at the project entities. It was engineered to reach Qualizza personally. After the unauthorized closing, the manufactured leverage was immediately

deployed through multi-state enforcement proceedings targeting his personal bank and brokerage accounts, guaranties, credit, and separate estate. The sequence was neither a series of ordinary business failures nor a series of happenstance mistakes. It was a deliberate, coordinated campaign to shift responsibility for the Hotel's financial collapse from the responsible actors to Qualizza, thereby damaging his creditworthiness, professional relationships, earning capacity, business opportunities, and personal estate.

## I. PARTIES

**1.** Plaintiff Michael S. Qualizza ("Qualizza" or "Plaintiff") is an individual residing in Austin, Texas. Qualizza is the managing member of QG Holding Co., LLC ("QGH"). QGH owns a 50% interest in Aries Community Capital, LLC ("ACC"), a Texas limited liability company. ACC's sole asset is The Urban Development Fund, LLC ("UDF"), a Delaware limited liability company. Qualizza is the managing member of UDF ST NMTC Partners, LLC ("UDF ST"), a Texas limited liability company. Qualizza is the managing member of American Impact Ventures ("AIV"), a Texas limited liability company. Qualizza formerly owned a majority interest in The Last Hotel STL ("TLHSTL"). Qualizza formerly served as a co-managing member of DFQ Management LLC ("DFQ"), a Delaware limited liability company. DFQ served as manager of the Hotel entities. Qualizza was the sole manager of Last Hotel F&B LLC, a Delaware limited liability company.

**2.** Qualizza appears in this action pro se.

**3.** Defendant Neil D. Freeman ("Freeman") is an individual residing in Florida. Freeman formerly served as a member and co-manager of DFQ. Freeman owns Aries Capital, LLC ("Aries"). Aries serves as the managing member of ACC, which, in turn, serves as the managing member of UDF.

**4.** Aries Community Capital, LLC ("ACC") is not a party to this action. ACC is a Texas limited liability company and serves as UDF's managing member.

**5.** Defendant Robert J. Habeeb ("Habeeb") resides in Glendale Heights, DuPage County, Illinois. Habeeb is the founder, chief executive officer, and sole manager of Maverick Hotels & Restaurants, LLC.

**6.** Defendant Maverick Hotels & Restaurants, LLC ("Maverick") is an Illinois limited liability company with its principal place of business at 1550 South Indiana Avenue, Suite 201B, Chicago, Illinois 60605.

**7.** Defendant Richard Walters ("Walters") is a Missouri-licensed attorney affiliated with Spencer Fane LLP and practicing from its St. Louis, Missouri, office.

**8.** Defendant Spencer Fane LLP ("Spencer Fane") is a law firm organized as a limited liability partnership with an office in St. Louis, Missouri.

**9.** Defendant Chicago Title Company, LLC (“Chicago Title”), a Delaware limited liability company, is authorized to provide title insurance and escrow services in Missouri.

**10.** Defendant U.S. Bancorp Community Development Corporation ("USB CDC") is organized under Minnesota law.

**11.** Defendant U.S. Bank National Association ("USBNA"), a national banking association based in Cincinnati, Ohio, provided financing for the Hotel. USB CDC and USBNA are collectively referred to as the "U.S. Bank Defendants."

**12.** Defendant Octagon Credit Partners LP ("Octagon") is a limited partnership organized under the laws of Delaware.

**13.** Defendant Dowd Bennett LLP ("Dowd Bennett") is a law firm organized as a limited liability partnership with an office in Clayton, Missouri.

**14.** Defendant James F. Bennett ("Bennett"), a Missouri resident and partner at Dowd Bennett, was a primary attorney responsible for the representations described in this Petition.

**15.** James Keledjian ("Keledjian"), who is not a party to this action, owns Associated Equities, Inc. ("AE").

**16.** Defendants John Does 1-10 are unknown persons or entities. Their names will be used if identified, with a valid factual and legal basis. Those John Does who knowingly joined, assisted, or furthered the acts in a Count are called the "Participating John Does," and Plaintiff will replace their names once identified through discovery.

## II. JURISDICTION AND VENUE

**17.** This Court has jurisdiction under Article V, Section 14 of the Missouri Constitution because Plaintiff seeks money damages exceeding $25,000, exclusive of interest and costs.

**18.** Missouri is the center of the transactions and conduct alleged here, making it the proper venue.

**19.** Qualizza was involved in developing, operating, and financing The Last Hotel at 1501 Washington Avenue, St. Louis (the "Hotel"), as well as in the Hotel's receivership proceedings.

**20.** The historic renovation of the International Shoe Building into The Last Hotel STL took place in St. Louis, Missouri.

**21.** The alleged misconduct involved a Missouri business that encompassed property, employees, inventory, insurance, taxes, guest operations, and the Hotel's sale.

**22.** The challenged March 5, 2026, closing transferred the Missouri Hotel and its assets.

**23.** The Cook County court issued receivership orders to take control of the Missouri Hotel.

**24.** Habeeb and Maverick, collectively known as "The Receiver," intentionally assumed responsibility for managing and selling the Missouri asset.

**25.** The receivership-operation claims arise from their exercise of that authority over Missouri property, not merely from the Illinois appointment order.

**26.** The U.S. Bank Consent Judgment was filed in the U.S. District Court for the Eastern District of Missouri in U.S. Bank N.A. v. Qualizza, No. 4:21-cv-00120-MTS.

**27.** Personal jurisdiction over each Defendant is asserted under Missouri's long-arm statute, section 506.500, RSMo, based on each Defendant's transaction of business, making of contracts, or commission of tortious acts within this state, as more specifically alleged below, and consistent with due process.

**28.** Plaintiff does not rely solely on his residence, another Defendant's contacts, or an effects-based theory.

**29.** Missouri jurisdiction applies to Freeman through co-developing, managing, controlling, participating in the receivership and sale process, and consenting to the March 5, 2026, closing of the Missouri Hotel sale.

**30.** The Receiver purposefully availed itself of Missouri by seeking and accepting authority over the Missouri Hotel as the Receiver.

**31.** The Receiver served as the court-appointed receiver for the Missouri Hotel from May 1, 2024, through February 28, 2025, taking possession of and operating the Hotel in St. Louis, Missouri, pursuant to an order entered in the Circuit Court of Cook County, Illinois, in Case No. 2022 CH 11088.

**32.** The Receiver was appointed with primary responsibility for signing the pending purchase-and-sale agreement (the "PSA") and with authority to sell the Missouri Hotel.

**33.** All Receiver personnel, revenue, inventory, insurance, security, and the sales process were based in Missouri.

**34.** The Receiver hired employees to work at the Missouri Hotel or to manage it.

**35.** The Receiver sought to operate the Hotel in Missouri for an extended period.

**36.** Walters and Spencer Fane ("Closing Counsel") purposefully provided Missouri legal and closing services for the Missouri Hotel located in Missouri.

**37.** Spencer Fane provided transactional and closing services for the Missouri Hotel sale.

**38.** Walters provided transactional and closing services for the Missouri Hotel sale.

**39.** Closing Counsel led the closing process for the Missouri Hotel.

**40.** Chicago Title has a Missouri office located at CTI Missouri, 923 NE Woods Chapel Rd, Suite 401, Lees Summit, MO 64064.

**41.** Chicago Title handled escrow and closing, disbursed sale proceeds, and performed closing functions for Missouri real estate and business assets.

**42.** U.S. Bank purposefully participated in the debt financing in Missouri.

**43.** USB CDC purchased all of the tax credits from the Missouri Hotel.

**44.** The claims stem from alleged post-Settlement obligations under Missouri law and from conduct related to the Missouri sale and tax credits.

**45.** U.S. Bank and USB CDC maintain a large corporate headquarters at 505 N 7th St #200 in Downtown St. Louis, Missouri, 63101.

**46.** USB CDC offices were located at 1325 Washington Ave, St. Louis, Missouri, just 1 block from the Hotel until 2024.

**47.** Octagon provided tax-credit bridge loans and issued a $9 million mezzanine loan to the Missouri Hotel.

**48.** Dowd Bennett and Bennett represented DFQ, Mr. Freeman, Mr. Dixon, and Qualizza in Missouri until Qualizza terminated their representation in 2022.

**49.** Even after termination, Dowd Bennett continued to represent DFQ, Mr. Freeman, and Mr. Dixon in an AAA arbitration concerning the breach of the Franchise Agreement between Missouri Hotel and Hyatt Hotels International (“Hyatt”).

**50.** Dowd Bennett represented DFQ in federal litigation in Missouri involving U.S. Bank.

**51.** Dowd Bennett represented Mr. Freeman in federal litigation in Missouri against U.S. Bank.

**52.** Dowd Bennett represented Mr. Dixon in federal litigation in Missouri against U.S. Bank.

**53.** Dowd Bennett represented Mr. Freeman and Mr. Dixon in defending their personal guarantees for the Missouri Hotel.

**54.** Dowd Bennett oversaw the settlement process for both the Missouri Hotel sale and the Hyatt arbitration.

**55.** Dowd Bennett's representation of Qualizza and the conduct alleged to have harmed him took place in Missouri.

**56.** The claims against Dowd Bennett stem from their services and the alleged impact on Plaintiff's rights and personal harm in Missouri.

**57.** Qualizza invested in the Last Hotel STL in the City of St. Louis, Missouri.

**58.** The acts and the resulting initial loss occurred at the Hotel in the City of St. Louis rather than at Qualizza's residence.

**59.** Venue is proper in the City of St. Louis under section 508.010.4, RSMo, because the first injury resulting from the acts in this case occurred at the Hotel within the City of St. Louis.

**60.** Venue is proper because substantial acts, omissions, and harm occurred in Missouri.

## III. NATURE OF ACTION

**61.** This Action concerns a coordinated course of conduct directed at Qualizza over nearly a decade.

**62.** This Action concerns potentially over 20 Defendants and at least 19 Counts and is being filed collectively for judicial efficiency.

**63.** This action includes tort claims against Defendants for intentional personal injury to Qualizza.

**64.** Although ownership was held through LLCs, Plaintiff's personal guaranties and equity primarily supported the project's obligations.

**65.** The present Petition does not ask this Court to vacate, stay, quash, modify, or disregard the federal judgment.

**66.** This Petition does not challenge the validity, enforceability, or finality of any federal judgment or order.

**67.** If the federal court determines the validity of the February 2026 Amendment, the amount due, credits, exemptions, or any other issue, Plaintiff will conform this action to that ruling and will not seek any relief inconsistent with that ruling.

**68.** This action alleges breaches of fiduciary duty.

**69.** This action alleges breaches of contract.

**70.** This action alleges fraud.

**71.** This action alleges fraudulent concealment.

**72.** This action alleges misrepresentation.

**73.** This action alleges negligent misrepresentation.

**74.** This action alleges civil conspiracy.

**75.** This action alleges professional negligence.

**76.** This action alleges legal malpractice.

**77.** This action alleges negligence.

**78.** This action alleges breaches of escrow duties.

**79.** This action alleges breaches of closing-process duties.

**80.** This action alleges breaches of the October 15, 2025, settlement agreement among Qualizza, the U.S. Bank Defendants, and the other parties thereto, attached as **Exhibit C** (the "Settlement Agreement").

**81.** This action alleges tortious interference with business expectancy and with contract, as outlined in the Counts below.

**82.** Not every Count applies to all Defendants.

**83.** This Petition alleges the conduct affected management.

**84.** This Petition alleges the conduct affected operation.

**85.** This Petition alleges the conduct affected preservation.

**86.** This Petition alleges the conduct affected the closing of the Hotel.

**87.** This Petition alleges the conduct impaired his managerial governance rights.

**88.** This Petition alleges the conduct significantly impaired the ability to sell the Hotel.

**89.** In this Petition, Plaintiff seeks actual and consequential damages.

**90.** In this Petition, Plaintiff seeks prejudgment and post-judgment interest, where authorized by law, and costs.

**91.** In this Petition, Plaintiff alleges the continuing decline in value was a premeditated action involving Neil Freeman, the Receiver, U.S. Bank, Dowd Bennett, and others.

**92.** In this Petition, claims against Freeman stem from a long history of conduct, including the Hotel, UDF, and related matters.

**93.** In this Petition, Plaintiff seeks recovery for actual personal payments.

**94.** In this Petition, Plaintiff seeks recovery of liabilities.

**95.** In this Petition, Plaintiff seeks recovery of judgments.

**96.** In this Petition, Plaintiff seeks recovery of garnished funds.

**97.** In this Petition, Plaintiff seeks recovery of operating advances.

**98.** In this Petition, Plaintiff seeks recovery of fees paid personally.

**99.** In this Petition, Plaintiff seeks recovery of lost compensation.

**100.** In this Petition, Plaintiff seeks recovery of business expectancies.

**101.** In this Petition, Plaintiff seeks recovery of intentional malicious injury of his personal estate.

## IV. DIRECT PERSONAL INJURY AND STANDING

**102.** Plaintiff's ownership of the Hotel project through entities does not merge with or transfer his personal obligations, including guaranties.

**103.** Plaintiff's ownership of the Hotel project through entities does not merge with or transfer his personal obligations, such as judgments.

**104.** Plaintiff's ownership of the Hotel project through entities does not merge with or transfer his personal obligations, such as garnished accounts.

**105.** Plaintiff's ownership of the Hotel project through entities does not merge with or transfer his personal obligations, including operating advances to any LLC.

**106.** Plaintiff suffered direct injury when Defendants' conduct triggered enforceable obligations, resulting in judgments.

**107.** Plaintiff suffered direct injury when Defendants' conduct led to garnishments of his property across multiple states.

**108.** Plaintiff suffered direct injury when Defendants' conduct triggered the destruction of his business expectations and personal income.

**109.** The Hotel's sale-value destruction is pleaded solely as the cause of Plaintiff's personal losses.

**110.** Plaintiff claims Defendants deliberately caused the sale value to be destroyed to affect his guaranteed obligations.

**111.** Plaintiff claims Defendants deliberately caused the sale value to be destroyed to shift multi-million-dollar deficiencies onto Plaintiff's separate estate.

**112.** Plaintiff disclaims any recovery of Hotel property.

**113.** Plaintiff disclaims any recovery of operating revenue or of LLC assets.

**114.** Plaintiff seeks recovery only for actual personal payments.

**115.** Plaintiff seeks recovery only for actual personal liabilities created.

**116.** Plaintiff seeks recovery only for actual personal liabilities of his estate's garnished funds.

**117.** Plaintiff seeks recovery only for actual personal liabilities and professional fees incurred.

**118.** Plaintiff seeks recovery only for actual personal liabilities and intentional harm to his personal estate.

**119.** Related proceedings are pending elsewhere, and this Petition is drawn to avoid them.

**120.** Plaintiff's derivative claims against Freeman for DFQ Management LLC and third-party claims against the Receiver are pending in the Cook County Circuit Court, Case No. 2022 CH 11088.

**121.** QG Holding Co., LLC's claims against Freeman and related parties, along with Plaintiff's derivative claims for Urban Development Fund, LLC, are pending in Cook County Case Nos. 2021 CH 05272, 2023 CH 02190, and 2023 CH 08316.

**122.** On August 6, 2026, ARQ-1501 St. Louis, LLC and Neil Freeman filed an action against Qualizza in the Circuit Court of Cook County, Illinois, under Case No. 2026L009289.

**123.** Qualizza was served with that action on August 31, 2026.

**124.** That action asserts claims brought derivatively on behalf of DFQ Management, LLC, as well as individual contract claims, and its claims are not asserted in this Petition.

**125.** Claims against the U.S. Bank Defendants are pending in federal court, including Case No. 1:26-cv-02251 in W.D. Tex.

**126.** This action asserts only Plaintiff's personal claims and injuries; it does not include any entity's claims, any pending claims elsewhere, or any claims released by the October 15, 2025, Settlement Agreement.

# V. COMMON FACTUAL ALLEGATIONS

## A. The Relationship, Its Breakdown, and the Recurring Beneficiary - The Urban Development Fund, LLC, Neil Freeman, USB CDC, and others including John Does.

**127.** For nearly two decades, Qualizza and U.S. Bank maintained a profitable partnership, syndicating millions in historic and new-market tax credits.

**128.** Before founding UDF, Qualizza served as Director of Investment Management at National Equity Fund, Inc. ("NEF"), where he helped raise a low-income-housing-tax-credit fund and oversaw approximately $3.1 billion in private equity syndications under the Low-Income Housing Tax Credit program.

**129.** Qualizza became a well-recognized and respected national tax-credit finance expert.

**130.** Qualizza, Edward Simon, and Chad Goodall advised Tax Credit Syndicators on technical, syndication structuring, and financial modeling through their advisory firm, QSG Consulting Group, LLC ("QSG").

**131.** Qualizza worked with KeyBank, Wells Fargo, the Community Reinvestment Fund, U.S. Bank, and additional institutions.

**132.** In mid-2001, Qualizza met with Mr. Keledjian to discuss a business opportunity to establish a community development entity ("CDE") for an NMTC application.

**133.** National Equity Fund, Inc. is an affiliate of the Local Initiatives Support Corporation ("LISC"), the largest community development organization in the United States.

**134.** LISC was among the organizations advocating for the creation of the federal New Markets Tax Credit program, which was enacted as part of the Community Renewal Tax Relief Act of 2000.

**135.** Qualizza participated in that work during his tenure at NEF, supporting LISC's bill-writing efforts through financial modeling.

**136.** Qualizza had advanced knowledge of the upcoming NMTC program.

**137.** Although Qualizza had significant tax credit experience and investor relationships, he lacked the lending experience needed to apply for the NMTC program.

**138.** E. James Keledjian introduced Qualizza to Mr. Freeman.

**139.** Mr. Freeman's company, Aries, was a commercial lending platform.

**140.** QSG, Aries, and AE formed Aries Community Capital ("ACC") in 2002.

**141.** QSG Consulting Group, LLC was later reorganized as QGH.

**142.** Qualizza holds a sixty percent interest in QGH and serves as QGH's manager.

**143.** Chad Goodall holds a forty percent interest in QGH.

**144.** References in this Petition to interests held by QSG Consulting Group, LLC and QG Holding Co., LLC refer to the same continuing interest ("QGH").

**145.** UDF was formed in 2002.

**146.** ACC owns UDF.

**147.** ACC was originally owned 46% by Aries, 8% by AE, and 46% by QGH.

**148.** ACC's membership interests are currently held 50% by QGH and 50% by Aries.

**149.** AE has no membership interest in ACC.

**150.** The 5% allocated to Keledjian's entity in Freeman's fee was a share of Aries' interest, not a membership interest in ACC.

**151.** Keledjian declined a finder's fee and instead requested to join the venture.

**152.** Keledjian testified in a sworn affidavit that, aside from serving on UDF's advisory board, he had a limited role in the operations of ACC and UDF.

**153.** Qualizza served as the managing member of UDF until he was removed without cause on July 14, 2021.

**154.** By 2010, UDF had secured 6 New Market Tax Credit ("NMTC") allocations, totaling $292 million.

**155.** In 2011, Qualizza and Goodall required renegotiation of the economic terms of their participation in the enterprise due to the uneven workload and revenue generation.

**156.** Qualizza and Goodall received no salaried compensation from UDF, ACC, or their affiliates—only their partnership distributions served as compensation.

**157.** As manager, Qualizza distributed almost 97% of the revenue generated.

**158.** ACC and UDF ST NMTC paid accounting and legal expenses from operations, prorated for UDF.

**159.** The only other expense was maintaining the annual LLC registrations.

**160.** Under Qualizza's management, UDF secured nine federal NMTC allocations totaling $435 million.

**161.** UDF also received approximately ten ST NMTC allocations, totaling more than $200M.

**162.** UDF and UDF ST received a combined total of more than $635 million in NMTC allocations.

**163.** This resulted in over one billion dollars in development within Low-Income Communities (“LIC”).

**164.** UDF made loans to more than 50 projects in LICs.

**165.** Most of the projects to which UDF made loans were in severely distressed census tracts.

**166.** U.S. Bank invested in nearly all of those UDF transactions and served as Qualizza's primary institutional counterparty.

**167.** USB CDC and UDF had major impacts on severely distressed, low-income communities throughout the United States.

**168.** In successful years before the relationship deteriorated, such as 2012 and 2014, Qualizza's personal income exceeded $5 million.

**169.** After Qualizza relocated from Illinois to Texas, U.S. Bank personnel increasingly viewed him as politically conservative.

**170.** Qualizza considered many USB CDC employees close personal friends.

**171.** Zachary 'Zack' M. Boyers served as Chairman and Chief Executive Officer of USB CDC, which is headquartered in St. Louis, Missouri.

**172.** Qualizza was very loyal to USB CDC.

**173.** Qualizza was very loyal to its chairman, Zach Boyers.

**174.** Qualizza considered Mr. Boyers one of his closest associates.

**175.** During the underwriting of the hotel financing, U.S. Bank reviewed Qualizza's financials.

**176.** When underwriting the hotel financing, U.S. Bank knew that his liquidity greatly exceeded that of other guarantors.

**177.** U.S. Bank knew that Qualizza's guarantees and liquidity would cover any shortfalls if the Hotel's other sources or guarantors failed to fulfill their obligations.

**178.** The maturity of the relationship did not end the parties' business dealings.

**179.** U.S. Bank remained the lender.

**180.** USB CDC remained the tax-credit investor for the Hotel.

**181.** USB CDC was the sole tax-credit investor in the Hotel and held a 99% interest in Last Hotel Master Tenant LLC (the "Master Tenant").

**182.** U.S. Bank wanted the project completed.

**183.** USB CDC maintained corporate offices approximately a block from the Hotel.

**184.** Between 2010 and 2019, Boyers sought personal benefits from Qualizza, beginning with eight U2 concert seats at Soldier Field that Qualizza had not made available to the public.

**185.** Qualizza never offered these benefits; Boyers demanded them.

**186.** Boyers' demands spanned eight to nine years and included tickets to sold-out shows and complimentary stays in a suite at the Roosevelt Hotel in New Orleans.

**187.** Qualizza holds a 1.25 percent minority stake in New Orleans' Roosevelt Hotel.

**188.** The requested benefits exceeded $15,000 in value and are documented in email correspondence.

**189.** Given U.S. Bank's position as UDF's tax-credit investor and as the Hotel's lender and equity source, declining Boyers' demands was not practical.

**190.** Kyle M. Hansen served as Executive Vice President and Community Lending Manager at USB CDC, which is headquartered in Minneapolis, Minnesota.

**191.** At all relevant times, Ada 'Laura' L. Vowell served as a Senior Vice President at USB CDC, led its NMTC acquisitions, and served as a relationship manager for the Hotel transaction.

**192.** Vowell currently serves as the Director of Community Finance at USB CDC.

**193.** Vowell used Qualizza's Colorado vacation home and stayed there as an unpaid overnight guest on several occasions.

**194.** After Qualizza stopped accommodating those demands, Boyers' treatment of him changed.

**195.** Steve Kramer is a Senior Vice President of Business Development at USB CDC.

**196.** During deposition, U.S. Bank's Steve Kramer said the HR officer investigated the improper gifts that Boyers, Vowell, and Kramer requested and received.

**197.** In early 2019, UDF received a new $50 million federal New Markets Tax Credit allocation and additional state-level allocations.

**198.** When Qualizza later offered to use UDF resources to provide additional new-NMTC financing for the Hotel, Vowell asked him, “Why would we do this for someone like you?”

**199.** On September 25, 2019, Qualizza hosted a closing dinner in the hotel restaurant, attended by U.S. Bank employees Vowell and Kramer, along with other project participants.

**200.** Despite Qualizza's attempts to change the subject, U.S. Bank employees repeatedly steered the dinner conversation toward political topics.

**201.** When Qualizza defended his political views, Kramer stood up and left the dinner, and Vowell called Qualizza a racist.

**202.** On January 30, 2020, Boyers told Qualizza that Boyers was mistreating him and that he was receiving no help from the Bank because Boyers hated Qualizza's political views.

**203.** Boyers told Qualizza he despised what Qualizza represented, refused to work with Qualizza any longer, and preferred that U.S. Bank never buy any more tax credits from Qualizza.

**204.** On April 6, 2023, U.S. Bancorp Community Development Corporation (USB CDC) began operating publicly under the name U.S. Bancorp Impact Finance.

**205.** On March 6, 2020, Qualizza's counsel sent a written demand to U.S. Bancorp's CEO and general counsel outlining the issues regarding the CDC.

**206.** That letter informed U.S. Bank's senior leadership about alleged hostility toward Qualizza.

**207.** That letter informed U.S. Bank's senior leadership of retaliation while USB CDC was still involved in the Hotel transaction.

**208.** By March 6, 2020, UDF had invested more than $500 million in projects financed by USB CDC.

**209.** Qualizza generated more than $50 million in profit for the Bank over the course of their relationship.

**210.** Qualizza generated more than $25 million in income for his partners.

**211.** After Qualizza's removal from UDF on July 14, 2021, Freeman became UDF's sole manager.

**212.** Either Freeman or Aries controlled the bank accounts of UDF, ACC, and UDF ST.

**213.** Qualizza's removal as UDF's manager was carried out by written consent on July 14, 2021.

**214.** The consent dated July 14, 2021, was signed on behalf of ACC by Aries manager Neil Freeman, in his capacity as ACC's manager.

**215.** No member of ACC, except the entity controlled by Freeman, executed the consent dated July 14, 2021.

**216.** The Amended and Restated Operating Agreement, effective May 1, 2007, governs ACC's operations.

**217.** **Exhibit A to the ACC Operating Agreement, the member schedule, lists three members: Aries Capital, LLC (460 Interests), QSG Consulting Group, LLC (460 Interests), and Associated Equities, Inc. (80 Interests).**

**218.** Section 1.27 of the ACC Operating Agreement defines “Member Consent” as the affirmative vote of Members holding at least sixty-six and two-thirds percent of the voting Membership Interests.

**219.** Section 7.12 of the ACC Operating Agreement provides that, despite other provisions, certain actions require Members' approval, referred to as "Member Consent."

**220.** Section 7.11 of the ACC Operating Agreement designates Freeman as President and CEO and Qualizza as Vice President and CFO.

**221. Freeman's and Keledjian's shares, together, represent 54% of ACC's Membership Interests, as shown in Exhibit A of the ACC Operating Agreement.**

**222.** Fifty-four percent falls short of the sixty-six and two-thirds percent threshold for Member Consent outlined in the ACC Operating Agreement.

**223.** On June 10, 2024, Aries Capital, LLC filed a claim with the American Arbitration Association, asserting that ACC requires Member Consent before retaining and paying counsel.

**224.** Section 7.12 of the ACC Operating Agreement requires Member Consent for expenses exceeding $5,000 and for entering into engagements or contractual commitments.

**225.** The ACC Operating Agreement provides for arbitration in the event of a deadlock among the members.

**226.** In the same filing, Aries Capital said that Aries Capital and Qualizza's entity each own 46% of ACC, while Keledjian's entity owns 8%. Ownership has changed over time.

**227.** Article X, Section 10.2 of the ACC Operating Agreement authorizes the Manager to distribute Operating Proceeds to Holders in proportion to each Holder's Percentage Interest.

**228.** Article X, Section 10.4(b), of the ACC Operating Agreement provides that all Profits will be distributed to the Holders in proportion to their respective Percentage Interests.

**229.** In 2011, ACC members adopted a new fee-distribution structure.

**230.** This new fee structure is documented in email correspondence.

**231.** The distribution spreadsheets detail the new fee structure.

**232.** The new fee structure and records referring to the fifty-fifty split as the "new deal," including consents from Freeman and Qualizza approving these allocations before each distribution.

**233.** Under this change, all net profits from the federal NMTC program were to be split equally, with 50% allocated to QGH and the other 50% to Aries.

**234.** Mr. Freeman agreed to allocate a portion of his share to AE, Mr. Keledjian's company.

**235.** This new fee-sharing arrangement replaced the original percentage-based membership interests in federal NMTC distributions.

**236.** At the same time, Qualizza established a new entity, UDF ST.

**237.** The UDF ST operating agreement allocated 80% of ownership to the Member Manager, QGH, and 20% to Aries.

**238.** UDF ST was established to manage the State NMTC allocations UDF received.

**239.** UDF ST applied on UDF's behalf and managed the entire state operation.

**240.** Since 2012, UDF ST has been highly profitable, generating tens of millions of dollars.

**241.** UDF ST managed and syndicated ST NMTC allocations for additional CDEs other than UDF.

**242.** Freeman benefited financially from UDF ST management and syndication of other CDEs' State NMTC allocations.

**243.** Mr. Qualizza lacks an exact UDF ST revenue figure because he has been locked out of all UDF operating data since his removal as Manager.

**244.** The parties maintained the fifty-fifty split from 2012 through January 6, 2021, without objection.

**245.** In 2021, Freeman and Goodall compiled a fee reconciliation for the UDF companies, detailing the fees earned by ACC and UDF ST NMTC Partners, LLC over the previous seven years.

**246.** During the reconciliation, Freeman allocated 50% of the ACC fee proceeds to Qualizza's entity, 45% to Aries, and 5% to Keledjian's entity.

**247.** Those percentages appear in that reconciliation as fixed multipliers in its formulas.

**248.** Freeman ceased allocating its 50% share of federal fees and its 80% share of state fees collected after January 6, 2021, to Qualizza's entity.

**249.** An Amended and Restated Limited Liability Company Operating Agreement governs UDF's operations.

**250.** The UDF Operating Agreement lists two members: Aries Community Capital, LLC, with a $990.00 contribution and a 99.99% interest, and Michael S. Qualizza, with a $10.00 contribution and a 0.01% interest.

**251.** Neil D. Freeman is not a member of UDF.

**252.** Section 4.7 of the UDF Operating Agreement provides that a manager may be removed or replaced, with or without cause, by a majority vote of Members entitled to vote.

**253.** Section 4.2(c) of the UDF Operating Agreement requires Members to ensure that one Manager is also a Member and serves as the Company's Tax Matters Member.

**254.** The Consent dated July 14, 2021, attempted to appoint a non-UDF member as UDF's sole manager.

**255.** On June 3, 2021, Freeman circulated a notice of a special meeting regarding UDF to UDF's advisory board and its shareholders.

**256.** Freeman's agenda indicated that he planned to discuss concerns regarding unilateral actions by Qualizza, ACC's CFO, and the UDF Manager.

**257.** The agenda indicated that Freeman would describe key events for approved community development entities, which must report them to the Community Development Financial Institutions Fund (the "CDFI Fund").

**258.** On July 16, 2021, Freeman informed UDF's advisory board that Qualizza had been removed as manager and instructed them to disregard any emails from Qualizza purporting to act as UDF's manager.

**259.** Freeman filed a lawsuit against Qualizza in the Delaware Court of Chancery, titled Freeman v. Qualizza, C.A. No. 2021-0615-PAF.

**260.** Qualizza continued to serve as UDF's manager under a status quo order entered in that action.

**261.** In early October 2021, Freeman contacted Keledjian to request consent to remove Qualizza as UDF's manager.

**262.** Keledjian stated in an affidavit that he learned of Freeman's attempt to remove Qualizza only after the Delaware lawsuit was filed.

**263.** Keledjian stated in an affidavit that he signed the consent after receiving advice from Freeman and using a draft consent Freeman provided.

**264.** A second written consent was executed on October 12, 2021.

**265.** Freeman obtained a second member's signature about three months after he declared the removal of Qualizza effective and notified UDF's advisory board.

**266.** On January 5, 2022, the Delaware court reversed the prior order.

**267.** On August 12, 2022, the Delaware Court of Chancery ruled that Qualizza's removal as UDF's manager took effect on July 14, 2021.

**268.** The Delaware action was a summary proceeding under Section 18-110 of the Delaware LLC Act and addressed only the validity of actions to elect or remove a manager.

**269.** The U.S. Bank Defendants were not parties to the Delaware litigation.

**270.** UDF ST operates under an agreement dated September 16, 2011 (the "UDF ST Operating Agreement").

**271. Exhibit A to the UDF ST Operating Agreement, the member schedule, lists two members: Aries Capital, LLC, with two hundred Membership Interests, and QSG Consulting Group, LLC, with eight hundred Membership Interests.**

**272.** Qualizza is named as the Manager of UDF ST NMTC Partners, LLC in that agreement.

**273.** Section 10.2 of the UDF ST Operating Agreement requires the manager to allocate operating proceeds in an 80%/20% split, with 80% to QGH and 20% to Aries.

**274.** Qualizza and Chad Goodall were the sole authorized signatories for UDF ST NMTC Partners, LLC's bank accounts.

**275.** Freeman's role was limited to signing documents and consents prepared by others.

**276.** USB CDC was the primary tax-credit investor in nearly all UDF and UDF ST transactions.

**277.** U.S. Bank held or controlled depository relationships through which those entities conducted operations.

**278.** After July 14, 2021, USB CDC transferred the claimed control of the UDF, ACC, and UDF ST accounts to Freeman.

**279.** U.S. Bank interpleaded only the UDF ST Operating Account.

**280.** Qualizza has remained the Manager of UDF ST and still is.

**281.** U.S. Bank recognized Freeman's claimed authority, even though Qualizza and Goodall were the only authorized signers on the UDF ST accounts and QGH owned 80% of UDF ST.

**282.** The Plaintiff argues that Freeman could not have controlled the UDF enterprise without USB CDC's support.

**283.** The conduct followed the alleged pattern: assert control beyond authority, then create a record afterward to justify that control and to harm Qualizza.

**284.** The allegations provide evidence of intent, motive, malice, and coordinated conduct directed at Qualizza personally.

**285.** The supporting interference and conspiracy claims in Counts IX and XIII are not entity-based claims.

**286.** Daniel Voelker, Qualizza's counsel, needed to file a lawsuit on QGH's behalf to recover control of the Interpleaded UDF ST Operating Bank Account.

**287.** Despite his expertise, extensive relationships, and significant efforts to generate income, Qualizza has not been able to generate revenue from AIV.

**288.** Qualizza is unable to earn a living due to ongoing intentional harm.

**289.** The intentional harm is a continuing conspiracy among the parties and John Does.

**290.** While underwriting the Hotel, U.S. Bank became aware of Qualizza's personal wealth and of structured guarantees that directly harmed Qualizza's personal estate.

**<u>B. The Historic Renovation of International Shoe Building into The Last Hotel STL</u>**

**291.** Plaintiff and partners redeveloped the International Shoe Building into The Last Hotel, using a mix of tax credits, debt, bridge financing, and multiple project entities.

**292.** Mr. Freeman claims to be a hotel expert in both financing and operations.

**293.** Mr. Dixon owned and operated the Iron Horse Hotel in Milwaukee, Wisconsin, the number-one boutique hotel in the US, for more than 5 years.

**294.** A key component of the Hotel's financing structure was the Historic Tax Credit ("HTC").

**295.** The International Shoe Building is one of the most historic buildings in the United States.

**296.** The Hotel was eligible for both the Federal HTC and Missouri State Historic Tax Credit ("MOHTC") programs.

**297.** Each HTC program is administered differently.

**298.** The National Park Service ("NPS") administers the Federal HTC program, while the MO Department of Economic Development administers the MOHTC program.

**299.** Both programs follow the federal government's three-step process.

**300.** To claim Historic Tax Credits, a developer must submit the Historic Preservation Certification Application to both the state and federal authorities.

**301.** This is a three-step process conducted by the Missouri SHPO and the NPS.

**302.** Because the Federal and Missouri programs mirror each other, developers usually submit these parts to the Missouri SHPO first.

**303.** If federal credits are requested, the SHPO reviews the application and forwards it to NPS for final approval.

**304.** Before beginning the SHPO/NPS process, Missouri requires developers to submit a "Preliminary Application" to the Department of Economic Development (DED) to obtain the state tax credit, which is subject to funding limits.

**305.** The International Shoe Building received the maximum MOHTC allocation of $13,575,688.

**306.** Part I focuses on securing the building's historic designation.

**307.** The International Shoe Building was historic.

**308.** The International Shoe Building is in a historic district.

**309.** The International Shoe Building is listed on the National Register of Historic Places.

**310.** This gave the International Shoe Building instant Part I approval.

**311.** Part II is the Rehabilitation Description.

**312.** Part II is the most critical and detailed step, and it must be approved before construction begins.

**313.** The applicant must demonstrate that the proposed work complies with the Secretary of the Interior's Standards for Rehabilitation.

**314.** The applicant provides a comprehensive architectural plan, elevation diagrams, project scope details, and pre-renovation photographs.

**315.** Part III is the Request for Certification of Completed Work, which is submitted to Missouri SHPO after construction and once the building is in service.

**316.** The Missouri SHPO reviews the completed project to confirm compliance with the approved Part II plan.

**317.** The SHPO forwards Part III to the NPS.

**318.** The NPS conducts the final review and officially approves Part III.

**319.** The federal tax credit cannot be claimed without final NPS sign-off.

**320.** The submission includes final project data, a breakdown of Qualified Rehabilitation Expenditures ("QREs"), and "before" and "after" photos of the exterior and interior.

**321.** The agencies compare the final photos with the Part II plan.

**322.** If the work aligns with the approved plan, they issue a completed certification required to claim tax credits from the IRS and the Missouri Department of Revenue.

**323.** In the Federal HTC, the project's accounting firm audits QREs. When the Building is in service, the owner receives a 20% Federal Tax Credit on Total QREs with no limit.

**324.** The IRS allows the pass-through of the Tax Credit from 1501 Washington St. Louis, LLC to Last Hotel Master Tenant, LLC under a lease agreement.

**325.** USB CDC owned 99% of the Master Tenant.

**326.** The scheduled HTC capital contributions for USB CDC to the Hotel were 10% at Closing.

**327.** The scheduled HTC capital contributions for USB CDC to the Hotel were 80% at PIS.

**328.** The scheduled HTC capital contributions for USB CDC to the Hotel were 10% for the first tax return, subject to meeting the Debt Service Coverage requirement.

**329.** The Total QREs were approximately $47M; 20% would be $10,747,162 in tax credits, at an HTC purchase price of $1.15 per credit.

**330.** The HTC purchase price was later reduced to $1.10.

**331.** USB CDC made a 10% capital contribution on 12/31/17.

**332.** USB CDC then contributed 75% on 1/6/20.

**333.** USB CDC applied a 5% adjuster for late HTC delivery.

**334.** The HTC credits were technically not overdue.

**335.** Whether the HTC Building is placed in service on January 1 or December 31, the credit remains the same and is claimed on the tax return for that year.

**336.** USB CDC benefited from the Credit in 2019, even though it did not pay for it until 2020.

**337.** USB CDC achieved a higher return on its HTC investment and lower overall costs.

**338.** They obtained $9,345,359 in Fed Credits with only a $9,251,259.00 contribution.

**339.** The Hotel was expected to receive $10,747,162 in total.

**340.** U.S. Bank never made its final Federal payment, leaving a holdback of approximately $1,495,903.40 that Equity had to replace with a new source.

**341.** The Hotel received the MOHTC Credit on May 5, 2021, with a projected amount of $11,799,695 at .94 cents on the dollar.

**342.** The Hotel actually received $9,480,717.33.

**343.** The Hotel then required about $3.8M in capital replacement from another source.

**344.** The difference between the projected and actual MOHTC proceeds was approximately $2,318,978.

**345.** The federal program relies on an accounting firm's analysis of QREs, whereas Missouri's HTC requires a comprehensive project audit for state approval.

**346.** The SHPO was then 16-20 months behind on certifying HTC audits.

**347.** The MOHTC proceeds were modeled to be funded in August 2019.

**348.** The timing of the MOHTC proceeds is also reflected in the Tax Credit Purchase Agreement dated December 27, 2017, between 1501 Washington St. Louis, LLC, as seller, and U.S. Bank National Association, as purchaser (the "Purchase Agreement").

**349.** Under the Purchase Agreement, U.S. Bank agreed to buy the Missouri State HTC at $0.94 per $1.00 of credit, for an estimated purchase price of approximately $10,297,271.00.

**350.** USB CDC acquired the MOHTC in January 2021.

**351.** USB CDC received the tax credit benefit in 2019, the PIS year. USB amends its tax returns to reflect the tax credit in the calendar year it was actually received.

**352.** The plaintiff's experience was with NMTC, not with MOHTC.

**353.** Once the Owners learned from others that the MOHTC would not arrive on time, they quickly sought a cheaper bridge lender.

**354.** Octagon provided mezzanine debt to the Hotel's financing structure.

**355.** Octagon provided historic tax credit bridge financing for the Hotel transaction.

**356.** Octagon's debt was expensive, but the construction-period interest was included in the QRE basis.

**357.** The Hotel was receiving fifty-five cents in Tax Credits for each QRE dollar.

**358.** Twenty percent from the federal government and twenty-five percent from the state of Missouri.

**359.** These sources of capital help explain the financial rationale behind these deals.

**360.** Developers might invest more than $50M in development, yet the hotel could be appraised at only $34.5M before opening.

**361.** Because the Federal program was changing on January 1, 2018, the deal would not qualify unless it closed by December 31, 2017, adding pressure to complete it.

**362.** Octagon made loans to other projects to bridge Missouri State Historic Tax Credits.

**363.** Octagon made those bridge loans in some cases before the loans to the Hotel.

**364.** Octagon had that knowledge before making the loans to the Hotel.

**365.** While Qualizza had significant experience with State NMTC, he had no experience with MOHTC.

**366.** USB CDC purchased a majority of the MOHTC from Historic Projects in Missouri.

**367.** USB CDC purchased a large quantity of Federal HTC from Historic Projects in Missouri.

**368.** USB CDC purchased a large quantity of Federal HTC from Historic Projects across the United States.

**369.** USB CDC purchased a large volume of Federal NMTC from CDEs in Missouri.

**370.** USB CDC acquired a significant volume of Federal NMTC from CDEs across the nation.

**371.** USB CDC was the largest purchaser of State Tax Credits in Missouri.

**372.** USB CDC was the largest credit enhancer for State Tax Credit Bonds issued by CDEs in Missouri.

**373.** USB CDC was the largest credit enhancer for State Tax Credit Bonds sold by CDEs in the United States.

**374.** On every other occasion, these are details the Bank would share with its business partner, Qualizza.

**375.** But this time, no word was communicated to Qualizza regarding the MOHTC delays.

**376.** Not by U.S. Bank or Octagon.

**377.** The Owners did not model the MOHTC arriving in August 2019; the Bank did, and Octagon used that timeframe as well.

**378.** The capital structure that ultimately concentrated personal exposure on Plaintiff did not arise by accident.

**379.** Upon information and belief, co-guarantor Timothy Dixon recently completed a hotel financing transaction with U.S. Bank Defendants in Minneapolis, resulting in Dixon retaining a ten percent ownership interest.

**380.** A third party introduced Dixon to Freeman as a potential development partner.

**381.** The USB CDC agreed to join the Hotel project only if Plaintiff were included.

**382.** USB CDC knew from prior dealings with Dixon that he lacked the personal finances to meet the guaranty obligations.

**383.** During the hotel financing, the U.S. Bank Defendants said they intended to provide or bridge significant project funding.

**384.** The U.S. Bank Defendants stated that, given U.S. Bank's large nearby St. Louis operations, the Hotel would be a major institutional customer.

**385.** These facts provide context for the structure and motive behind the conduct, not as independent claims.

**386.** On December 29, 2017, USBNA made a loan of up to $12,300,000 to 1501 Washington St. Louis, LLC, a Delaware LLC, evidenced by a promissory note.

**387.** **Plaintiff, Freeman, and Dixon (collectively, the "Guarantors") executed a single Payment Guaranty Agreement dated December 29, 2017, jointly and severally, in favor of U.S. Bank National Association, guaranteeing the obligations of 1501 Washington St. Louis, LLC under a Construction Loan Agreement of even date in a principal amount of up to $12,300,000.00 (the "Payment Guaranty"), attached as Exhibit B.**

**388.** The October 15, 2025, Settlement Agreement later provided that each Guarantor was jointly and severally liable for repayment.

**389.** U.S. Bank reduced its senior loan from the previously discussed ~$22M to ~$12.3M.

**390.** U.S. Bank initially led Qualizza to believe that USB CDC intended to serve as the Hotel's exclusive lender and tax credit investor.

**391.** The hotel's initial capital structure at closing consisted of seven sources, totaling about $58,978,290.00.

**392.** Not all of these sources were funded at the Closing.

**393.** The USB CDC Historic Tax Credit equity required bridging, except for the CDC's initial capital contribution of $2,993,219, which was not bridged.

**394.** The total amount for the Deferred Developer Fee source was approximately $4,195,721.00.

**395.** The original Owner Equity source totaled approximately $10,644,035.00.

**396.** The NMTC loans provided approximately $7,890,000.00 in capital.

**397.** The NMTC loans did not require bridge financing.

**398.** The total amount of the USB CDC Federal Historic Tax Credit Equity source was approximately $9,977,398.

**399.** This required Octagon to secure a Federal HTC bridge loan of approximately $7,753,943.

**400.** The MOHTC Equity source was projected to be approximately $10,297,271.

**401.** None of the MOHTC proceeds were to be used during Construction.

**402.** This required Octagon to secure a bridge loan of approximately $10,000,000.

**403.** The Octagon Mezzanine Debt source was approximately $9,000,000.00.

**404.** The USB Senior Debt source totaled approximately $12,300,000.00.

**405.** That brought the Hotel's total sources to approximately $58,978,290.00.

**406.** The final capital structure and Hotel operations would not have passed conventional underwriting.

**407.** The closing capital structure would have required the Lenders to underwrite each guarantor's liquidity.

**408.** The closing capital structure would have required the Lenders to underwrite each guarantor's debt obligations.

**409.** The closing capital structure would have required the Lenders to underwrite each guarantor's repayment capacity.

**410.** The closing capital structure would have required the Lenders to underwrite the timing risk of the state historic-tax-credit proceeds.

**411.** The closing capital structure would have required the Lenders to underwrite that each guarantor had been thoroughly stress tested.

**412.** In January 2017, U.S. Bank's credit team decided the Project wouldn't succeed even under a stressed but plausible pro forma, so they passed on the transaction.

**413.** In deposition testimony, U.S. Bank's Kyle Hansen said the deal was dead in January 2017 as credit approvers wouldn't approve the loan, but Boyers revived it.

**414.** In U.S. Bank correspondence dated November 15, 2017, six weeks before closing, Hansen called Dixon's situation 'a mess,' citing extensive financial issues.

**415.** In U.S. Bank correspondence, Hansen cited Dixon's extensive financial issues, a tendency for litigation, and lender issues.

**416.** In U.S. Bank correspondence, Hansen questioned whether the Bank was comfortable with Dixon as a material guarantor.

**417.** U.S. Bank nevertheless closed the financing on December 29, 2017.

**418.** U.S. Bank did not disclose this to Qualizza.

**419.** The Hotel financing required the Guarantors to maintain collective liquidity of at least $6,000,000.

**420.** The Hotel financing required the Guarantors to collectively maintain a gross net worth of at least $60,000,000.

**421.** The Hotel was placed in service in June 2019.

**422.** As of June 2019, Octagon had approximately $27,000,000 in the Project.

**423.** As of June 2019, Octagon had approximately $9,000,000 in mezzanine capital under the Deal.

**424.** As of June 2019, Octagon had approximately $18,000,000 in bridge loans from HTC.

**425.** That $18,000,000 bridged the Federal and State HTC Equity proceeds because USB CDC had not yet contributed any additional HTC funds to the Hotel.

**426.** Each Guarantor was underwritten in accordance with those requirements prior to closing.

**427.** $27,000,000 is nearly five times the Guarantor's liquidity requirement.

**428.** $27,000,000 is nearly 50% of the guarantor's gross net worth requirement.

**429.** Those requirements were to remain in effect until the Hotel incurred new debt.

**430.** Dixon failed to meet either requirement at closing.

**431.** Freeman's balance sheet was highly leveraged at closing.

**432.** Freeman claimed a net worth sufficient to meet the gross net worth requirement.

**433.** Freeman did not meet his share of the liquidity requirement.

**434.** Because the net worth requirement was measured on a gross basis, it did not reflect the leverage in Freeman's balance sheet.

**435.** The Hotel was never able to refinance its debt.

**436.** The liquidity and net worth requirements remained in effect from December 29, 2017, until the sale was finalized on March 5, 2026.

**437.** Plaintiff alone had substantial unencumbered cash and no comparable outside debt.

**438.** U.S. Bank and Octagon knew or had access to that information during the financing.

**439.** Plaintiff was personally exposed to approximately $27 million in Octagon loans.

**440.** Only the Plaintiff had substantial liquid assets.

**441.** That concentration placed approximately sixty-six percent of the personal financial risk on the Plaintiff.

**442.** The participants knew or should have known of that potential outcome from underwriting.

**443.** These allegations are presented as background, motivation, and the basis for the subsequent actions.

**444.** During the underwriting of hotel financing, U.S. Bank and Octagon knew that Dixon lacked the liquidity and resources to satisfy their guarantor requirements.

**445.** Qualizza was the guarantor whose personal liquidity was intended to cover the Hotel's shortfalls.

**446.** The state historic-tax-credit proceeds, essential to the capital structure, were delayed by nearly two years past the scheduled timeline for the sale of the credits and for the Owners' receipt of the proceeds needed to repay the bridge loan.

**447.** USB CDC held an ownership stake in Last Hotel Master Tenant LLC and participated in the tax-credit arrangement, whereas USBNA provided debt secured by personal guarantees.

**448.** These connected debt and equity roles gave the U.S. Bank Defendants access to project underwriting.

**449.** These connected debt and equity roles gave the U.S. Bank Defendants access to the project guarantor's financials.

**450.** These connected debt and equity roles provided the U.S. Bank Defendants with access to project, underwriting, and tax-credit data.

**451.** These connected debt and equity roles gave the U.S. Bank Defendants access to project and underwriting information, which is crucial for understanding Plaintiff's personal risk concentration and impending harm.

**452.** The U.S. Bank Defendants failed to fund their controlled sources either on time or in full.

**453.** The U.S. Bank Loan of $12,300,000 was funded for only approximately $12,000,000.

**454.** Tax-credit pay-ins were postponed and reduced because of an adjuster's actions.

**455.** Tax-credit funding was delayed due to issues the Plaintiff claims were pretextual.

**456.** In Qualizza's past USB CDC work, USB CDC was flexible and often waived specific funding requirements.

**457.** Qualizza observed these changes in conditions and waivers on multiple occasions over 15 years.

**458.** The hotel's general contractor was Paric Corporation ("Paric"), a leading Missouri contractor that oversaw the demolition contractor, GenCorp.

**459.** The construction contingency was negotiated at eight percent rather than ten percent, partly because U.S. Bank presented Paric as a preferred, high-performing contractor.

**460.** U.S. Bank knew, through its site consultants and its financing of other Paric historic projects, such as the Opera House, about Paric's history of cost overruns on similar projects.

**461.** U.S. Bank did not disclose that history to the Ownership during underwriting or during contractor selection.

**462.** After the demolition contractor fell behind schedule, Paric issued Change Order No. 10 in December 2018.

**463.** Paric requested an increase of approximately $1,032,000 from DFQ.

**464.** The Ownership had signed nine documented change orders totaling approximately $3,000,000 to date.

**465.** Change Order No. 10 failed to satisfy the documentation requirements of Section 15.2 of the Construction Contract.

**466.** U.S. Bank treated Change Order No. 10 as a Material Adverse Change, which prevented lien-free completion, a condition required to draw the tax credit funding.

**467.** U.S. Bank demanded that the Ownership either pay Change Order No. 10 or reserve 150 percent of its value.

**468.** During an arbitration in the summer of 2019, Paric doubled its claim from approximately $1,270,000 to approximately $2,600,000 on the day of the hearing.

**469.** The Ownership withdrew from arbitration, filed suit, and prevailed on the contract's mediation requirement.

**470.** The Capital Consultants site reports were obtained via subpoena.

**471.** USB CDC refused to produce the Capital Consultants site reports voluntarily.

**472.** The Capital Consultants site reports indicated that the Project was never more than four weeks behind schedule.

**473.** The Hotel was modeled with a six-week cushion through December 2018.

**474.** The Capital Consultants' site reports claimed the delays were attributable to Paric's performance.

**475.** After a conference call in February 2019, U.S. Bank's Steve Kramer gave Qualizza a thirty-day deadline to resolve the Paric Change Order dispute.

**476.** U.S. Bank's Steve Kramer told Qualizza that the deal might be transferred to U.S. Bank's Special Assets Group.

**477.** In November 2019, U.S. Bank's Steve Kramer told Freeman and Qualizza that the Ownership was required to settle with Paric.

**478.** Kramer said that otherwise U.S. Bank would declare the loan in default.

**479.** Kramer also stated that USB CDC would not buy additional tax credits from UDF.

**480.** Asked whether that was a threat, Kramer confirmed that it was.

**481.** Under that pressure, the Ownership settled with Paric for approximately $1,300,000 on a claim the Ownership believes it would have won.

**482.** After accounting for sales-tax savings and delay costs, Paric owed the Ownership. The forced Paric settlement caused an economic swing of approximately $3 million to $4 million.

**483.** U.S. Bank's funding delays extended the owner's bridge financing, with rates up to 15%, costing about $3,000,000.

**484.** U.S. Bank delayed its consent to replace it with a 5% bridge-loan takeout facility.

**485.** Partner capital requirements increased from about $6 million to $10.6 million at closing.

**486.** Then, in late 2020, the Partner capital requirements climbed to $14,500,000.

**487.** Qualizza was now personally covering approximately two-thirds of the increase through personal funding after the Dixon buyout.

**488.** The U.S. Bank Paric-related conduct is presented for background information.

**489.** The U.S. Bank Paric-related conduct demonstrates motive.

**490.** The U.S. Bank Paric-related conduct caused the direct personal injuries alleged in this Petition.

**491.** The U.S. Bank Paric-related conduct is not asserted as a claim against the U.S. Bank Defendants, and no entity asserts any claim.

**492.** All funding gaps had to be addressed, and because personal guarantees were in place, covering them was essential.

**493.** The funding gaps were intentionally allowed to snowball.

**494.** Shortfalls were covered with costly capital, including debt Octagon incurred against the Plaintiff.

**495.** The Plaintiff also financed Hotel operations, sometimes spending more than $200,000 per month.

**496.** Exiting was not an option because the guaranteed structure required support throughout the five-year tax-credit compliance period.

**497.** In late 2019, after the Hotel exhausted its reserves, it required operating funds.

**498.** The Guarantors made continuing capital contributions pursuant to their guarantees.

**499.** Personal completion guarantees bind the Guarantors.

**500.** Operating deficit guarantees bind the Guarantors.

**501.** Loan guarantees bind the Guarantors.

**502.** Tax credit recapture guarantees bind the Guarantors.

**503.** Mr. Dixon was on the brink of financial collapse around 2018.

**504.** Mr. Dixon needed to be bought out because he had not fully contributed his original owner's equity to the project.

**505.** Mr. Dixon could no longer meet his ongoing obligations at the Hotel.

**506.** Mr. Freeman declined to participate in Dixon's buyout.

**507.** QGH reluctantly acquired Mr. Dixon's interest.

**508.** QGH invested an additional approximately $3,500,000 in the Dixon buyout.

**509.** Qualizza was now consistently responsible for providing 66% of the hotel's required funding.

**510.** QGH was not a Guarantor.

**511.** Qualizza was now the primary target of financial harm.

**512.** These events put Qualizza squarely in the crosshairs for the significant personal harm that followed.

**513.** Plaintiff assumed all associated rights, except Dixon's personal guarantor obligations, and became a co-managing member in place of Dixon.

**514.** Qualizza's one-third stake in the Sponsor Equity was valued at approximately $3,548,012.

**515.** Plaintiff did not intend to double his investment, but without that funding, the Hotel likely would have failed within six months, causing Qualizza further harm.

**516.** Qualizza was originally intended to be a 25% member, not a manager.

**517.** The original sponsor structure allocated 50% of Sponsor Equity to Dixon and 25% to Freeman.

**518.** A week before the December 29, 2017, closing, Dixon told Freeman and Qualizza he couldn't fund his 50% share.

**519.** As a result, the sponsor's shares were restructured into equal one-third interests.

**520.** A 25% stake in the Sponsor Equity would be worth about $2,661,009.

**521.** Qualizza's one-third share exceeded a twenty-five percent share by about $887,003.

**522.** Freeman lacked liquid assets and couldn't contribute his fair share during Plaintiff's buyout of Dixon's interest.

**523.** Approximately 66% of Qualizza's hotel-related financial commitments are now backed by his personal guarantees, funding, or other forms of risk exposure.

**524.** The exact amount of personal liability and distribution has yet to be decided.

**525.** Qualizza assumed Dixon's management roles following the buyout.

**526.** Qualizza became the sole manager of Last Hotel F&B LLC and a co-manager of DFQ.

**527.** Before buying out Dixon, Qualizza held no management position at the Hotel entities.

**528.** Since Mr. Dixon was no longer involved, Qualizza and Mr. Freeman, who had not yet been in conflict, decided to brand the hotel as part of the Hyatt Unbound Boutique Collection.

**529.** Mr. Dixon insisted the hotel stay independent and vital to the Brand. The core was an exceptional Bar and Restaurant, with comfortable rooms and an upstairs pool.

**530.** Mr. Freeman now strongly advocated branding the hotel with a well-known national hotel company.

**531.** Freeman was adamant about leading the negotiations with Hyatt.

**532.** Freeman had an established relationship with Hyatt.

**533.** Mr. Freeman also had a preexisting relationship with HRI, Hyatt's approved management company.

**534.** The proposal was for Hyatt to contribute $1.5M to the Hotel as key money under a 30-year branding agreement.

**535.** Then COVID hit, prompting both HRI and Hyatt to reduce their staffs in response to the crisis.

**536.** Hyatt changed its deal terms because of COVID-related financial stress, they said.

**537.** Hyatt was now splitting its $1.5M in key money into two payments: $750K at franchise signing and $750K after 6 months.

**538.** HRI operated its hotel portfolio with skeleton staffing.

**539.** Hotel employees learned from HRI staff that Hyatt and HRI were unable to meet their contractual commitments.

**540.** Additionally, HRI's high monthly run rate at the hotel caused large monthly deficits.

**541.** At the Last Hotel, HRI had about eighty employees, and occupancy averaged only 10%.

**542.** At this point, the drain on Mr. Qualizza's finances had become overwhelming.

**543.** Qualizza now has over $10,000,000 in personal equity in the Hotel.

**544.** Freeman agreed that HRI needed to be replaced.

**545.** Mr. Qualizza's only experience in hotel operations and development was financing hotels in low-income communities through Tax Credits.

**546.** Faced with no choice but to halt HRI's large operational capital calls, the Plaintiff took control of the Hotel to stop monthly losses of over $200K caused by HRI's and Hyatt's gross mismanagement.

**547.** Qualizza spent 16 months establishing a reliable income stream to generate net operating income for the Hotel.

**548.** Initially, Hyatt agreed to work with Mr. Qualizza.

**549.** Hyatt gave Qualizza access to its systems, a Hyatt email address, and the Revenue Manager at the other downtown Hyatt property.

**550.** The Franchise Agreement included a provision allowing Ownership to manage the Hotel. It also stated that such permission should not be unreasonably withheld.

**551.** During COVID, finding another competent management company was impossible because the entire industry was on the brink of collapse.

**552.** Freeman relied on Hyatt's default and enforcement positions to support removing TeamQ LLC ("TeamQ") from hotel management.

**553.** Hyatt ceased providing operational assistance and issued default notices to the Hotel.

**554.** Hyatt had not paid the second $750,000 installment on its key-money commitment.

**555.** Hyatt required new personal guaranties as a condition of fulfilling its commitment.

**556.** Hyatt breached its franchise agreement.

**557.** Hyatt filed an AAA arbitration claim seeking $1.5 million in damages.

**558.** Dowd Bennett represented the Hotel entities in the Hyatt matter despite Qualizza's objection and without the member consent Qualizza contends was required.

**559.** Qualizza did substantial work on hotel financing and sale, including intermediate stages, without compensation.

**560.** Qualizza used personal funds and credit to cover operating and professional expenses, backing the project with guarantees.

**561.** Qualizza was never reimbursed for those expenses and costs.

**562.** Plaintiff spent about three and a half years traveling between Austin and St. Louis to manage and support the Hotel, at his own expense, often away from his young family.

**563.** Mr. Qualizza formed TEAMQ, a Texas LLC, to serve as the hotel's interim management company.

**564.** Every employee joined TEAMQ except for two: the GM and the Controller.

**565.** No Management Company other than TEAMQ has made a profit at the Hotel.

**566.** Not before or after.

**567.** Despite lacking hotel management experience, Qualizza improved the hotel's operations, market position, and sales within 18 months.

**568.** Under Plaintiff's stewardship, the Hotel's value rose from about $21 million to roughly $52 million, according to a broker’s opinion.

**569.** The broker successfully increased buyer interest to about $34 million, with several bidders submitting serious LOIs.

**C. Freeman's Coordinated Conduct and Personal Objective**

**570.** Freeman had contractual and fiduciary duties due to his role as co-manager.

**571.** Freeman's duties extended to Plaintiff.

**572.** Freeman's duties extended to the parties' trust.

**573.** Freeman's duties extended to the provisions of the DFQ Management LLC Operating Agreement (**Exhibit A**).

**574.** Section 8 of the Operating Agreement required approval from all managers whenever there was more than one manager.

**575.** Freeman conspired with the Receiver to control operations and the flow of information.

**576.** Freeman used litigation.

**577.** Freeman used the receivership.

**578.** The Receivership stripped the Plaintiff of substantial control.

**579.** Freeman intended to cause Qualizza significant financial harm.

**580.** The Receiver intended to cause Qualizza substantial personal financial harm.

**581.** Freeman knew that Plaintiff had withheld consent to management actions taken without Qualizza's approval.

**582.** Freeman intentionally destroyed the Hotel's value.

**583.** Freeman intentionally obstructed the Hotel's sale to harm Qualizza.

**584.** Freeman, with the assistance of others, intentionally created situations in which defaults would impact Plaintiff's personal assets.

**585.** Despite that knowledge, Freeman continued self-dealing or conduct that increased Plaintiff's exposure while protecting his position.

**586.** Freeman is currently engaging in the same conduct during the post-sale garnishment process.

**587.** DFQ had a signed agreement for O'Reilly's $34 million purchase and was nearing the closing.

**588.** O'Reilly requested additional time to complete the due diligence.

**589.** Freeman rejected the request for additional time, thereby canceling the $34 million transaction.

**590.** Freeman signed the $34,000,000 purchase-and-sale agreement only after Qualizza sought a preliminary injunction compelling him to proceed.

**591.** Freeman would have received an economic benefit if the sale had closed.

**592.** The refusal increased Qualizza's personal financial risk.

**593.** Viable sale values thereafter declined from about $34,000,000 to $29,000,000.

**594.** The reduction from $34,000,000 to $29,000,000 was about $5,000,000.

**595.** Interest rates rose during the period of Freeman's obstruction of the $34,000,000 transaction.

**596.** The rise in interest rates during that period contributed to the lower offer.

**597.** At $29M, Mr. Qualizza, the Broker, and the Hotel buyer decided they had had enough of Mr. Freeman's erratic behavior and self-dealing.

**598.** Mr. Qualizza sought to appoint a Receiver to facilitate the $29M sale to Mr. O'Reilly.

**599.** Freeman used entities he controlled as vehicles for conduct directed at Plaintiff.

**600.** Freeman caused DFQ Management LLC to close on March 5, 2026, without the Plaintiff's consent as a co-manager, thereby violating the Plaintiff's rights.

**601.** USB CDC later cited DFQ's role as Managing Member of Last Hotel Master Tenant LLC in a default notice against Plaintiff.

**602.** On July 6, 2026, USB CDC removed DFQ as Managing Member, citing issues, including concerns about closing that Qualizza had warned DFQ's counsel about.

**603.** Plaintiff seeks no recovery of DFQ's property; Freeman's misuse of DFQ directly affected Plaintiff's individual governance rights and personal guaranty exposure.

**604.** While serving as a member and co-manager, Freeman coordinated with individuals whose interests were adverse to Qualizza's interests.

**605.** Freeman concealed material information and engaged in or facilitated self-dealing.

**606.** Freeman supported conduct by receivership that destroyed Qualizza's Hotel value.

**607.** Freeman exploited the resulting distress to transfer losses and liabilities to Qualizza.

**608.** As a result, Qualizza stopped contributing additional capital to the Hotel.

**609.** Mr. Freeman was minimally involved in co-developing and managing the Hotel.

**610.** Freeman did not participate in the financing and obstructed all sale decisions.

**611.** Mr. Freeman has been the Tax Matters Partner since the Entities were formed.

**612.** Freeman has never done tax work or bookkeeping for the Hotel.

**D. Receiver and Operator Destruction of Value**

**613.** Qualizza initiated Circuit Court of Cook County Case No. 2022 CH 11088 to resolve a management deadlock and finalize the sale of the Hotel.

**614.** Qualizza supported appointing a neutral receiver solely to complete the pending sale.

**615.** In December 2023, Qualizza secured a $29,000,000 offer from the O'Reilly Group through hotel broker Herb Warmbrodt.

**616.** Qualizza was always ready, willing, and able to execute a purchase-and-sale agreement for $29,000,000.

**617.** On December 20, 2023, the Seller Parties executed a Reinstatement Purchase and Sale Agreement for the Hotel, with a purchase price of $29,000,000.

**618.** Freeman claimed that the O'Reilly Group was not a legitimate purchaser of the Hotel.

**619.** Freeman sought to impose conditions on the transaction that favored his position.

**620.** Freeman executed that agreement both individually and as Manager of ARQ-1501 St. Louis, LLC.

**621.** Qualizza executed that agreement individually and as Manager of RMZ-1501 St. Louis, LLC, and of the other selling entities.

**622.** Section 7.7 of that agreement was titled "Freeman Termination Right."

**623.** Section 7.7 required Qualizza to provide all financial, operational, and other information requested by Freeman within ten days of the agreement's execution by all parties.

**624.** Section 7.7 gave Freeman forty-five days from the date of execution to determine whether the gross proceeds from the sale would be sufficient to satisfy all debts, loans, taxes, commissions, and obligations of Freeman and its related entities.

**625.** Section 7.7 defined the determination as whether the proceeds are sufficient "such that Freeman shall not be required to contribute any funds to satisfy the Last Hotel Obligations."

**626.** Section 7.7 provided that Freeman, at his sole discretion, could terminate the agreement if, in his sole opinion, he determined that the proceeds would not be sufficient.

**627.** Section 7.7 provided that, in the event of a conflict between Section 7.7 and any other term of the agreement, including its exhibits, amendments, or addenda, Section 7.7 would prevail.

**628.** The sole criterion for Freeman's termination right under Section 7.7 was whether Freeman personally would be required to contribute funds.

**629. An exhibit within that agreement, labeled "Exhibit G" in the agreement itself, was titled "Freeman Addendum."**

**630.** Under Section 4.1 of the December 20, 2023, agreement, the Purchaser's forty-five-day due diligence period commenced on the Effective Date.

**631.** A later-executed version of the same agreement, dated December 29, 2023, defined the forty-five-day period in Section 7.7 as the "Freeman Review Period."

**632.** Under Section 4.1 of the December 29, 2023, version, the Purchaser's forty-five-day due diligence period did not commence until the Freeman Review Period expired.

**633.** The December 29, 2023, revision therefore placed Freeman's review period ahead of the Purchaser's due diligence period.

**634.** Qualizza did not consent to placing Freeman's existing compensated hotel manager in control of the Hotel.

**635.** Before the appointment, Freeman filed a Motion in Cook County court to remove Qualizza and to permit Freeman to operate the Hotel.

**636.** Freeman proposed that Robert Habeeb and his management company, Maverick Hotel Management, be appointed as the receiver to operate the Hotel.

**637.** On May 1, 2024, the Cook County court appointed Habeeb and Maverick as Receivers, pursuant to an order prepared by Freeman's counsel.

**638.** The May 1, 2024, order denied Freeman's motion to remove Qualizza as DFQ's co-manager.

**639.** The May 1, 2024, order told Freeman's counsel, by name, not to contact Qualizza.

**640.** In seeking the appointment, the Receiver claimed independence from Freeman and Qualizza.

**641.** At the time of the appointment, the Receiver had managed Riverview Inn & Suites in Rockford, Illinois, since at least October 2023.

**642.** Freeman is an owner of Riverview Inn & Suites.

**643.** Since 2017, the former owner of the Riverview Inn has been suing Freeman for fraud.

**644.** Habeeb received regular compensation from Freeman for managing the Riverview Inn & Suites.

**645.** Freeman's supporting affidavit stated that Freeman had conducted extensive research to locate Maverick.

**646.** Freeman's affidavit said he knew Habeeb only through mutual business associates.

**647.** The list of Maverick-managed properties submitted in support of the appointment omitted the Riverview Inn & Suites.

**648.** Freeman did not disclose his paid management relationship with the Receiver.

**649.** The Receiver failed to disclose its relationship with Freeman.

**650.** That relationship was key to determining whether the Receiver could be considered neutral.

**651.** Qualizza had proposed an independent, experienced local alternative to serve as the Receiver.

**652.** Qualizza was unaware of the relationship when the appointment was considered.

**653.** Qualizza does not ask this Court to vacate or reverse the Cook County appointment order.

**654.** The pre-appointment conduct is pleaded as an independent fraud and as the entry point to subsequent conduct involving the Missouri Hotel.

**655.** When the Receiver was appointed, the Hotel had approximately $440,000 in operating cash.

**656.** When the Receiver was appointed, the Hotel had no material accounts payable.

**657.** The Hotel was entering the summer revenue operating season.

**658.** A majority of the Hotel's profits came from the summer months.

**659.** The O'Reilly transaction was expected to close within sixty to ninety days.

**660.** On May 20, 2024, nineteen days after the initial appointment, Maverick submitted a $1,000,000 Funding Request for the Hotel.

**661.** The Receiver requested new funding primarily to reboot the F&B business and to provide additional working capital.

**662.** On or around May 20, 2024, John Poss, Maverick's Vice President of Finance, sent the Funding Request to Qualizza and to several lawyers involved in the receivership.

**663.** Habeeb was copied on the transmission.

**664.** Qualizza was included in the transmission to Q@tlhstl.com.

**665.** The Funding Request was sent to the legal team.

**666.** The Funding Request named Qualizza as the contact for funding-related inquiries and instructed that the funds be transferred to the designated account.

**667.** Qualizza would have had to contribute 66% from personal funds.

**668.** The Funding Request was a deliberate act of personal financial harm directed at Qualizza.

**669.** The Funding Request stemmed from a conspiracy among the parties.

**670.** The requested $400,000 in funding was allocated to staffing and training.

**671.** The funding request allocated $200,000 for renovations, food-and-beverage improvements, and infrastructure upgrades.

**672.** The funding request allocated $100,000 to marketing.

**673.** The funding request allocated $300,000 to operating expenses.

**674.** The funding plan projected 75 percent occupancy within one year.

**675.** The funding plan projected a positive cash flow within eighteen months.

**676.** The funding plan did not secure the funds required to close the pending $29 million sale.

**677.** The eighteen-month operating plan directly conflicted with the expected sixty- to ninety-day hotel sales cycle.

**678.** On June 4, 2024, the Cook County court entered the Comprehensive Receivership Order (the "CRO").

**679.** Effective June 3, 2024, the CRO granted the Receiver full operating control.

**680.** The CRO directed the Receiver to consummate an arm's-length sale as soon as practicable.

**681.** The CRO marked the $29 million offer as pending.

**682.** The CRO directed the Receiver and the parties to execute a purchase-and-sale agreement acceptable to each party.

**683.** The CRO required the Receiver to manage and maintain the Hotel, prevent waste, and maximize revenue until the sale was completed.

**684.** The CRO required the Receiver to maintain and renew the Hotel's operating licenses without interruption.

**685.** The CRO required the Receiver to fulfill tax-reporting obligations arising from the receivership.

**686.** The CRO needed court approval before the Receiver could retain or pay counsel.

**687.** The CRO required periodic reports on sales efforts, receipts, disbursements, and the Receiver's compensation.

**688.** The Receiver failed to execute the pending $29 million PSA as ordered by the Court.

**689.** On June 17, 2024, the Receiver reported that an executed purchase-and-sale agreement was expected.

**690.** However, the Receiver had not contacted the buyer or its counsel, as required to support that representation.

**691.** Qualizza retained Terry Banich of Katten Muchin Rosenman LLP, at Qualizza's own expense, as DFQ Receiver Counsel to facilitate Qualizza's participation in the sale process.

**692.** In July 2024, Banich facilitated communication between the Receiver and the buyer.

**693.** The Receiver reduced the buyer's agreed-upon forty-five-day diligence period to thirty days.

**694.** Freeman had imposed the same diligence restriction on the earlier O'Reilly transaction.

**695.** The conditions the Receiver imposed were Freeman's unilateral due-diligence conditions.

**696.** Those were the same conditions that had frustrated the $34,000,000 transaction months before.

**697.** Before the appointment, Freeman told the Cook County court that he would not attempt to impose his unilateral conditions on the existing purchase-and-sale agreement.

**698.** Freeman imposed those conditions through the Receiver despite that representation.

**699.** The Receiver opened its engagement with the O'Reilly Group by insisting on those terms.

**700.** The Receiver imposed additional conditions that favored Freeman's requested carve-outs.

**701.** The O'Reilly Group disengaged after the Receiver imposed restrictions and conditions.

**702.** Qualizza retained additional counsel at personal expense to reengage the O'Reilly Group in the transaction.

**703.** The O'Reilly Group re-engaged after the Hotel's condition and sale value deteriorated.

**704.** On February 10, 2025, the Master Tenant, 1501 Washington St Louis LLC, Freeman, and Qualizza executed a purchase-and-sale agreement with the O'Reilly Group for the Hotel, with a purchase price of $18,500,000.

**705.** Freeman executed that purchase-and-sale agreement.

**706.** That price was approximately $10,500,000 below the $29,000,000 transaction that had been pending when the Receiver assumed control.

**707.** Section 4.2 of that purchase-and-sale agreement gave the O'Reilly Group sixty days to conduct due diligence.

**708.** The Hotel closed its doors on March 6, 2025.

**709.** The Hotel closed twenty-four days into the sixty-day due diligence period.

**710.** After the Hotel closed, the O'Reilly Group reduced its offer from $18,500,000 to $5,000,000.

**711.** That $13,500,000 reduction followed the Hotel's closure.

**712.** On or about April 9, 2025, Qualizza and Freeman rejected the reduced offer of $5,000,000.

**713.** The Receiver excluded Qualizza from material sales and from communications operations.

**714.** On June 25, 2024, the Cook County court entered an order addressing the status of the receivership.

**715.** The June 25, 2024, order directed the Receiver to use his best efforts to secure a $250,000 bond and to report on the bond at the next status.

**716.** The June 25, 2024, order directed the Receiver to update the parties' counsel as soon as possible on any progress in the sale of the Hotel.

**717.** The June 25, 2024, order directed the Receiver to report, in his monthly written report, on the status of his efforts to sell the Hotel.

**718.** The June 25, 2024, order directed the Receiver to communicate with Qualizza through Qualizza's counsel.

**719.** The June 25, 2024, order directed Qualizza not to contact the Receiver directly.

**720.** The June 25, 2024, order required that all communications between Qualizza and the Receiver be conducted through Qualizza's counsel.

**721.** The Receiver repeatedly aligned their sales positions with Freeman's.

**722.** Each month of delay resulted in operating losses that reduced the proceeds available to satisfy the obligations Qualizza had personally guaranteed.

**723.** During approximately ten months of Receiver control, the Hotel reported negative operating results each month.

**724.** Those losses included the Hotel's principal summer operating season.

**725.** The Hotel's food-and-beverage operations remained largely closed throughout the receivership period.

**726.** The Hotel received numerous one-star guest reviews throughout the receivership.

**727.** A key-card malfunction persisted for about forty-five days during the receivership.

**728.** Approximately $60,000 in liquor inventory was stolen during the receivership.

**729.** Almost all hotel linens were lost during the receivership.

**730.** Hotel security equipment was removed or disabled during the receivership period.

**731.** The Hotel's insurance lapsed for about three months without notifying Qualizza, causing a loss.

**732.** Hotel payroll during the receivership was twice that under prior management.

**733.** The Receiver exhausted the approximately $440,000 in operating cash DFQ provided.

**734.** The Receiver's October 2024 report identified $387,786.53 in overdue vendor invoices, which concealed numerous other unpaid obligations.

**735.** The same report stated that all Receiver fees due under the court order had been paid and that the Receiver had received the payment.

**736.** The Receiver retained three attorneys from Faegre Drinker Biddle & Reath LLP at rates up to $1,275 per hour.

**737.** The Receiver did not first obtain the CRO's approval of their compensation and retention.

**738.** The Receiver failed to remit all customer-collected sales and lodging taxes while managing the Hotel's accounts.

**739.** While managing the Hotel's accounts, the Receiver failed to file all required sales and lodging tax returns.

**740.** Qualizza repeatedly provided the Receiver with written notice of unpaid taxes.

**741.** When the 2023 income tax filings were incomplete, Qualizza personally oversaw their preparation.

**742.** A June 4, 2026, Missouri Department of Revenue statement later identified May, June, July, August, October, and November 2024 as months with non-filer status.

**743.** Those non-filer periods occurred while the Receiver controlled the Hotel.

**744.** The Missouri Department of Revenue statement showed an aggregate balance of $863,975.83 for the listed Hotel tax periods.

**745.** The aggregate balance included $151,921.91 in penalties.

**746.** The aggregate balance included $86,603.94 in interest.

**747.** The unpaid sales taxes prevented the Hotel from obtaining a Missouri statement of no tax due.

**748.** Last Hotel F&B LLC held Missouri retail liquor-by-drink, extended-hours, and Sunday-by-drink licenses for the Hotel's premises at 1501 Washington Avenue.

**749.** The Missouri liquor license renewal application for the period from July 1, 2024, to June 30, 2025, required submission of a Certificate of No Tax Due from the Director of Revenue.

**750.** The renewal fee for that period was due by May 1, 2024.

**751.** The Missouri Division of Alcohol and Tobacco Control issued the license, effective July 1, 2024, and expiring on June 30, 2025.

**752.** That license could not have been issued without the required Certificate of No Tax Due.

**753.** The Hotel's liquor license was current before the Receiver's appointment.

**754.** The absence of a no-tax-due statement prevented the renewal of the Hotel's liquor license.

**755.** The CRO expressly required the Receiver to maintain and renew that license without interruption.

**756.** The Receiver intentionally failed to renew the Hotel's liquor license.

**757.** The license failure adversely affected the food-and-beverage operation and reduced the Hotel's going-concern value.

**758.** The Receiver later sought to hold Qualizza personally liable for the tax and licensing violations.

**759.** In November 2024, the court waived the Receiver's remaining obligation to proceed with the sale.

**760.** The Receiver continued to oversee Hotel operations through February 28, 2025.

**761.** The Receiver failed to coordinate an orderly transition of the Hotel's accounts, records, licenses, employees, or physical control.

**762.** After withdrawing, the Receiver sought $222,074.50 in fees and $8,849.35 in costs.

**763.** The Receiver sought to impose many charges on Qualizza personally.

**764.** On March 6, 2025, Herb Warmbrodt of HREC Investment Advisors, the Hotel's broker, arranged an overnight tour for the buyer from O'Reilly.

**765.** The O'Reilly buyer had deposited $250,000 in earnest money for the $18,500,000 transaction.

**766.** The Receiver abruptly closed the Hotel on March 6, 2025.

**767.** The Plaintiff received no prior notice of the closure.

**768.** Hotel employees received no advance notice of the closure.

**769.** Booked guests received no prior notice of the closure.

**770.** At 1:05 p.m. on March 6, Habeeb stated that staffing changes would accompany the management transition.

**771.** At 4:07 p.m. on March 6, Habeeb reported Maverick was no longer on site.

**772.** No functioning replacement management team had been appointed to lead before the closure.

**773.** On the day the Cook County court granted the Receiver leave to exit, Mike Evanoff, the Hotel's former manager, went to the Hotel and requested that control of the Hotel be returned to him.

**774.** The Receiver refused to return control of the Hotel to Evanoff.

**775.** The Receiver made no transition of Hotel operations before departing.

**776.** Neither Evanoff nor Qualizza was authorized to secure the Hotel or to continue its operations.

**777.** Last Hotel F&B LLC operated the Hotel's food, beverage, and hospitality services under a sublease from the Master Tenant.

**778.** The Plaintiff was the sole manager of Last Hotel F&B LLC.

**779.** Freeman held no governance role at Last Hotel F&B LLC.

**780.** Freeman and Maverick caused or facilitated the Hotel's closure without Qualizza's authorization.

**781.** The closure ended Last Hotel F&B LLC's operations.

**782.** The closure led to the discharge of its employees.

**783.** The closure canceled guests' reservations.

**784.** The closure ended material vendor and licensing relationships.

**785.** Qualizza's claim regarding the closure is limited to interference with his individual management authority and his personal business expectancy.

**786.** The Plaintiff does not claim that Last Hotel F&B LLC's contracts, operating revenue, or goodwill are his personal property.

**787.** The O'Reilly Group withdrew from the transaction following the closure.

**788.** The hotel's broker stopped participating after the closure.

**789.** The closure left Qualizza to remarket a nonoperating hotel that produced no revenue.

**790.** The hotel remained closed and vacant.

**791.** The vacant hotel was repeatedly vandalized.

**792.** More than thirty televisions were stolen from the Hotel after closing.

**793.** Neighbors sent Qualizza photographs and videos documenting the vandalism.

**794.** By the end of the receivership period, after its failed transition, the Hotel owed about $1 million in accounts payable.

**795.** The Hotel also incurred nearly $1 million in taxes.

**796.** No sale was consummated during the receivership period.

**797.** The Hotel entered receivership amid a pending $29 million transaction.

**798.** The hotel was sold on March 5, 2026, for $14 million.

**799.** The decline from $29 million to $14 million was approximately $15 million.

**800.** The decline from the earlier $34 million transaction to the $14 million sale was approximately $20 million.

**801.** The decline from the $18,500,000 February 2025 transaction to the $14 million sale was approximately $4,500,000.

**802.** Viable sale values declined at every stage of the Receiver's control and afterward.

**803.** Freeman, Habeeb, and Maverick knew Qualizza had secured major obligations for the hotel.

**804.** Freeman, Habeeb, and Maverick knew that reducing the sale proceeds increased the deficiencies against Qualizza personally.

**805.** The Receiver's fee demand sought payment from Qualizza personally.

**806.** The Plaintiff paid personal counsel to protect the sale and his guaranty exposure.

**807.** The Receiver's nonpayment to vendors impaired trade accounts and business relationships with Qualizza.

**808.** The Receiver's conduct increased Qualizza's settlement exposure, judgments, garnishments, enforcement costs, and depletion of his separate estate.

**809.** The repeated alignment among Freeman, Habeeb, and Maverick was not a series of unrelated operational errors.

**810.** Freeman, Habeeb, and Maverick sought to use the receivership to maintain Freeman's control, prevent an unfavorable sale, and shift losses onto Qualizza.

**811.** Freeman, Habeeb, and Maverick acted with knowledge that their conduct would cause Qualizza direct personal harm through his guaranties, governance rights, credit, professional reputation, and separate assets.

**812.** The Plaintiff seeks no recovery for property or operating losses of any Hotel entity, except to the extent those losses cause him personal financial harm.

**813.** The Plaintiff is pursuing claims for personal guaranty liability, settlement losses, personal payments, judgment exposure, garnishment, lost business opportunities, and other direct damages.

**E. Hyatt Settlement and Personal $800,000 Loss**

**814.** Qualizza was personally liable under guarantees or other individual obligations related to Hyatt.

**815.** Dowd Bennett and Bennett represented DFQ, Freeman, and Dixon on matters affecting their exposure.

**816.** Robert Barnes represented Qualizza individually in the Hyatt matter.

**817.** The parties reached an agreement in AAA Case No. 01-21-0004-1914 on March 3, 2023.

**818.** Dowd Bennett and Bennett simultaneously represented Freeman, Dixon, and DFQ in the Hyatt matter.

**819.** Dowd Bennett and Bennett recommended or caused the Hyatt settlement without allowing Qualizza to present his claims.

**820.** Dowd Bennett and Bennett conducted no discovery and took no depositions before settling the claims for about $1.5 million.

**821.** Dowd Bennett was fully aware that its intentional conduct would cause Qualizza substantial financial harm.

**822.** Dowd Bennett took its direction from Freeman.

**823.** The settlement foreclosed Qualizza's opportunity to pursue a larger recovery through litigation.

**824.** After Daniel Voelker challenged the Hyatt settlement terms in Cook County, Dowd Bennett and Bennett withdrew from the case.

**825.** Hyatt Franchising, L.L.C. v. Last Hotel Master Tenant LLC, Cook County Case No. 2023 L 006177, settled on September 3, 2025.

**826.** Qualizza paid $20,000 to Hyatt to reduce his remaining enforcement risk, rather than the full remaining second payment.

**827.** The Hyatt franchise agreement contained a provision permitting owner-operator operation of the Hotel.

**828.** Hyatt disabled its hotel systems without prior notice.

**829.** The hotel purchased Square payment devices to continue processing transactions while awaiting delivery of the new systems.

**830.** The Hyatt settlement caused Qualizza over $800,000 in personal loss or liability.

**831.** Qualizza also incurred more than $200,000 in personal legal fees related to the Hyatt matters.

**832.** DFQ did not pay for those personal losses or fees.

**833.** But for conflicts of interest, nondisclosure, and poor settlement advice, Plaintiff would not have accepted the Hyatt resolution and would have achieved a better outcome.

**834.** Qualizza's only motivation for leaving Hyatt was the pending $34M sale.

**835.** Qualizza did not want to set aside a large contingency reserve for the Hyatt litigation.

**F. U.S. Bank Transaction, Conflicted Representation, and Personal Judgment**

**836.** The U.S. Bank Defendants participated in the 2017 historic tax credit and New Markets Tax Credit transactions.

**837.** The transaction projections assumed a Missouri state historic tax credit delivery date only four months after the target placement-in-service date.

**838.** Internal U.S. Bank experience contradicted the projected delivery schedule.

**839.** The conflicting internal experience was excluded from the projections submitted to Qualizza.

**840.** Qualizza relied on the projected timeline when entering into personal guarantees and funding obligations.

**841.** During the pandemic, the U.S. Bank Defendants moved the matter to Special Assets after realizing the performance metrics were nearly impossible to meet.

**842.** The resulting enforcement posture heightened Qualizza's personal exposure.

**843.** These facts are pleaded as context, motive, and causation, not as a pre-Settlement claim released under the Settlement Agreement.

**844.** In 2021, Dowd Bennett and Bennett were retained by Qualizza to defend against U.S. Bank's claims.

**845.** Dowd Bennett and Bennett initially represented all Guarantors regarding their personal guarantees and claims against the Bank Defendants.

**846.** Dowd Bennett was co-founded by James Bennett, the former United States Attorney for the Eastern District of Missouri.

**847.** The engagement included representation of Plaintiff, individually, alongside Freeman, Dixon, DFQ Management LLC, and related entities.

**848.** During a recorded phone call, Bennett informed Qualizza that evidence in the U.S. Bank lawsuit indicated that the U.S. Bank parties were pursuing their own interests.

**849.** Bennett claimed that the U.S. Bank parties either intentionally or recklessly misrepresented the time needed to secure the tax credits.

**850.** Bennett said the funding was postponed because it included unsuitable items.

**851.** Bennett described the affirmative case as strong and noted that additional depositions remained pending.

**852.** Bennett's affirmative claims were not recoverable.

**853.** The litigation concluded with the Settlement Agreement and Consent Judgment, under which Qualizza paid rather than recovered any funds.

**854.** Beginning in 2022, Qualizza terminated Dowd Bennett and Bennett as his individual counsel and withdrew his consent to Dowd Bennett's serving as DFQ's co-manager.

**855.** Qualizza repeated the termination and, on multiple occasions, demanded the firm's withdrawal.

**856.** On August 3, 2022, Bennett filed a notice withdrawing from representation of Qualizza in the U.S. Bank litigation.

**857.** On the same day, Bennett continued filing papers for 1501 Washington St. Louis, LLC; DFQ; Freeman; and Dixon.

**858.** On September 29, 2022, the court granted Bennett's withdrawal from Qualizza and admitted Robert Barnes pro hac vice as Qualizza's separate counsel.

**859.** Two days after filing the notice of withdrawal, Bennett messaged Freeman's personal attorney, John Perkaus, regarding Qualizza and proposed a call.

**860.** The engagement structure required Qualizza's continued consent to Dowd Bennett's representation of the entities.

**861.** Freeman had previously relied on the same consent structure to prevent Qualizza from retaining counsel on entity matters.

**862.** Dowd Bennett continued to represent the entities and Freeman in the U.S. Bank litigation through the Settlement Agreement and Consent Judgment dated October 15, 2025.

**863.** Qualizza stopped paying Dowd Bennett's invoices after 2022 and didn't receive any additional invoices from them.

**864.** Upon information and belief, no other client has paid Dowd Bennett for its ongoing representation.

**865.** After September 29, 2022, Qualizza was a former Dowd Bennett client in the same or substantially related matters.

**866.** On May 15, 2025, Qualizza again terminated Dowd Bennett in all matters involving Dowd Bennett and DFQ.

**867.** The May 15, 2025, letter demanded that Dowd Bennett withdraw its representation of Freeman and Dixon due to the conflict.

**868.** The letter also requested disclosure of Dowd Bennett's malpractice carrier and stated that Dowd Bennett had disregarded prior termination letters.

**869.** After terminating its representation of Qualizza, Dowd Bennett continued to follow Freeman's direction on the Hyatt and U.S. Bank matters.

**870.** Dowd Bennett negotiated and executed a settlement agreement that bound the entities and imposed guaranty obligations on Qualizza personally.

**871.** Qualizza's separate personal counsel was excluded from the entity-level settlement decision-making process.

**872.** The settlement decisions were made without Qualizza's authorization and despite his objections.

**873.** Dowd Bennett and Bennett represented to the federal court that the parties had agreed to settlement terms that Qualizza had not authorized.

**874.** On May 4, 2025, Qualizza stated his settlement position in a letter to counsel, including Bennett.

**875.** The terms later stated as agreed did not align with Qualizza's written position.

**876.** Counsel told Qualizza that he might be compelled to settle without Qualizza's approval.

**877.** Qualizza's later acquiescence occurred after that advice and didn't constitute informed consent to the settlement's key effects.

**878.** On October 15, 2025, the U.S. Bank Defendants, Qualizza, Freeman, Dixon, DFQ, and 1501 Washington St. Louis, LLC, executed the Settlement Agreement, which is attached as **Exhibit C.**

**879.** The Settlement Agreement reduced the debt to $14,250,000 and established a Consent Judgment against the three guarantors, who were jointly and severally liable.

**880.** Qualizza asserts that the Settlement Agreement's release does not extend to any pre-Settlement claims against the U.S. Bank Defendants.

**881.** Section 8(b) excepts the U.S. Bank Parties' express obligations under the Settlement Agreement.

**882.** Dowd Bennett did not plead all of Qualizza's pre-settlement rights in the federal action before the U.S. District Court for the Eastern District of Missouri ("EDMO").

**883.** Section 7 of the Settlement Agreement states that USB CDC waived its right to 'priority return' or 'put price' under the Master Tenant Operating Agreement and agreed to execute consents for the Hotel sale in accordance with the Settlement Agreement.

**884.** Sections 29 and 30 address amendments and modifications, and Section 30 requires a written agreement signed by all Parties for any modification to be effective.

**885.** On October 15, 2025, the U.S. District Court for the EDMO entered a $14,250,000 Consent Judgment against Plaintiff, Freeman, and Dixon in U.S. Bank National Association v. Qualizza, No. 4:21-cv-00120-MTS.

**886.** Enforcement later included garnishment proceedings against Plaintiff's personal bank and brokerage accounts.

**887.** The judgment, garnishments, settlement payments, enforcement costs, and asset impairments constitute direct injuries to Plaintiff. DFQ Management LLC neither incurred the judgment nor paid the funds withdrawn from Plaintiff's accounts.

**G. Octagon Financing and Personal Enforcement**

**888.** Octagon provided mezzanine and historic tax credit bridge financing, secured by personal guaranties and a collateral assignment.

**889.** Octagon acted in the Hotel financing through its principal contact, John 'JP' Williamson.

**890.** On June 26, 2017, Octagon Finance, LLC issued a term sheet for a combined $24,000,000 in bridge and mezzanine financing for the Project.

**891.** Qualizza executed the Octagon term sheet in his capacity as Manager of 1501 Washington St Louis LLC.

**892.** John P. Williamson signed it in his capacity as Managing Member of Octagon Finance, LLC.

**893.** The executed term sheet provided for a $16,000,000 historic tax credit bridge loan and a mezzanine loan of up to $8,000,000.

**894.** Under the term sheet, the bridge was secured by federal and state historic tax credit equity, with a first lien on the credits and on the proceeds.

**895.** Paragraph 18 of the executed term sheet stated: "Guarantors: TBD. The personal guarantee will be capped at the amount of the Mezzanine Loan."

**896.** The Mezzanine Loan amount under the executed term sheet was up to $8,000,000.

**897.** The executed term sheet provided that the Loan and the loan documents "shall be governed by the laws of Virginia and be enforceable in the courts of Missouri."

**898.** Octagon's second confessed judgment of $16,825,273 exceeded the capped personal exposure outlined in the executed term sheet.

**899.** The capped exposure for personal guarantors was material to Qualizza's execution and maintenance of his personal guaranties.

**900.** The Hotel financing closed on December 29, 2017.

**901.** On December 29, 2017, DFQ Management LLC executed a Mezzanine Loan Promissory Note in favor of Octagon Credit Partners LP, with a maximum loan amount of $9,000,000.

**902.** On December 29, 2017, Qualizza executed a Mezzanine Loan Guaranty Agreement in favor of Octagon Credit Partners LP.

**903.** The executed Mezzanine Loan Guaranty unconditionally guaranteed all of the Borrower's obligations to the Lender.

**904.** The executed Mezzanine Loan Guaranty contained no cap on Qualizza's personal exposure for the Mezzanine Loan.

**905.** The cap outlined in paragraph 18 of the executed term sheet was not carried forward into the executed Mezzanine Loan Guaranty.

**906.** The first page of the Mezzanine Loan Guaranty stated that it contained a confession-of-judgment clause, allowing the creditor to obtain a judgment without further notice.

**907.** Section 14 of the executed Mezzanine Loan Guaranty provided that the internal laws of the State of Missouri governed the Guaranty.

**908.** If at least $17,000,000 was not prepaid under the Mezzanine and HTC Loans within fifteen months, the interest rate on those loans increased from 8% to 13%.

**909.** Octagon had prior experience with delays in delivering Missouri state historic tax credits.

**910.** Octagon did not disclose that experience before Qualizza undertook or maintained the personal obligations that supported its financing.

**911.** Octagon's combined exposure to mezzanine and tax-credit bridge totaled approximately $27 million.

**912.** Qualizza served as a personal guarantor, with approximately $6 million in liquidity and a net worth of about $20 million.

**913.** Octagon underwrote each personal guarantor.

**914.** Neither the Project's cash flows nor any guarantor could support Octagon's $27,000,000 exposure if tax-credit equity and takeout didn't materialize as modeled.

**915.** Octagon knew that from its underwriting of the Project and of each guarantor.

**916.** Octagon extended the financing, relying on Qualizza as guarantor, on his liquidity, and on the assurance that his guarantees would cover any shortfalls.

**917.** That risk materialized: U.S. Bank's tax-credit equity was delayed and reduced, construction costs exceeded projections, and Hyatt's commitments failed, leaving the Project unable to service Octagon's debt without Qualizza's personal funding.

**918.** Octagon arranged financing with USB CDC, the tax-credit buyer, on a loan-to-own basis, with the right to seize the Hotel if the tax-credit takeout failed.

**919.** When the receivership's actions and the March 5, 2026, fire sale left the asset unable to satisfy Octagon's debt, Octagon pursued personal enforcement against Qualizza through a multi-jurisdictional confession-of-judgment campaign.

**920.** The origination allegations regarding USB CDC support Qualizza's claims against Octagon by providing context, motive, knowledge, and causation.

**921.** Octagon's investment committee relied on Qualizza's personal financial capacity when approving the credit application.

**922.** A third party introduced Octagon to Qualizza after USB CDC's anticipated tax-credit takeout was denied.

**923.** The expected bridge loan takeout was not delivered as scheduled because U.S. Bank failed to provide the required capital under the deal's financial structure.

**924.** Interest and Octagon's asserted exposure both increased during the delay period.

**925.** Octagon pursued Qualizza in multiple jurisdictions under a confession-of-judgment provision that Qualizza contends is unenforceable under Missouri law.

**926.** Octagon knew before March 5, 2026, that the Hotel was for sale.

**927.** Octagon was informed of a significant sales attempt and of Freeman's interference.

**928.** On February 24, 2026, Qualizza notified the closing participants in writing that Octagon's unreleased collateral assignment constituted a critical closing defect.

**929.** The Hotel sale closed without Octagon's approval to release its collateral assignment.

**930.** The alleged concealment harms Plaintiff through personal judgments, enforcement costs, legal expenses, and increased guaranty deficiencies.

**931.** The Octagon loan documents included a warrant of attorney authorizing an attorney-in-fact to confess judgment against Qualizza without notice or a hearing.

**932.** Qualizza signed those documents in Texas, and the documents state that Missouri law governs.

**933.** Jurisdiction applies to Qualizza as a Texas resident.

**934.** Octagon stated that the default date is November 30, 2023.

**935.** On December 12, 2023, Octagon obtained a $13,328,973 judgment against Qualizza in the Charlottesville Circuit Court.

**936.** Qualizza, a Texas resident, was not in Virginia and received no prior notice of the confession.

**937.** Octagon domesticated the December 12, 2023, judgment in Summit County, Colorado, Case No. 2025CV30232.

**938.** Octagon obtained a charging order in the case involving Qualizza's interests.

**939.** In November and December 2025, Octagon conducted post-judgment discovery in Travis County, Texas, in Case No. D-1-GN-25-008986, targeting Qualizza's counsel, family members, and Qualizza's assets.

**940.** On February 6, 2026, Octagon caused a second judgment to be confessed against Qualizza in the same Virginia court, again using the same attorney-in-fact mechanism.

**941.** The second confessed judgment totaled $16,825,273, with post-judgment interest accruing at 13% per year.

**942.** On February 11, 2026, a Virginia court entered a Consent Order in which Octagon agreed that the December 12, 2023, confessed judgment was void ab initio as to Qualizza. A copy is attached as **Exhibit F**.

**943.** Octagon obtained the second confession of judgment five days before consenting that the first confession of judgment under the same instrument was void ab initio.

**944.** On March 3, 2026, the Colorado court vacated the domesticated judgment and the charging order in Case No. 2025CV30232.

**945.** Octagon acknowledged in that proceeding that the underlying foreign judgment was void ab initio.

**946.** On March 10, 2026, Octagon filed Summit County Case No. 2026CV30044 against Qualizza and RMZ Keystone Holding Co., LLC, thereby initiating legal proceedings.

**947.** RMZ Keystone Holding Co, LLC was primarily owned and managed by a third party and had not previously received any demand from Octagon.

**948.** On March 11, 2026, Octagon recorded a lis pendens on Colorado real property.

**949.** In its complaint, Octagon admitted that it agreed to vacate the earlier judgment as void ab initio, even though it relied on the same confession mechanism.

**950.** Excerpts from the complaint, including the sworn verification, are attached as **Exhibit G** and incorporated herein.

**951.** On March 25, 2026, Octagon filed the vacated Virginia judgment in the Circuit Court of Cook County, Case No. 2026L003477.

**952.** The Illinois caption was named Qualizza, even though the Virginia judgment had been vacated as void ab initio as to him.

**953.** On June 19, 2026, Octagon's Illinois counsel acknowledged Qualizza's dismissal in the underlying Virginia case.

**954.** On June 22, 2026, counsel sent Qualizza a proposed Agreed Order to quash his registration.

**955.** The proposed order stated that Qualizza was dismissed with prejudice in Virginia on February 11, 2026, and that his Illinois registration would be vacated retroactively.

**956.** Qualizza signed and returned the proposed order on June 29, 2026. A copy of the Agreed Order, signed and returned by Qualizza, is attached as **Exhibit H**.

**957.** Octagon's counsel said the order would be filed and sent to Qualizza on July 13, 2026.

**958.** Qualizza has not received an entered order or a court-filed copy as of the filing date.

**959.** The confession-of-judgment campaign forced Qualizza to defend himself in Virginia, Colorado, and Illinois.

**960.** During the proceedings, Octagon claimed a 13% interest in a $16,825,273 demand and disputed the validity of the confession-of-debt mechanism.

**H. The February-March 2026 Closing and Failure to Extinguish Personal Exposure**

**961.** Walters, Spencer Fane, and Chicago Title handled the hotel closing.

**962.** Walters, Spencer Fane, and Chicago Title handled the Hotel's payoff at closing.

**963.** Walters, Spencer Fane, and Chicago Title handled the lien releases for the Hotel closing.

**964.** Walters, Spencer Fane, and Chicago Title handled the escrow disbursements for the Hotel closing.

**965.** Walters, Spencer Fane, and Chicago Title handled the Hotel's closing.

**966.** Walters, Spencer Fane, and Chicago Title managed the release of the signature pages.

**967.** Walters, Spencer Fane, and Chicago Title handled the Hotel transfer documents.

**968.** Chicago Title served as the title company and escrow agent for the Hotel closing on March 5, 2026, under Escrow No. 25-10959CHE.

**969.** These responsibilities affected obligations that were enforceable against Qualizza.

**970.** Walters and Spencer Fane had assisted prospective buyer Tim O'Reilly in three prior attempts to acquire the Hotel.

**971.** Qualizza was aware that Spencer Fane's prior representation of the buyer created a conflict of interest.

**972.** Qualizza did not approve Spencer Fane's engagement as seller-side closing counsel and did not sign the engagement agreement.

**973.** Qualizza did not provide Spencer Fane with a retainer or a deposit.

**974.** On February 3, 2026, Freeman and Dixon executed separate counterparts to the Amendment to the Settlement Agreement, which are attached as **Exhibits D-1** and **D-2.**

**975.** Qualizza did not sign the alleged amendment.

**976.** Qualizza did not receive an electronic signature request for the alleged amendment.

**977.** Qualizza did not provide a counterpart to the alleged amendment.

**978.** The alleged Amendment allowed U.S. Bank to accept less than $14,250,000 for the Hotel sale, resulting in a post-closing shortfall.

**979.** Section 30 of the Settlement Agreement required a signed written agreement from all Parties for any modification.

**980.** The purported Amendment did not become binding on Qualizza under Section 30.

**981.** On February 23, 2026, Spencer Fane circulated draft closing documents and signature-page packets for a Hotel sale scheduled for February 27, 2026.

**982.** On February 24, 2026, Qualizza sent Walters and the other closing participants written notice of three structural defects.

**983.** The draft documents did not collapse the top-tier entity structure or transfer furniture, fixtures, and equipment held by those entities to the fee owner.

**984.** Second, the draft documents treated USB CDC's 99% investor membership in the Master Tenant as a lease rather than as ownership.

**985.** Qualizza wanted to execute the Put. That would have transferred USB CDC's 99% interest in the Master Tenant back to DFQ.

**986.** Third, Qualizza stated that Octagon was required to release its collateral assignment.

**987.** Qualizza warned that unresolved defects would leave U.S. Bank and Octagon with leverage over him after the closing.

**988.** At closing, Qualizza provided the participants with the Master Tenant agreements and related documents.

**989.** On February 25, 2026, Qualizza instructed Spencer Fane to keep his signature pages in escrow and to refrain from releasing them without his approval.

**990.** Spencer Fane confirmed receipt of the instruction.

**991.** Qualizza signed the closing documents and delivered the signature pages, including the notarized originals, which were sent by overnight delivery per that instruction.

**992.** Qualizza never approved releasing the signature pages under that instruction.

**993.** On March 3, 2026, Walters told Freeman, Perkaus, Qualizza, Woodrow, and others that he spoke with U.S. Bank's counsel, Mark Bossi, about the Closing Statement and the amount U.S. Bank would accept to release its deed of trust.

**994.** Walters said U.S. Bank wouldn't reduce its payoff until it reviewed the Closing Statement and would pursue the difference afterward.

**995.** On March 5, 2026, Walters circulated a revised Closing Statement reflecting a decrease in U.S. Bank's payoff from $14,250,000 to approximately $13,299,435.43, as well as a remaining post-closing deficiency.

**996.** The email stated that U.S. Bank rejected Freeman's $221,986 reimbursement request.

**997.** The email stated that U.S. Bank rejected invoices totaling $16,125 from RubinBrown.

**998.** Walters stated that he had separately spoken with Perkaus regarding those issues.

**999.** At 3:01 p.m., U.S. Bank issued a Payment Statement for $13,299,435.43 from the USB Special Assets Group.

**1000.** At 3:45 p.m., Qualizza objected in writing to any payment to Perkaus at closing, stating that Perkaus represented Freeman, not the seller entities.

**1001.** Qualizza demanded that RubinBrown be paid because RubinBrown needed to process the Tax Returns to comply with the US Bank Settlement Agreement.

**1002.** The Payment Statement preserved the unsatisfied portion of the joint-and-several judgment obligations.

**1003.** The hotel sale was completed on March 5, 2026.

**1004.** The closing occurred without Qualizza's approval to release the signature pages held in escrow.

**1005.** Qualizza received no advance notice that the closing would be consummated.

**1006.** Qualizza learned of the completed sale about five days later, when the buyer reached out to him.

**1007.** Chicago Title's outgoing-wire record shows that on March 6, 2026, it wired $13,299,435.43 to U.S. Bank's Special Assets Group, $70,240.45 to Spencer Fane, and $50,000 to Perkaus & Farley.

**1008.** The outgoing wire record shows no payments made to RubinBrown.

**1009.** The $50,000 payment to Freeman's counsel was made after Qualizza's written objection and without notifying him of the rejection.

**1010.** Qualizza later sent Spencer Fane a demand for the closing binder and related documents.

**1011.** The final closing record includes multiple signature pages for Qualizza.

**1012.** Some closing documents include signature pages signed and delivered by Qualizza, subject to his written escrow hold.

**1013.** One executed page has two signature blocks for Qualizza, but only one is signed.

**1014.** Other pages bear purported electronic signatures from Qualizza that are unnotarized and disputed pending authentication of the electronic-signature record.

**1015.** The executed closing record and the notarized signature pages delivered by Qualizza are in Defendants' possession and under Defendants' control.

**1016.** The closing participants did not correct the upper-tier transfer, the USB CDC membership interest, or the Octagon collateral defects Qualizza identified.

**1017.** After closing, USB CDC issued a default letter and asserted put-related rights.

**1018.** After closing, Octagon continued asserting its personal enforcement rights and its collateral rights against Qualizza.

**1019.** After closing, Qualizza attempted to assist U.S. Bank in obtaining the required post-closing documents.

**1020.** Qualizza asked Missouri attorney Elkin Kistner, who had not participated in the underlying case, to contact Thompson Coburn about those documents.

**1021.** Thompson Coburn did not provide a substantive response to the request.

**1022.** The U.S. Bank Counsel cited Kistner's communication to support their claim that Counsel represented Qualizza in post-judgment garnishment.

**1023.** Qualizza is representing himself Pro Se in the post-garnishment proceedings and related matters.

**1024.** The executed Closing Statement is attached as **Exhibit E**.

**1025.** The Closing Statement states a sale consideration of $14 million and a payment of $13,299,435.43 to U.S. Bank.

**1026.** Under the executed Closing Statement, only $13,299,435.43 of the $14,000,000 purchase price was applied to U.S. Bank's debt.

**1027.** Qualizza remained a personal guarantor with 66% liability.

**1028.** The remaining $700,564.57 in sale proceeds was disbursed to commissions, attorney fees, taxes, title and escrow charges, and holdbacks rather than to the guaranteed debt.

**1029.** Those non-debt disbursements included a $350,000 payment to Bang Realty.

**1030.** Those non-debt disbursements included $70,240.45 paid to Spencer Fane.

**1031.** Those non-debt disbursements included a $50,000 payment to Perkaus & Farley.

**1032.** Those non-debt disbursements included $119,799.73 in convention and tourism taxes.

**1033.** Those non-debt disbursements included $44,690.38 in real estate taxes for 2023-2025.

**1034.** Those non-debt disbursements included a $46,502.05 water and sewer holdback amount.

**1035.** Those non-debt disbursements included $16,069 in title, escrow, and recording fees.

**1036.** Those non-debt disbursements included $3,262.96 in pro-rated taxes.

**1037.** Earlier versions of the same escrow's Seller's Closing Statement allocated the full $14,250,000 of Reduced Indebtedness to U.S. Bank.

**1038.** Version 5 of the Closing Statement, printed on March 2, 2026, showed a $14,250,000 payoff to U.S. Bank and a Balance Due From Seller of $1,118,131.30.

**1039.** Version 7 of the Closing Statement, printed at 12:47 p.m. on March 5, 2026, the closing day, showed a $14,250,000 payoff to U.S. Bank and a Balance Due From Seller of $1,188,675.57.

**1040.** The executed Closing Statement, printed at 3:54 p.m. that day, reduced U.S. Bank's payoff by $950,564.57 and showed a Balance Due To Seller of $0.00.

**1041.** Closing statements indicated that the entire Reduced Indebtedness would be settled at closing, leaving no principal deficiency that could be enforced against Qualizza personally.

**1042.** As a guarantor, Qualizza was entitled to have the sale proceeds applied to the guaranteed debt.

**1043.** The structure of the Closing Statement, not just the sale price, caused the $971,646.76 deficiency now being enforced against Qualizza personally.

**1044.** The Closing Statement indicates that no sale proceeds were owed to the Seller.

**1045.** The closing proceeded despite unresolved issues regarding seller authority, payoff, release, and escrow instructions.

**1046.** Chicago Title did not verify whether the Hotel entities owed Missouri sales taxes or City of St. Louis employee taxes prior to closing the sale.

**1047.** Approximately $863,975.83 in unpaid tax obligations remained outstanding at the closing.

**1048.** Qualizza contends that those unpaid obligations expose him personally under sections 144.157 and 347.187 of RSMo.

**1049.** Qualizza seeks compensation only for personal losses from unpaid liabilities, not to recover an entity's title claim.

**I. Post-Closing Deficiency, Garnishment, and Continuing Leverage**

**1050.** The Consent Judgment stayed execution for 136 days after October 15, 2025.

**1051.** The stay was scheduled to end on February 28, 2026.

**1052.** On March 6, 2026, the payoff at closing was wired to U.S. Bank's Special Assets Group.

**1053.** Post-judgment interest at nine percent per year accrued on the portion remaining unsatisfied after the stay ended.

**1054.** On April 29, 2026, USBNA filed a Partial Satisfaction of Judgment, crediting the $13,299,435.43 closing payment as the Recovery Amount.

**1055.** The filing stated that, after applying the Recovery Amount first to interest and then to principal, $971,646.76 in principal remained unpaid as of March 7, 2026.

**1056.** In its May 2026 garnishment papers, USBNA stated that the outstanding balance was approximately $990,813.49.

**1057.** The U.S. Bank Defendants treated the purported February 3, 2026, Amendment as effective for Qualizza, despite his failure to sign it.

**1058.** Beginning on or about May 26, 2026, the U.S. Bank Defendants caused garnishment writs to issue against Qualizza's accounts at multiple financial institutions.

**1059.** The writs restrained retirement accounts and property that Qualizza contends were owned by non-debtor family members.

**1060.** Qualizza has challenged the garnishments, ownership issues, exemptions, and the amount enforceable in the federal action.

**1061.** This Petition does not ask the Missouri court to quash, stay, or re-adjudicate the federal garnishment proceedings.

**1062.** On or about April 30, 2026, USB CDC sent Qualizza a Notice of Put and the related membership interest purchase documents.

**1063.** On the same date, counsel for the U.S. Bank Defendants issued a Notice of Default regarding post-transaction obligations.

**1064.** The Default Letter was sent to DFQ, the managing member of Last Hotel Master Tenant LLC, via Dowd Bennett and Spencer Fane, with a copy to Ginsberg Jacobs LLC.

**1065.** The Default Letter was neither addressed to Qualizza nor sent directly to Qualizza.

**1066.** The put and default positions conflict with the waiver and release outlined in Section 7 of the Settlement Agreement.

**1067.** The put and default positions also conflict with Qualizza's post-sale unwind obligations.

**1068.** On April 30, 2026, USB CDC issued a notice of default under the Last Hotel Master Tenant LLC Operating Agreement.

**1069.** On July 6, 2026, USB CDC, through counsel, stated that DFQ had been removed as the managing member of Last Hotel Master Tenant LLC.

**1070.** USB CDC designated itself the successor managing member.

**1071.** USB CDC cited the failure to file and deliver partnership tax returns for the 2024 fiscal year, and potentially for earlier years, as grounds for removal.

**1072.** During those periods, the Receiver and Freeman controlled the tax-return process, excluding Qualizza.

**1073.** USB CDC also cited the Hotel's sale as grounds for removal, even though the closing took place without Qualizza's authorization.

**1074.** The July 6, 2026, letter was copied to Spencer Fane, attention Walters, and to Dowd Bennett, attention Bennett.

**1075.** After the closing, Octagon continued to assert personal jurisdiction over Qualizza in multiple jurisdictions.

**1076.** Those assertions concerned obligations that Qualizza contends a properly structured closing would have extinguished or resolved.

**J. The Recurring Pattern, Intent, and Malice**

**1077.** The events above are linked by recurring actors, information, and a beneficiary; they're not unrelated reversals.

**1078.** U.S. Bank employees expressed animosity toward Qualizza.

**1079.** U.S. Bank intended to end its business relationship with Qualizza.

**1080.** U.S. Bank informed its senior leadership about this conduct.

**1081.** Freeman repeatedly benefited from decisions that removed Qualizza's control.

**1082.** Freeman repeatedly benefited from decisions that limited Qualizza's access to accounts.

**1083.** Freeman repeatedly benefited from decisions that restricted Qualizza's access to information.

**1084.** Freeman repeatedly benefited from decisions that impeded Qualizza's ability to originate tax-credit transactions.

**1085.** Freeman repeatedly benefited from decisions that hindered Qualizza's operation of the Hotel.

**1086.** At the Hotel, Freeman supported the appointment of a receiver.

**1087.** Freeman did not disclose to Qualizza or the court his compensation arrangement with the Receiver.

**1088.** The Receiver's operations and sale process reduced the value available to satisfy obligations that U.S. Bank and Freeman knew Qualizza had personally guaranteed.

**1089.** During the March 2026 closing, Walters repeatedly contacted the legal counsel for U.S. Bank and for Freeman regarding the payment.

**1090.** Walters repeatedly contacted U.S. Bank's and Freeman's legal counsel regarding the seller's distributions.

**1091.** Walters repeatedly contacted U.S. Bank's and Freeman's legal counsel regarding the post-closing deficit.

**1092.** The sale of the Hotel closed without Qualizza's knowledge or consent and without his release of the escrowed signature pages.

**1093.** Freeman's personal counsel was paid $50,000 despite Qualizza's objection.

**1094.** RubinBrown, the Hotel's accountants, were intentionally left unpaid for approximately $16,125.

**1095.** Therefore, the Hotel's federal and state tax returns for 2024 and 2025 were never completed.

**1096.** The unfiled Tax Returns were intentionally left unfiled to create a significant deficiency that U.S. Bank could cite in its Default Letter after closing.

**1097.** The Settlement Agreement required the Hotel entities to provide their 2024 and 2025 federal and state tax returns.

**1098.** U.S. Bank pursued the remaining deficiency against Qualizza's personal accounts.

**1099.** Freeman benefited from the closing's structure.

**1100.** At each stage, a mechanism that initially appeared to concern an entity ultimately and intentionally affected Qualizza's personal guarantees.

**1101.** Each such mechanism ultimately and intentionally affected Qualizza's personal funds.

**1102.** Each such mechanism ultimately and intentionally affected Qualizza's personal relationships.

**1103.** Each such mechanism ultimately and intentionally affected Qualizza's personal creditworthiness.

**1104.** Each such mechanism ultimately and intentionally affected Qualizza's personal earning capacity.

**1105.** Ultimately and intentionally, Qualizza's personal estate was affected.

**1106.** The repeated involvement of the same actors and beneficiaries, together with their knowledge of Qualizza's personal-guaranty exposure and of who would benefit if that exposure increased, indicates a shared purpose and coordinated effort rather than coincidence or error.

## COUNT I - BREACH OF FIDUCIARY DUTY
**(Against Freeman)**

**1107.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1108.** Freeman owed fiduciary duties to the Plaintiff as a co-manager, as outlined in the Operating Agreement (**Exhibit A**), including loyalty, disclosure, good faith, and fair dealing.

**1109.** Freeman intentionally concealed material information from Qualizza.

**1110.** Freeman intentionally engaged in or facilitated self-dealing.

**1111.** Freeman intentionally conspired with persons whose interests were adverse to Qualizza's.

**1112.** Freeman intentionally and with malice obstructed value-preserving transactions at the Hotel.

**1113.** Freeman intentionally supported conduct that destroyed the Hotel's value and increased Qualizza's exposure under the personal guaranty.

**1114.** Freeman intentionally acted without the co-manager's consent required under the DFQ Operating Agreement.

**1115.** Freeman intentionally caused or consented to the March 5, 2026, closing without Qualizza's approval, even though Qualizza's signature pages were still under an escrow hold.

**1116.** Freeman knew his actions would reduce the Hotel's value and thereby increase the amounts enforceable against Qualizza personally under his guaranties.

**1117.** Freeman intentionally caused the Closing to increase Plaintiff's liability under the personal guaranties.

**1118.** Freeman was aware that selling the Hotel at the March closing would directly damage Qualizza's estate.

**1119.** Plaintiff incurred damages: personal advances, guaranty deficits, settlement losses, judgments, garnishments, enforcement costs, and other depletion of his personal estate.

**1120.** Freeman acted intentionally and with malice.

## COUNT II - BREACH OF CONTRACT
**(Against Freeman)**

**1121.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1122.** Qualizza and Freeman were parties to the DFQ Operating Agreement, attached as **Exhibit A.**

**1123.** Section 8 of the DFQ Operating Agreement required managers' consent for specified management actions when there was more than one manager.

**1124.** The Operating Agreement and related agreements set forth enforceable obligations between Qualizza and Freeman regarding management, consent, disclosure, funding, allocation, and accounting.

**1125.** Qualizza performed his obligations under the DFQ Operating Agreement or was excused from further performance by Freeman's conduct.

**1126.** Freeman intentionally acted without proper authority or adequate disclosure.

**1127.** Freeman either initiated or consented to closing the sale of the Hotel without obtaining Qualizza's approval.

**1128.** Freeman intentionally compromised Qualizza's management and consent rights.

**1129.** Freeman intentionally failed to provide the required accounting under the governing agreements for which he was responsible.

**1130.** Freeman intentionally exploited company mechanisms to impose obligations on Qualizza, knowing they would become Qualizza's personal financial liabilities.

**1131.** The plaintiff's damages arise from violations of personal contractual rights, not merely from LLC interest loss.

**1132.** Freeman's intentional breaches created enforceable obligations against the plaintiff under personal guarantees, regardless of the entity's loss.

## COUNT III - FRAUDULENT PROCUREMENT OF RECEIVER APPOINTMENT
**(Against Freeman, Habeeb, and Maverick)**

**1133.** Qualizza incorporates by reference Paragraphs 1 through 16, 570 through 813, and 1077 through 1106 of this Petition.

**1134.** The intentional statements and omissions created a false impression that the Receiver had no material relationship with Freeman.

**1135.** Freeman knew that his description of the relationship was false or materially incomplete.

**1136.** Habeeb recognized that the independence representation was either incorrect or a material misrepresentation.

**1137.** Maverick knew that its depiction of independence was either false or a gross misrepresentation.

**1138.** The nature of the compensated relationship was peculiarly within the Defendants' knowledge.

**1139.** The compensated relationship was material to the court's selection of a neutral receiver.

**1140.** The undisclosed business relationship was crucial for Qualizza to challenge Habeeb's appointment and protect his interests.

**1141.** Defendants intended the appointing court to rely on the false impression that the Receiver was independent.

**1142.** Defendants intended for Qualizza to act unaware of the compensated relationship.

**1143.** Qualizza was unaware of the prior business relationship between Habeeb and Freeman.

**1144.** Although Qualizza disagreed with Freeman's candidate and proposed an alternative, concealment prevented disclosure of the relationship to the court.

**1145.** Based on the representations of independence, Qualizza did not seek the Receiver's disqualification for undisclosed paid relationships.

**1146.** In reliance on those representations, Qualizza did not renew his request for an independent alternative receiver or for protective conditions.

**1147.** Qualizza had the right to rely on representations of independence made to the appointing court about the proposed receiver.

**1148.** The court appointed the Receiver without knowledge of the undisclosed relationship.

**1149.** The appointment placed Freeman's existing compensated hotel manager in complete control of the Hotel and its operating accounts, as Defendants intended.

**1150.** Nineteen days after Maverick was appointed the Receiver, Maverick requested that Ownership contribute $1 million in capital to fund an 18-month operating plan that directly conflicted with the court-ordered sale of the Hotel.

**1151.** The subsequent acts alleged in this Petition were the intended and foreseeable consequences of the control exerted through the concealed relationship.

**1152.** The fraud directly caused Qualizza to incur personal legal expenses to protect the sale and Qualizza's guaranty exposure.

**1153.** The fraud was intended to increase, and did increase, Qualizza's guarantee deficiencies, settlement risks, judgments, garnishments, enforcement costs, credit damage, and erosion of his estate.

**1154.** Qualizza does not intend to challenge or overturn the order appointing the Receiver.

**1155.** This Count seeks damages for Defendants' pre-appointment misrepresentations and concealment, as well as for personal injuries caused by the fraud.

**1156.** Defendants conspired intentionally, willfully, and with malice and a conscious disregard for Qualizza's rights, causing Plaintiff significant personal harm.

## COUNT IV - BREACH OF FIDUCIARY DUTY BY THE RECEIVER
**(Against Habeeb and Maverick, individually and as former Receiver)**

**1157.** Qualizza incorporates by reference Paragraphs 1 through 16, 570 through 813, and 1077 through 1106 of this Petition.

**1158.** As a court-appointed receiver, the Receiver owed duties of loyalty, honesty, good faith, impartiality, reasonable care, and preservation to all interested parties in the receivership, including Qualizza.

**1159.** The CRO outlines the Receiver's authority and obligations.

**1160.** The Receiver breached its duties by pursuing an eighteen-month operating plan instead of promptly completing the pending sale.

**1161.** The Receiver breached its duties by failing to contact the Hotel's broker and the buyer for nearly three months after the receivership began.

**1162.** The Receiver breached its duties by imposing Freeman's prior-sale restrictions on the buyer.

**1163.** The Receiver breached its duties by excluding Qualizza from key communications about the sale.

**1164.** The Receiver breached its duties by intentionally operating the Hotel despite significant ongoing monthly operating deficits.

**1165.** The Receiver breached its duties by depleting the Hotel's approximately $440,000 in operating cash within less than sixty days.

**1166.** The Receiver breached its duties by intentionally accumulating substantial unpaid obligations to vendors.

**1167.** The Receiver breached its duties by intentionally paying Receiver fees while vendor obligations remained unpaid.

**1168.** The Receiver breached its duties by failing to safeguard the Hotel's inventory, equipment, and other property.

**1169.** The Receiver intentionally breached its duties by allowing the Hotel's insurance to lapse without notifying Qualizza.

**1170.** The Receiver intentionally failed to fulfill its duties by failing to submit all required sales and lodging tax returns during its management of the entity.

**1171.** The Receiver intentionally breached its duties by failing to remit all sales and lodging taxes collected during its control.

**1172.** The Receiver intentionally breached its duties by failing to renew the Hotel's liquor license.

**1173.** The Receiver intentionally breached its duties by retaining and compensating counsel without the required approval under the Comprehensive Receivership Order.

**1174.** The Receiver intentionally breached its duties by failing to provide the Court with timely, complete reports on operations and sales.

**1175.** The Receiver intentionally breached its duties by withdrawing without an orderly transition of accounts, records, licenses, employees, and physical control.

**1176.** The acts involving the Hotel's operations, accounts, vendor payments, Receiver fees, tax compliance, licensing, payroll, and transition aimed to reduce the Hotel's value and increase amounts enforceable against Qualizza personally.

**1177.** Section 2-415(c) of the Illinois Code of Civil Procedure permits suit concerning those business acts without prior leave of the appointing court.

**1178.** The Receiver's intentional concealment of material information, conspiracy with others, and failure to complete the Sale were intended to harm Qualizza.

**1179.** The Receiver was fully aware that he was acting beyond the authority conferred by the Comprehensive Receivership Order.

**1180.** This Count does not ask this Court to direct the Cook County receivership or to displace the appointing court's continuing jurisdiction over that receivership.

**1181.** Qualizza's entity-level and derivative claims remain pending in Cook County Case No. 2022 CH 11088.

**1182.** This Count concerns only Qualizza's direct personal injuries and intentional financial harm.

**1183.** The Receiver was aware that Qualizza had personally guaranteed substantial hotel obligations.

**1184.** The Receiver knew that operating the hotel at a loss would reduce the sales proceeds, thereby increasing the amounts enforceable against Qualizza personally.

**1185.** The Receiver later sought to charge Qualizza personally for the Receiver's fees.

**1186.** Its breaches directly caused Qualizza to incur substantial legal and protective costs.

**1187.** The Receiver's intentional breaches worsened Qualizza's guarantee issues, settlement losses, judgments, garnishments, enforcement costs, credit damage, and the depletion of his estate.

**1188.** The Receiver acted willfully and conspired with others to increase Qualizza's personal financial consequences.

**1189.** When the Receiver took possession, the Hotel was solvent, a going concern with no accounts payable, approximately $440,000 in working capital, and a $29 million purchase-and-sale agreement ready for execution.

**1190.** When the Receiver relinquished control just over 10 months later, the Hotel was shuttered, vacant, vandalized, and had exhausted its operating cash.

**1191.** The Hotel now owed approximately $1,000,000 in accounts payable and had nearly $1 million in unpaid sales and lodging taxes.

**1192.** The Receiver intentionally allowed the Hotel's liquor license to lapse. This caused the purchase-and-sale agreement to be canceled, thereby reducing the sale proceeds and increasing the deficiency enforceable against Qualizza personally.

**1193.** The destruction of the solvent asset under the Receiver's control occurred while the Receiver conspired with Freeman to operate the Hotel rather than sell it as the CRO ordered.

**1194.** The Receiver's deliberate breach of the duty to preserve the property increased the deficiency for which Qualizza is personally liable.

**1195.** After the Receiver left the hotel vacant and vandalized, Qualizza had to personally fund and maintain security measures at the property to protect the asset.

**1196. The conduct alleged in this Count was not undertaken pursuant to the Comprehensive Receivership Order ("CRO").**

**1197. The CRO directed the Receiver to consummate an arm's-length sale as soon as practicable.**

**1198. Instead, the Receiver obstructed that sale, sought $1,000,000 in renovation capital to operate the Hotel for eighteen months, adopted Freeman's previously rejected due diligence conditions, allowed the Hotel to deteriorate, and abandoned it without transition.**

**1199. These intentional acts were outside and contrary to the court's directive and were taken with willful and deliberate intent to benefit Freeman at the expense of Qualizza's personal guaranty exposure.**

**1200. Because the Receiver acted ultra vires and in defiance of the appointing court's purpose, no quasi-judicial immunity attaches to the challenged conduct.**

**1201.** **<u>This Count seeks damages for the Receiver's independent tortious conduct and does not constitute a collateral attack on the Cook County appointment order.</u>**

**1202.** **<u>Consistent with the principle recognized in Missouri that an independent action lies for fraud in procuring a court order without time limitation and without constituting a collateral attack, Plaintiff seeks only money damages for the personal injuries caused by the fraudulently procured and ultra vires receivership, not modification or vacatur of the appointment order itself.</u>**

## <u>COUNT V - CIVIL CONSPIRACY CONCERNING THE RECEIVERSHIP</u>

**(Against Freeman, Habeeb, Maverick, and Participating John Does)**

**1203.** Qualizza incorporates by reference Paragraphs 1 through 16, 570 through 813, 1077 through 1106, and 1133 through 1202 of this Petition.

**1204.** Freeman, Habeeb, and Maverick intentionally conspired to reach an agreement before the appointment, thereby placing Freeman's paid hotel manager in control of the Hotel.

**1205.** The conspiracy included concealing the compensated relationship from Qualizza and the appointing court.

**1206.** The conspiracy involved using the receivership to preserve Freeman's operational control rather than promptly completing a sale on terms Freeman opposed.

**1207.** The conspiracy included shifting the resulting operating losses and reduced sale proceeds to Qualizza through his personal guarantees and separate personal financial assets.

**1208.** Before the appointment, Freeman sought authorization to operate the Hotel and to remove Qualizza as DFQ's co-manager.

**1209.** Before the appointment, Defendants concealed the existing compensated management relationship.

**1210.** After the appointment, the Receiver reiterated the sale restrictions Freeman had previously imposed.

**1211.** After the appointment, the Receiver excluded Qualizza while aligning the material sales positions with Freeman.

**1212.** After the appointment, the Receiver paid the Receiver's fees, but the vendor and tax obligations remained unpaid.

**1213.** After the appointment, Defendants allowed operating losses and deterioration to increase Qualizza's known exposure under his personal guaranties.

**1214.** The fraudulent procurement alleged in Count III was an overt act in furtherance of the conspiracy.

**1215.** The breaches of fiduciary duty alleged in Count IV were overt acts in furtherance of the conspiracy.

**1216.** Freeman's direction, assistance, and adoption of the Receiver's acts were overt acts in furtherance of the agreement.

**1217.** The abrupt closure and failed transition were overt acts in furtherance of the conspiracy.

**1218.** The participating John Does knowingly assisted in one or more of those overt acts.

**1219.** The actionable wrongs underlying the claims are the alleged fraud in Count III and the alleged fiduciary breaches in Count IV.

**1220.** Freeman's liability arises from his own agreement and from his acts furthering the conspiracy.

**1221.** Freeman does not derive immunity from the Receiver's appointment.

**1222.** The conspiracy's objective was to inflict significant financial harm on Qualizza.

**1223.** Defendants knew that Qualizza personally guaranteed substantial Hotel obligations.

**1224.** Defendants knew that each loss and each reduction in sales increased Qualizza's liability.

**1225.** Defendants' concerted conduct caused Qualizza to incur personal legal expenses and protective costs.

**1226.** Defendants' conduct worsened Qualizza's guarantee issues, resulting in losses, judgments, garnishments, enforcement costs, credit damage, lost prospects, and the draining of his estate.

**1227.** Each conspirator is jointly liable for the direct personal damages resulting from acts committed in furtherance of the conspiracy.

**1228.** Each Defendant is jointly liable under concert-of-action principles because their concerted actions caused Qualizza's injury, regardless of any agreement; proof of conspiracy isn't required.

**1229.** Defendants conspired intentionally, willfully, maliciously, and with conscious disregard for Qualizza's rights, with the intent to cause Qualizza personal harm.

**1230. Each Defendant is jointly liable under concert-of-action principles because their concerted wrongful acts contributed to Qualizza's injury, regardless of any agreement. Proof of the conspiracy is not required.**

**1231. Freeman engineered the Receiver's appointment through a false affidavit and concealed compensation.**

**1232. As a private actor who corrupted the appointment process, Freeman derives no immunity from the Receiver's status as a court officer.**

**1233. Under the principle that immunity does not change the character of a co-conspirator's conduct, private persons who participate in subverting the judicial process are not shielded by any official's immunity, and each remains personally liable for the injuries caused.**

## COUNT VI - LEGAL MALPRACTICE AND INDEPENDENT BREACH OF FIDUCIARY DUTY

**(Against Walters and Spencer Fane)**

**1234.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1235.** Walters and Spencer Fane represented Qualizza, handled closing obligations, and resolved liabilities arising from the personal guarantees and the sale of the Hotel.

**1236.** Walters and Spencer Fane ("Closing Counsel") sent the closing and signature materials directly to Qualizza.

**1237.** Closing Counsel received Qualizza's written objections and the escrow hold instruction.

**1238.** Closing Counsel acknowledged the hold instruction.

**1239.** Closing Counsel's acceptance of the instruction created a direct obligation to retain Qualizza's signature pages until Qualizza authorized their release.

**1240.** By sending the closing and signature materials directly to Qualizza, receiving his objections, and accepting his hold instruction, Closing Counsel undertook to act on Qualizza's behalf at the closing, and Qualizza reasonably believed that Closing Counsel was acting for him.

**1241.** Those acts created an attorney-client relationship between Qualizza and Closing Counsel by conduct, even without a signed engagement agreement or retainer.

**1242.** Alternatively, if no attorney-client relationship existed, Closing Counsel held Qualizza's executed signature pages subject to his hold instruction and owed him fiduciary duties as a holder of property held for a specific purpose.

**1243.** Closing Counsel, as Qualizza's attorneys or fiduciaries, owed duties of care, loyalty, candor, disclosure, confidentiality, and protection of Qualizza's interests, including faithful adherence to lawful client instructions.

**1244.** Closing Counsel placed others' interests ahead of Qualizza's.

**1245.** Closing Counsel failed to disclose the material conflict arising from their prior representation of the buyer in three attempts to purchase the Hotel.

**1246.** Closing Counsel intentionally failed to protect Qualizza from the personal liabilities that persisted after closing.

**1247.** Qualizza never approved the release of his signature pages.

**1248.** Closing Counsel failed to honor or safeguard Qualizza's escrow hold instruction.

**1249.** Closing Counsel failed to ensure that the closing structure accurately transferred the relevant assets and ownership interests.

**1250.** Closing Counsel failed to resolve payoff and release conditions that directly affected Qualizza's interests.

**1251.** Closing Counsel failed to correct or disclose the material closing defects identified in Qualizza's notice dated February 24, 2026.

**1252.** Closing Counsel allowed or facilitated the closing despite unresolved personal obligations, collateral, and enforcement exposure risks to Qualizza.

**1253.** The sale nevertheless closed without advance notice to Qualizza, even though the identified personal-enforcement risks remained unresolved.

**1254.** The independent fiduciary-duty theory concerns alleged disloyalty, nondisclosure, and disregard for Qualizza's instructions, not merely poor professional judgment.

**1255.** Experienced closing counsel following Qualizza's instructions would have withheld his signature pages, disclosed the conflict, and refused to close until the payoff, release, transfer, and collateral conditions were met.

**1256.** If Closing Counsel had done so, the closing would not have been consummated in the form it took.

**1257.** Qualizza's escrowed signature pages would not have been released.

**1258.** The closing would have been delayed until the upper-tier transfer defects, the USB CDC membership interest, and the Octagon collateral assignment were resolved.

**1259.** The full $14,250,000 in Reduced Indebtedness would have been applied to U.S. Bank debt at closing.

**1260.** The post-closing deficiency now enforced against Qualizza personally would have been eliminated or substantially reduced.

**1261.** Qualizza suffered actual personal damages, including ongoing liability, enforcement expenses, payments, and loss of settlement value.

## COUNT VII - BREACH OF ESCROW AND CLOSING UNDERTAKINGS AND, IN THE ALTERNATIVE, NEGLIGENCE
**(Against Chicago Title)**

**1262.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1263.** Qualizza asserts the contractual and negligence theories in this Count, alternatively.

**1264.** Qualizza was a party, beneficiary, or protected participant under the escrow instructions, title commitments, policies, and closing agreements for Escrow No. 25-10959CHE.

**1265.** Chicago Title intentionally breached those undertakings by failing to satisfy the required payoff, release, escrow, and recording obligations.

**1266.** Chicago Title was responsible for escrow, payoff, title, and closing to safeguard the participants, including Qualizza, from liens, misapplied funds, and ongoing personal obligations.

**1267.** Chicago Title intentionally failed to comply with the escrow instructions for the transaction.

**1268.** Chicago Title intentionally failed to verify the closing conditions that affected the seller's authority.

**1269.** Chicago Title intentionally failed to obtain or confirm releases affecting Qualizza's personal obligations.

**1270.** Chicago Title intentionally disbursed proceeds despite the seller's authority being unresolved.

**1271.** Chicago Title intentionally disbursed proceeds without confirming the release of Qualizza's escrowed signature pages.

**1272.** Those breaches directly caused, increased, or contributed to Qualizza's personal liability and to the enforcement actions now underway.

## COUNT VIII - BREACH OF SETTLEMENT AGREEMENT
**(Against USB CDC and USBNA)**

**1273.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1274.** The Settlement Agreement, dated October 15, 2025, and attached as **Exhibit C**, is a written contract governed by Missouri law.

**1275.** Qualizza participated in the Settlement Agreement as a guarantor, with the document outlining his rights and responsibilities.

**1276.** Qualizza performed his obligations under the Settlement Agreement or was excused from further performance by the U.S. Bank Defendants' conduct.

**1277.** Section 8(b) excludes the U.S. Bank Parties' obligations under the Settlement Agreement from the scope of the release.

**1278.** The U.S. Bank Defendants treated the unsigned purported Amendment as effective with respect to Qualizza.

**1279.** The U.S. Bank Defendants asserted put, priority-return, default, or unwind positions inconsistent with Section 7's waiver and release.

**1280.** The U.S. Bank Defendants failed to cooperate with the required post-sale unwind and further-assurance procedures.

**1281.** The U.S. Bank Defendants failed to apply the required credits and releases properly.

**1282.** The U.S. Bank Defendants pursued inconsistent remedies, thereby increasing collection pressure on Qualizza personally.

**1283.** This Count does not ask the Missouri court to vacate, stay, quash, or modify the federal Consent Judgment or the federal garnishment proceedings.

**1284.** Plaintiff suffered direct contractual damages in an amount to be determined at trial.

## COUNT IX - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

**(Against USB CDC, USBNA, Neil Freeman, and Participating John Does)**

**1285.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1286.** Plaintiff had legitimate business expectations and established relationships in NMTC, HTC, and community development finance.

**1287.** Those expectations included Qualizza's continued personal management role in UDF ST's tax-credit business.

**1288.** The defendants were fully aware of Qualizza's successful business career, expertise, relationships, and revenue-generating ability.

**1289.** Defendants deliberately obstructed Plaintiff's ability to generate revenue by engaging in defamation litigation.

**1290.** Defendants control a multi-billion-dollar tax-credit business and exert significant influence in the marketplace.

**1291.** Upon information and belief, Defendants pressured others not to work with or do business with Plaintiff, causing his new business ventures to generate no income.

**1292.** Defendants also used confidential information and spread accusations intended to isolate him professionally and to prevent him from earning income.

**1293.** U.S. Bank turned over control of the UDF ST project bank accounts to Freeman, intentionally making it impossible for Qualizza to operate the business.

**1294.** Qualizza and Goodall were the sole authorized signatories for those accounts, and QGH owned eighty percent of UDF ST.

**1295.** Qualizza was thereafter removed from access to the UDF ST project's accounts.

**1296.** The defendants' interference prevented Qualizza from operating the state tax-credit platform and the transaction pipeline, through which Qualizza had previously generated significant income.

**1297.** The interference involved wrongful conduct, including disparaging statements, misuse of confidential information, and post-Settlement actions, as alleged.

**1298.** The interference was unjustified and caused Plaintiff to lose identifiable engagements, compensation, and opportunities.

**1299.** The conduct alleged in this Count does not arise under or relate to the federal lawsuit, the Hotel, or the Loan Documents as defined in the Section 8(b) release.

## COUNT X - FRAUDULENT CONCEALMENT
**(Against Octagon)**

**1300.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1301.** Octagon gained superior insight into Missouri HTC delivery delays through its bridge-loan business in Missouri.

**1302.** Before Qualizza executed his personal guaranties, Octagon knew that the Missouri HTC program had a history of significant delays.

**1303.** Octagon knew that the takeout schedule provided to Qualizza was incorrect.

**1304.** Octagon possessed superior knowledge of the Missouri state historic tax credit delivery timeline that was not reasonably accessible to Qualizza.

**1305.** Octagon's presentation of the projected takeout schedule was incomplete and misleading because it omitted any mention of its experience with ST HTC delivery delays.

**1306.** That information was material to Qualizza's decision to execute and to maintain the personal guarantees.

**1307.** Octagon had a duty to disclose the information.

**1308.** Octagon intentionally or recklessly failed to disclose it.

**1309.** Plaintiff lacked equal knowledge, reasonably relied on the disclosed transaction structure, and faced higher personal guaranty liability and enforcement costs.

## COUNT XI - NEGLIGENT MISREPRESENTATION
**(Against Octagon and USB CDC)**

**1310.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1311.** This Count is pleaded in the alternative to Count X.

**1312.** The Hotel's financial model projected that the Hotel would receive its MO ST Tax Credits in August 2019.

**1313.** USB CDC and Octagon, having experience with Missouri HTC bridge loans, knew the State's HTC delivery was significantly delayed compared to their schedule and that the Hotel wouldn't meet the initial date.

**1314.** USB CDC and Octagon were also aware of delays at SHPO when they set the timelines.

**1315.** Because Octagon and USB CDC failed to exercise reasonable care, given their prior Missouri historic tax credit bridge-loan experience, the schedule inaccurately described the expected delivery timeline.

**1316.** Octagon and USB CDC intentionally provided that information to mislead a limited group of people, including Qualizza, about the Hotel financing transaction.

**1317.** Qualizza justifiably relied on that information in executing and maintaining his personal guaranties and funding obligations.

**1318.** Qualizza lacked access to Octagon and to USB CDC's deal-specific State HTC delivery experience.

**1319.** Qualizza could not have reasonably discovered the latter through ordinary diligence.

**1320.** Reliance on ST HTC delivery in August 2019 caused significant personal financial harm, including interest carry costs, higher payments, personal guaranty exposure, judgments, and legal expenses.

**1321.** The losses stem from USB CDC actions, resulting in an approximate shortfall of $2,318,978 between expected and actual MOHTC proceeds.

**1322.** That shortfall significantly increased the cost of carrying Octagon's bridge financing for nearly fourteen months beyond the modeled takeout date.

**1323.** The Hotel successfully repaid a significant part of Octagon's ST HTC bridge loan through a Midland Bank HTC bridge facility, incurring much lower interest carry costs than Octagon.

**1324.** Midland Bank closed its HTC Bridge loan without USB CDC's consent.

**1325.** USB CDC unreasonably withheld consent, causing further personal harm to Qualizza.

**1326.** This count is based on Octagon's and USB CDC's representations regarding the Missouri HTC delivery schedule made before closing, as well as on the ongoing personal guaranty exposure resulting from those representations.

## COUNT XII - LEGAL MALPRACTICE AND INDEPENDENT BREACH OF FIDUCIARY DUTY

**(Against Dowd Bennett LLP and James F. Bennett)**

**1327.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1328.** Dowd Bennett and Bennett represented Qualizza individually in the U.S. Bank litigation, the Hyatt matters, and related settlement decisions, while also representing DFQ, Freeman, and Dixon.

**1329.** In 2022, Qualizza terminated Dowd Bennett's representation of him individually.

**1330.** As co-manager, Qualizza withdrew his approval of Dowd Bennett's representation of DFQ.

**1331.** Qualizza did not provide informed written consent to continued representation after his interests became materially adverse to those of DFQ, Freeman, and Dixon.

**1332.** Yet after withdrawing from Qualizza, Dowd Bennett continued to represent Freeman, DFQ, and other Hotel entities in those same matters.

**1333.** Dowd Bennett and Bennett represented DFQ, Freeman, and Dixon ("the co-clients") in the U.S. Bank litigation, the Hyatt matters, and related settlement proceedings.

**1334.** Dowd Bennett continued to control litigation and settlement strategy for the co-clients whose interests were adverse to Qualizza's.

**1335.** The co-clients had adverse interests regarding fault, settlement payments, the Hotel sale, guarantor liability, and claims against the lenders.

**1336.** Dowd Bennett and Bennett owed Qualizza a professional duty of care.

**1337.** As former counsel, Dowd Bennett and Bennett still owe Qualizza a duty of confidentiality and a duty of care with respect to the related matters.

**1338.** Dowd Bennett and Bennett remained bound by fiduciary duties such as loyalty, disclosure, exercising independent judgment, safeguarding client files, and avoiding conflicts of interest while these duties were in force.

**1339.** Dowd Bennett and Bennett failed to obtain Qualizza's informed, written consent regarding the material conflicts.

**1340.** They intentionally failed to provide Qualizza with discovery materials and with settlement information.

**1341.** Dowd Bennett and Bennett intentionally failed to use the underwriting evidence developed during discovery to protect Qualizza's guarantor position.

**1342.** Dowd Bennett and Bennett intentionally failed to provide independent advice on allocating liability among the co-clients.

**1343.** That deprived Qualizza of a meaningful opportunity to reject terms adverse to his interests.

**1344.** Dowd Bennett and Bennett intentionally failed to safeguard Qualizza's privileged communications and Qualizza's client file.

**1345.** A privileged communication from Qualizza to Bennett was redacted to remove Qualizza's demand that Dowd Bennett withdraw as DFQ's counsel.

**1346.** The redacted communication was submitted in support of a request to remove Qualizza as DFQ's co-manager.

**1347.** The court denied the request to remove Qualizza.

**1348.** After Qualizza withdrew, Dowd Bennett continued to serve as counsel to the Hotel entities.

**1349.** That continuing position limited Qualizza's successor counsel's access to litigation information and to client files.

**1350.** Dowd Bennett and Bennett intentionally prioritized the interests of adverse co-clients over Qualizza's interests.

**1351.** Bennett intentionally entered into settlements adverse to Qualizza's interests without Qualizza's informed consent.

**1352.** Dowd Bennett and Bennett intentionally used or permitted the use of Qualizza's confidential communications against him, in redacted form.

**1353.** Dowd Bennett and Bennett intentionally used their ongoing representation to implement settlement decisions that imposed personal liability on Qualizza, without Qualizza's authorization.

**1354.** The independent fiduciary-duty theory is pleaded separately because the alleged conduct constitutes constructive fraud rather than a breach of the standard of care.

**1355.** Dowd Bennett and Bennett intentionally used Qualizza's confidential communications to harm Qualizza's interests.

**1356.** Dowd Bennett and Bennett intentionally continued binding their former client by making settlement decisions without his authorization.

**1357.** No other recognized tort applies to these facts.

**1358.** But for the alleged breaches, Qualizza would have rejected the Hyatt settlement or materially improved it in Ownership's favor.

**1359.** Without the alleged breaches, Qualizza could have avoided or minimized around $800,000 in personal Hyatt losses, in addition to legal fees.

**1360.** Absent the alleged breaches, Qualizza would have avoided or mitigated the U.S. Bank judgment and related enforcement losses.

**1361.** But for the alleged breaches, Qualizza would have preserved his claims and defenses and achieved a materially more favorable outcome.

**1362.** Qualizza incurred personal damages from Dowd Bennett due to Dowd Bennett's intentional mishandling of the Hyatt settlement.

**1363.** Qualizza incurred personal damages from Dowd Bennett due to Dowd Bennett's handling of the U.S. Bank settlement and the post-judgment proceedings.

**1364.** Qualizza incurred personal damages from Dowd Bennett due to Dowd Bennett's intentional mishandling of post-settlement obligations.

**1365.** Qualizza incurred personal damages from Dowd Bennett due to Dowd Bennett's intentional mishandling of the post-settlement garnishment process.

**1366.** Qualizza incurred additional damages, including legal and enforcement costs, after accounting for credits, collectability, mitigation, and other causes.

## COUNT XIII - CIVIL CONSPIRACY TO COMMIT FRAUD AND TORTIOUS INTERFERENCE

**(Against Freeman, USB CDC, USBNA, and Participating John Does)**

**1367.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1368.** Freeman, USB CDC, and USBNA are legally distinct persons capable of entering into an agreement or understanding.

**1369.** The wrongful acts encompass fraud, concealment of authority and signature pages, tortious interference with Qualizza's personal business prospects, and Freeman's violations of fiduciary and contractual obligations.

**1370.** Upon information and belief, Freeman and the U.S. Bank Defendants conspired to finalize the Hotel sale without Qualizza's approval to preserve a post-closing deficiency and to shift enforcement to Qualizza's estate.

**1371.** The Conspiracy is inferred from communications, acts, knowledge of Qualizza's objections, exposure, and the consistent allocation of benefits and burdens.

**1372.** Freeman nevertheless intentionally proceeded as though the purported Amendment authorized the closing and the post-closing deficiency asserted against Qualizza.

**1373.** U.S. Bank treated the unsigned Amendment as effective against Qualizza and structured its March 5, 2026, Payment Statement to reflect the unsatisfied joint obligations after the closing.

**1374.** Upon information and belief, Freeman and the U.S. Bank Defendants agreed to exclude Qualizza from the UDF after his July 14, 2021, removal.

**1375.** U.S. Bank confirmed Freeman's authority over the UDF, ACC, and UDF ST accounts, even though Qualizza and Goodall were the only authorized signers for the UDF ST project accounts.

**1376.** U.S. Bank continued to manage and assist Freeman in exiting NMTC transactions without Qualizza's member consent.

**1377.** The exclusion was intentional. It was intended to prevent Qualizza from exercising his contractual rights and from receiving QGH's share of compensation.

**1378.** The facts in this Petition reveal U.S. Bank's animosity toward Qualizza and the advantage Freeman gained from that hostility, demonstrating motive, knowledge, and intent and negating any notion of an innocent mistake. These are not presented as separate claims in this Count.

**1379.** The alleged acts caused Qualizza to lose protections, face increased liabilities, harm business prospects, incur judgments and garnishments, incur expenses, and drain his estate.

**1380.** Each participant is liable for direct personal damage caused while pursuing the conspiracy's common goal.

**1381.** Each Defendant shares joint liability under concert-of-action rules because their coordinated wrongful acts contributed to Qualizza's injury, even without proof of a formal conspiracy or agreement.

## COUNT XIV - TORTIOUS INTERFERENCE WITH CONTRACT

**(Against USB CDC, USBNA, Dowd Bennett, and Participating John Does)**

**1382.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1383.** The DFQ Operating Agreement was a valid contract between Qualizza and Freeman.

**1384.** The U.S. Bank Defendants and Dowd Bennett were not parties to the DFQ Operating Agreement.

**1385.** The U.S. Bank Defendants and Dowd Bennett were aware of the DFQ Operating Agreement, including Qualizza's consent and management rights under the agreement.

**1386.** The U.S. Bank Defendants intentionally entered into a Settlement Agreement containing unachievable terms.

**1387.** U.S. Bank enforced those terms under maximum personal financial pressure.

**1388.** Dowd Bennett negotiated the U.S. Bank Settlement Agreement.

**1389.** The U.S. Bank Defendants and Dowd Bennett caused Freeman to breach the DFQ Operating Agreement by closing the Hotel sale on March 5, 2026, without obtaining Qualizza's required co-manager approval and without notifying him.

**1390.** Dowd Bennett caused the breach by negotiating settlement and closing decisions that violated Qualizza's rights under the DFQ Operating Agreement.

**1391.** The U.S. Bank Defendants and Dowd Bennett intentionally and unjustifiably caused Freeman to breach the DFQ Operating Agreement, thereby harming Qualizza's personal financial interests.

**1392.** John Doe(s) participated in the personal harm to Qualizza.

**1393.** The interference employed wrongful means, including treating the unsigned Amendment as effective and releasing Qualizza's escrowed signature pages without his authorization.

**1394.** Dowd Bennett's wrongful means also included using Qualizza's redacted privileged communication against him, continuing to bind Qualizza through settlement and closing decisions after he had terminated the representation, and doing so without his authorization.

**1395.** Dowd Bennett's conduct exceeded the lawful scope of representing the co-clients.

**1396.** Using Qualizza's privileged communication against him and binding him without authority are acts a lawyer may not commit for any client.

**1397.** Acting against a former client to whom the lawyer still owed confidentiality and loyalty further indicates a motive to cause harm.

**1398.** The U.S. Bank Defendants considered the unsigned Amendment valid and released Qualizza's escrowed signature pages without obtaining Qualizza's approval.

**1399.** The interference was without justification.

**1400.** As to the Settlement Agreement, Count VIII addresses the U.S. Bank Defendants' obligations; this Count addresses interference with the DFQ Operating Agreement.

**1401.** The intentional interference caused Qualizza personal damages, including post-closing deficiency, judgments, garnishments, enforcement costs, and depletion of his estate.

## <u>COUNT XV - DECLARATORY JUDGMENT</u>
### (Against USB CDC, USBNA, and Octagon)

**1402.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1403.** This Count is brought under sections 527.010 and 527.020, RSMo, and seeks only a declaration of Plaintiff's presently affected contract, judgment, and property rights.

**1404.** A controversy exists between Qualizza and the U.S. Bank Defendants over whether the February 3, 2026, Amendment to the Settlement Agreement is binding on Qualizza.

**1405.** Section 30 of the Settlement Agreement requires a written signature. Qualizza did not sign the Amendment.

**1406.** A current, justiciable controversy exists between Qualizza and the U.S. Bank Defendants regarding their obligations under Section 7 of the Settlement Agreement, including waivers and releases.

**1407.** A controversy exists between Qualizza and Octagon over the status and release of Octagon's collateral assignment, which Qualizza flagged as an unresolved closing defect to the closing participants on February 24, 2026.

**1408.** Qualizza has a legally protectable interest in each matter because each matter directly affects obligations enforceable against his separate personal estate.

**1409.** Count VIII seeks damages for breaches of the Settlement Agreement that have already occurred.

**1410.** This Count seeks a construction of the Settlement Agreement, the alleged Amendment, and the Octagon collateral assignment, and a declaration of the parties' rights under them in the future, which an action for damages cannot provide.

**1411.** Qualizza therefore lacks an adequate remedy at law for the declaration sought in this Count, and each controversy is ripe for resolution.

**1412.** This Count is limited to matters that have not been finally adjudicated by another court and are not pending before any other court.

**1413.** Plaintiff does not seek to vacate, modify, stay, or collaterally attack any judgment or order entered by any other court.

**1414.** Qualizza requests a declaration regarding the parties' rights, status, and legal relations under the Settlement Agreement, the supposed Amendment, and the Octagon loan and collateral documents, along with any other relief allowed under section 527.080, RSMo.

## COUNT XVI - CONVERSION
**(Against Chicago Title and Spencer Fane)**

**1415.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1416.** Qualizza personally executed and delivered the notarized signature pages to the closing, subject to his written instruction that they be held and not released without his express approval.

**1417.** Those signature pages and the identifiable sale proceeds generated at the closing were property or funds delivered for a specific purpose and were subject to Qualizza's right of control.

**1418.** Chicago Title and Spencer Fane intentionally and wrongfully exercised dominion over Qualizza's property by releasing his escrowed signature pages without his consent.

**1419.** Despite Qualizza's written objection, Chicago Title and Spencer Fane intentionally executed a closing that diverted proceeds, including a $50,000 disbursement to Perkaus & Farley, causing Qualizza significant personal financial harm.

**1420.** Under Missouri law, if funds intended for a specific purpose and delivered into escrow or at closing are diverted to another purpose, they can be subject to a legal action for conversion.

**1421.** Qualizza suffered substantial personal damages due to the intentional wrongful exercise of dominion, such as higher personal liability, enforcement costs, and the reduction in value of the diverted funds and the signature pages.

## COUNT XVII - MONEY HAD AND RECEIVED
**(Against Chicago Title)**

**1422.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1423.** This Count is pleaded in the alternative to Count XVI.

**1424.** As the escrow and closing agent, Chicago Title received the proceeds from the March 5, 2026, Hotel sale.

**1425.** The proceeds consisted of identifiable funds that, in equity and good conscience, rightfully belonged to Qualizza or should have been used to satisfy Qualizza's personal obligations rather than being disbursed as they were.

**1426.** Chicago Title benefited from those funds and applied or disbursed them in a manner that was unjust to Qualizza and violated his instructions.

**1427.** Qualizza is entitled to the restitution of the amounts Chicago Title received, which, in equity and good conscience, should be paid to satisfy the Settlement Agreement.

## COUNT XVIII - ABUSE OF PROCESS
**(Against Octagon)**

**1428.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1429.** Octagon used a confession-of-judgment provision ("COJ") against Qualizza under a warrant of attorney, without prior notice.

**1430.** Octagon then intentionally domesticated and registered those judgments in several states.

**1431.** Octagon obtained the second COJ on February 6, 2026, five days before agreeing that the first COJ, entered under the same instrument, was void ab initio with respect to Qualizza.

**1432.** Octagon thereafter intentionally registered the vacated Virginia judgment against Qualizza in Illinois, even though the judgment had been vacated as void ab initio as to Qualizza.

**1433.** Octagon's use of the process was neither warranted nor authorized by the proper function of that process.

**1434.** Octagon intentionally used its position to coerce payment of a disputed personal demand and to collapse Qualizza's personal financial estate.

**1435.** Octagon's intentional abuse of the COJ provision is intended to force Qualizza to defend the proceedings in Virginia, thereby causing Qualizza to incur significant personal legal expenses.

**1436.** Octagon deliberately misuses the COJ provision to compel Qualizza to defend cases in Colorado, leading to substantial personal legal costs for Qualizza.

**1437.** Octagon's intentional abuse of the COJ provision is intended to force Qualizza to defend proceedings in Illinois, thereby causing Qualizza to incur significant personal legal expenses.

**1438.** Octagon's intentional abuse of the COJ provision is intended to force Qualizza to defend the proceedings, thereby incurring significant personal legal expenses,

including limited-appearance and appellate counsel, an appellate bond, and lost time.

**1439.** Octagon's intentional abuse of process has directly caused and continues to cause Qualizza significant personal injury.

## COUNT XIX - FRAUDULENT INDUCEMENT AND CANCELLATION OR REFORMATION OF GUARANTY

**(Against Octagon)**

**1440.** Qualizza incorporates Paragraphs 1 through 1106 of this Petition by reference.

**1441.** This Count is pleaded in the alternative to Counts X, XI, and XVIII.

**1442.** Paragraph 18 of the executed June 26, 2017, term sheet provided that any personal guarantee would be capped at the Mezzanine Loan amount.

**1443.** That representation concerned a then-existing material term of the proposed financing.

**1444.** The representation was material to Qualizza's decision to serve as a personal guarantor.

**1445.** Octagon was aware of the amount of personal guarantees, in both liquidity and net worth, needed to underwrite its loans.

**1446.** Octagon knew the extent of the personal guaranty it would require at closing.

**1447.** Octagon intended that Qualizza rely on the represented cap in proceeding toward closing.

**1448.** Qualizza was unaware of any intention to require an uncapped personal guaranty.

**1449.** Qualizza relied on the represented cap in proceeding to closing and in executing the Mezzanine Loan Guaranty.

**1450.** Qualizza had the right to rely on the representation in Octagon's executed term sheet.

**1451.** The Mezzanine Loan Guaranty presented to Qualizza at the December 29, 2017, closing had no cap.

**1452.** Octagon intentionally failed to disclose to Qualizza that the cap was missing.

**1453.** The Hotel's December 29, 2017, closing included more than 100 documents totaling more than 1,500 pages.

**1454.** Qualizza's reliance directly and proximately caused personal exposure that exceeded the stated cap.

**1455.** Octagon's second confessed judgment of $16,825,273 exceeded the cap outlined in paragraph 18 of its executed term sheet.

**1456.** Section 14 of the executed Mezzanine Loan Guaranty provides that Missouri law governs the instrument.

**1457.** Qualizza seeks cancellation of the Mezzanine Loan Guaranty obtained by fraudulent inducement.

**1458.** Alternatively, Qualizza seeks to reform the Mezzanine Loan Guaranty to align with the capped personal exposure outlined in paragraph 18 of the term sheet.

**1459.** Alternatively, Qualizza seeks a declaration that his personal exposure under the Mezzanine Loan Guaranty is limited to the Mezzanine Loan amount.

**1460.** Qualizza seeks no relief in this Count that would duplicate the money damages sought in Counts X and XI.

## VI. DAMAGES, CREDITS, AND NON-DUPLICATION

**1461.** The amounts presently asserted against Qualizza personally total at least $17,816,086.

**1462.** This total comprises the $16,825,273 judgment against Qualizza as of February 6, 2026, and approximately $990,813.49 claimed by USBNA in May 2026 garnishment documents.

**1463.** That total continues to increase because post-judgment interest accrues on the Octagon judgment at 13% per year, approximately $2,187,285 annually.

**1464.** Each of those amounts can be claimed against Qualizza's personal assets and separate estate, not against the Hotel entity's property.

**1465.** Qualizza seeks approximately $800,000 in personal losses from the Hyatt resolution, plus his legal expenses.

**1466.** Qualizza seeks reimbursement for amounts paid, adjudicated, garnished, or enforced against him arising from U.S. Bank's actionable, intentional post-Settlement conduct.

**1467.** Qualizza seeks to recover personal losses and enforcement expenses arising from Octagon's conduct.

**1468.** From the December 29, 2017, closing through the filing of this Petition, Qualizza has invested at least $12,500,000 of his own funds in the Hotel.

**1469.** Of that amount, approximately $3,548,012 was Qualizza's original sponsor's equity contribution.

**1470.** Of that amount, approximately $3,500,000 was paid to acquire Dixon's interest.

**1471.** Of that amount, approximately $2,500,000 was advanced to support hotel operations.

**1472.** Of that amount, at least $2,200,000 was paid as legal fees.

**1473.** Of that amount, approximately $800,000 was paid to resolve the Hyatt matter.

**1474.** The amount Qualizza has been required to expend exceeds his committed one-third sponsor equity share by approximately $9,000,000.

**1475.** Qualizza seeks reimbursement for operating advances and professional expenses paid from his personal funds.

**1476.** Qualizza seeks reimbursement for replacement counsel and enforcement-defense expenses paid out of pocket.

**1477.** Qualizza seeks incremental personal guaranty deficiencies caused by the destruction of the Hotel's sale value, which was done with the intent to cause him personal financial harm.

**1478.** Qualizza seeks lost individual compensation, equity, and business expectancies resulting from intentional personal harm.

**1479.** Qualizza seeks tax-exposure relief under sections 144.157 and 347.187 of RSMo only if a valid personal liability is imposed on him and is caused by the alleged conduct.

**1480.** Qualizza intends to pursue other direct personal damages identified during the trial and uncovered through discovery and depositions.

**1481.** Defendants were responsible for allocating funds and for the flow of instructions and approvals among the lenders and the closing professionals.

**1482.** Qualizza's total personal exposure arising from the Hotel is at least $30,316,086.

**1483.** That figure is the sum of the personal funds Qualizza has spent and the amounts currently asserted against him personally.

**1484.** That figure reflects Qualizza's personal exposure and is not the measure of damages sought in this Petition.

**1485.** Qualizza does not seek double recovery.

**1486.** Qualizza will credit the $13,299,435.43 Partial Satisfaction filed by U.S. Bank.

**1487.** Qualizza will credit other payments, offsets, settlements, co-obligor contributions, and recoveries attributable to the same injury.

**1488.** The $14,250,000 Consent Judgment is not automatically the measure of damages for any Defendant.

**1489.** Qualizza seeks only the incremental loss attributable to each Defendant's actionable conduct.

**1490.** Amounts that legally belong to an LLC or have already been credited to an obligation are excluded from Qualizza's individual recovery.

## VII. PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests that the Court:**

**a.** Enter judgment for Qualizza on each Count on which he prevails.

**b.** Compensatory Damages: Award the Plaintiff fair and reasonable actual damages above the jurisdictional minimum, to be proven at trial. These damages include out-of-pocket expenses, operating advances, guaranty deficiencies, garnishments, and legal and enforcement fees. For the contract Counts (II and VIII), award actual damages to be proven at trial. No fixed dollar amount is requested for the tort Counts under Rule 55.05.

**c.** Order a comprehensive accounting to distinguish the entity's property from the Plaintiff's personal advances, payments, obligations, offsets, allocations, and reimbursement rights.

**d.** Award damages against Dowd Bennett and Bennett for the Hyatt loss, U.S. Bank judgment-related damages, fees, and enforcement costs proven to have resulted from malpractice and breach of fiduciary duty.

**e.** Award damages against the Receiver for personal guaranty deficiencies and losses directly resulting from the Receiver's fraudulent procurement of the appointment, obstruction of the O'Reilly sale(s), grossly negligent mismanagement of the Hotel, and conspiratorial conduct with Freeman and others, including John Does.

**f.** Award damages against Freeman, the U.S. Bank Defendants, and other responsible parties for incremental personal guaranty deficiencies, garnishments, and payments arising from the unauthorized sale of the Hotel, and, on Count IX, for the lost personal compensation and business expectancies alleged therein.

**g.** Voiding of Unauthorized Instruments: Find and order that the unsigned February 3, 2026, Amendment is void and unenforceable as to Plaintiff; order Octagon's

collateral assignment released under Missouri law; and enforce the Section 7 waivers in the Settlement Agreement.

**h.** Removal of Qualizza's personal guarantee under the Dec. 29, 2017, Mezzanine Loan Guaranty, as alleged in Count XIX (fraudulent inducement).

**i.** Award prejudgment and post-judgment interest, taxable costs, and attorneys' fees as authorized by law.

**j.** RESERVATION REGARDING PUNITIVE DAMAGES

**k.** Plaintiff does not plead a specific dollar amount for punitive damages in this Petition. Pursuant to section 510.261.5, RSMo, Plaintiff reserves the right to seek leave to amend this Petition to add a claim for punitive damages after conducting discovery sufficient to establish a reasonable basis for such relief. The conduct alleged herein, if proven, may support an award of punitive damages under sections 510.261 and 510.263, RSMo.

**l.** Grant such other monetary relief as authorized by law and as the Court deems appropriate, without duplicating any entity-owned recovery or any recovery obtained in another proceeding.

# JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

/s/ Michael S. Qualizza

**Michael S. Qualizza**
Pro Se
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

# VERIFICATION

**STATE OF TEXAS**
**COUNTY OF TRAVIS**

I, Michael S. Qualizza, being first duly sworn, state that I am the Plaintiff in this action; that I have read the foregoing Petition; and that, based on my personal knowledge, the factual allegations set forth therein are true and correct, except for those concerning intent, agreement, internal communications, and information within Defendants' exclusive control, which are stated upon information and belief and which I believe to be true.

Executed on the ____ day of __________________, 2026, at Austin, Travis County, Texas.

________________________________

Michael S. Qualizza, Plaintiff, Pro Se

Subscribed and sworn to before me this ____ day of __________________, 2026.

________________________________

Notary Public, State of Texas

My commission expires: __________________

**REQUEST FOR ISSUANCE OF SUMMONS**

Plaintiff requests that the Clerk of the Circuit Court issue summons to each Defendant named in the caption above for service pursuant to Rule 54 of the Missouri Rules of Civil Procedure. No Defendant has been served, and no counsel has entered an appearance in this action. Accordingly, service of this Petition will be effected by summons rather than by electronic notice. Plaintiff will file a certificate of service for each Defendant upon completion of service.

Respectfully submitted,

/s/ Michael S. Qualizza
**Michael S. Qualizza**
Pro Se
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

# CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2026, I filed the foregoing PETITION FOR PERSONAL DAMAGES, together with all supporting exhibits, with the Clerk of the Circuit Court of the City of St. Louis. As of the date of filing, no Defendant has been served, and no counsel has entered an appearance in this action. Accordingly, no party is entitled to service by electronic notice. Service of the Petition and summons will be made upon each Defendant pursuant to Rule 54 of the Missouri Rules of Civil Procedure. Plaintiff will file a certificate of service for each Defendant upon completion of service.

Respectfully submitted,

/s/ Michael S. Qualizza
**Michael S. Qualizza**
Pro Se
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com